RECEIPT NUMBER
515226    ORIGINAL

157 pgs
Attach A—F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**K & R INDUSTRIES, INC.,**
  a Michigan corporation,

         Plaintiff,

  v.

**ONTEL PRODUCTS CORPORATION,**
a New Jersey Corporation; **ASHOK
"Chuck" KHUBANI,** a natural
person who resides in New Jersey;
**WALGREENS, INC.,** an Illinois
corporation; **CVS, INC.,** a Delaware
corporation headquartered in
Woonsocket, Rhode Island;
**TARGET CORPORATION,** a
Minnesota corporation; **BED, BATH
& BEYOND, INC.,** a New York
Corporation; **LINENS 'N THINGS,
INC.,** a Delaware corporation,
headquartered in Clifton, New Jersey;
**HARRIET CARTER GIFTS, INC.,**
a Pennsylvania corporation; **DR.
LEONARD'S HEALTHCARE
CORP.,** a Delaware Corporation
headquatered in New Jersey; and
**DOEs 1-99, INCLUSIVE,** business
entities from various jurisdictions,
whose identities are to be determined,

         Defendants.

```
JUDGE : Roberts, Victoria A.
DECK  : S. Division Civil Deck
DATE  : 10/18/2004 @ 14:58:12
CASE NUMBER : 2:04CV74055
CMP K & R IND INC V ONTEL PRODS
CORP ET AL (DQH)
```

United States Magistrate Judge
MAGISTRATE JUDGE CAPEL,

### JURY TRIAL DEMANDED

## COMPLAINT FOR PATENT INFRINGEMENT, TRADEMARK INFRINGEMENT, TRADE DRESS INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, AND UNFAIR COMPETITION

1.     This is a patent, trademark, and trade dress infringement lawsuit. It is only one

1 aspect of a larger pattern in which some (not all)[1] very large suppliers and retailers of

2 consumer products too often engage in the unfair, deliberate, and tortious exploitation of the

3 original ideas and intellectual property of small businesses and entrepreneurs.  See, e.g.,

4 Carlye Adler, *SPECIAL FEATURE: Can you spot the knockoff?  If you're a designer, big*

5 *retailers want your ideas.  They just don't want to pay for them.*, FORTUNE SMALL BUSINESS

6 (Mar. 12, 2002) (specifically referencing Defendant Target Corporation), Tab A.

7     2.      Although the product at issue in this case is novel and unique (the

8 GlassMaster® is an articulated cleaning wand for use on all windows and glass surfaces, as

9 well as other polished and non-polished surfaces), the fact-pattern in this lawsuit is hardly

10 unique or unusual.  See, e.g., X-It Products Corp. v. Walter Kidde Portable Equip., 227 F.

11 Supp. 2d 494, 546, 549 (E.D. Va. 2002), Tab B.

12                     **SUBJECT-MATTER JURISDICTION**

13     3.      This honorable Court has subject-matter jurisdiction under 28 U.S.C. § 1331

14 (federal question), and 28 U.S.C. § 1338(a), (b),[2] because several causes of action asserted

15     [1]Some of the Named Defendants, on information and belief, may well have

16 different and more appropriate standards, concerning  respect for and protection of the intellectual property rights of others than Ontel Products Corp.  Contemporaneously with

17 the filing of the Complaint and service of Summons on Ontel, we are informing the additional Named Defendants that Plaintiff reserves the right to amend the Complaint,

18 and to remove their names from the suit, in the event it turns out that the necessary measures are in place to ensure that Plaintiff's intellectual property rights are not

19 infringed.

20     [2](a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and

21 trademarks.  Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

(continued...)

Page -2-

1  by the Plaintiff arise under the Constitution or Laws of the United States, namely: (1) False

2  Designation of Origin, in violation of Lanham Trademark Act, 15 U.S.C. § 1125(a); (2)

3  Trademark Infringement in Violation of the Lanham Trademark Act, 15 U.S.C. §§

4  1114(1)(a), 1125(a); (3) Patent infringement, in violation of Title 35, United States Code; (4)

5  Trade Dress Infringement in violation of 15 U.S.C. § 1125(a), and (5) Unfair Competition

6  under section 1125(a).

7       4.     This honorable Court has supplemental jurisdiction over all state-law causes

8  of action under 28 U.S.C. § 1367(a) and/or 28 U.S.C. § 1338(b).

9       5.     Insofar as claims against the Named Defendants (Defendants other than the

10  "John Doe" defendants), this honorable Court also has subject-matter jurisdiction under 28

11  U.S.C. § 1332(a)(1), (c)(1) (diversity of jurisdiction), because the Plaintiff (in Michigan) and

12  the Named Defendants reside in different States (complete diversity exists) and the matter

13  in controversy exceeds the value of $75,000.00, exclusive of interest and costs. However, one

14  or more of DOEs 1- 99, INCLUSIVE, are potentially believed to be incorporated and/or to

15  have their principal places of business in Michigan.

16                    **PERSONAL JURISDICTION**

17       6.     On Information and belief, this honorable Court has general personal

18

19       [2](...continued)
        (b) The district courts shall have original jurisdiction of any civil action

20  asserting a claim of unfair competition when joined with a substantial and related claim
        under the copyright, patent, plant variety protection or trademark laws. . . .

21
        28 U.S.C. § 1338.

                        Page -3-

1  jurisdiction, for purposes of the Michigan Long-Arm statute, and the Due Process Clauses

2  of the Fifth and Fourteenth Amendments, over Defendant **Ontel Products Corporation**

3  ("Ontel") because Ontel has purposefully availed itself in a continuous and systematic

4  manner of the State of Michigan, the benefits of doing business in Michigan, and the benefits

5  and protections of Michigan law, by transacting business in a continuous and systematic

6  manner, in Michigan, for many years.

7     7.    Defendant Ashok Khubani, on information and belief is subject to general and

8  specific personal jurisdiction in the State of Michigan.

9     8.    Defendant **WALGREENS, INC.,** is subject to general personal jurisdiction

10  in the State of Michigan because it transacts business in a continuous and systematic manner

11  in the state of Michigan, and has done so for many years.  It maintains multiple physical

12  locations of presence in the State of Michigan for the purpose of transacting business.

13     9.    Defendant **CVS, INC.,** is subject to general personal jurisdiction in the State

14  of Michigan because it transacts business in a continuous and systematic manner in the state

15  of Michigan, and has done so for many years.  It maintains multiple physical locations of

16  presence in the State of Michigan for the purpose of transacting business.

17     10.    Defendant **TARGET CORPORATION**, is subject to general personal

18  jurisdiction in the State of Michigan because it transacts business in a continuous and

19  systematic manner in the state of Michigan, and has done so for many years.  It maintains

20  multiple physical locations of presence in the State of Michigan for the purpose of

21  transacting business.

1        11.     Defendant **BED, BATH & BEYOND, INC.,** is subject to general personal

2  jurisdiction in the State of Michigan because it transacts business in a continuous and

3  systematic manner in the state of Michigan, and has done so for many years.  It maintains

4  multiple physical locations of presence in the State of Michigan for the purpose of

5  transacting business.

6        12.     Defendant **LINENS 'N THINGS, INC.,** is subject to general personal

7  jurisdiction in the State of Michigan because it transacts business in a continuous and

8  systematic manner in the state of Michigan, and has done so for many years.  It maintains

9  multiple physical locations of presence in the State of Michigan for the purpose of

10  transacting business.

11        13.     Defendant **WAL-MART STORES, INC.,** is subject to general personal

12  jurisdiction in the State of Michigan because it transacts business in a continuous and

13  systematic manner in the state of Michigan, and has done so for many years.  It maintains

14  multiple physical locations of presence in the State of Michigan for the purpose of

15  transacting business.

16        14.     Defendant **HARRIET CARTER GIFTS, INC.,** is subject to general personal

17  jurisdiction in the State of Michigan because it transacts business in a continuous and

18  systematic manner in the state of Michigan, and has done so for many years.

19        15.     Defendant **DR. LEONARD'S HEALTHCARE CORPORATION** is subject

20  to general personal jurisdiction in the State of Michigan because it transacts business in a

21  continuous and systematic manner in the state of Michigan, and has done so for many years.

Page -5-

**PARTIES**

16.    Plaintiff, K & R Industries, Inc., is a Michigan corporation with its headquarters in Wayne County, Michigan.  K & R Industries, is the exclusive inventor, licensor, and commercial source of a patented cleaning wand called the GlassMaster®.  The GlassMaster® is protected by the following non-exclusive list of patents:

- Pat. No. 6,795,999 – Cleaning apparatus and system (published Sep. 28, 2004) (Exh. C);

- Pat. No. 6,769,153 – Vehicle window cleaning apparatus and system (published Aug. 2, 2004) (Exh. D);

- Pat. No. 6,523,213 – Vehicle window cleaning apparatus and system (published Feb. 25, 2003) (Exh. E);

- Pat. No. 6,178,584 – Vehicle window cleaning apparatus (published Jan. 30, 2001) (Exh. F).

17.    Plaintiff is the exclusive owner of the federally-registered trademark GLASSMASTER®, Reg. No. 2,466,153, for goods of the following description: "Window cleaning kits, comprised of a handle, paddles interchangeably connected to the handle and an elastic trimmed cloth cleaning towel." Plaintiff's trademark registration, in force since July 3, 2001, presumptively establishes Plaintiff's exclusive, nationwide, ownership of the mark.[3]

---

[3]"Any registration . . . of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall

(continued...)

1    18.    At all times since November 28, 2000, Plaintiff and Plaintiff's authorized

2  distributors and licensees, have actively and consistently used the GlassMaster® trademark,

3  in interstate commerce, on and in connection with its cleaning product.  The GlassMaster®

4  mark has consistently been used on and affixed to all product packaging of the Plaintiff's

5  cleaning device.

6    19.    Defendant **ONTEL PRODUCTS CORPORATION** ("Ontel"), is a New

7  Jersey Corporation, with its principal place of business in Fairfield, New Jersey.

8    20.    Defendant **ASHOK "Chuck" KHUBANI**, is a natural person who resides in

9  Fairfield, New Jersey, who is personally and directly involved in all aspects of the business

10  of Defendant Ontel, and, on information and belief, even resides at the same address as

11  Ontel's headquarters. On information and belief, Ontel is an *alter ego* of Khubani.

12    21.    Defendants **DOEs 1-99, INCLUSIVE**, are merchants and retailers throughout

13  the United States (excluding those who, on account of obtaining proper trademark licensing

14  or authorization from Plaintiff, or who Plaintiff has for other reasons voluntarily elected not

15  to sue), who are also subject to suit for patent infringement, and for the strict-liability torts

16  of trademark and trade dress infringement, as well as for unfair competition and other causes

17  _____

18    [3](...continued)
   be prima facie evidence of the validity of the registered mark and of the registration of the
19  mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to
   use the registered mark in commerce on or in connection with the goods or services
20  specified in the registration subject to any conditions or limitations stated therein . . . ."

21    15 U.S.C. § 1115(a); see also 15 U.S.C. § 1057(b), (c).  There are no conditions or
   limitations set forth in Plaintiff's trademark registration.

1 of action – because they have, without Plaintiff's authorization, offered and sold in

2 commerce products (products made and distributed by Defendant Ontel) that infringe one or

3 more of Plaintiff's patents, or Plaintiff's registered trademark GlassMaster®, and which

4 products also infringe the trade dress of Plaintiff's GlassMaster® product and packaging.

5 Some of DOEs 1-99, INCLUSIVE, may also be corporate affiliates of Defendant Ontel

6 Products Corporation, that are actively involved in the distribution of infringing merchandise,

7 and the active infringement of Plaintiff's patents, Plaintiff's GlassMaster® trademark, and

8 Plaintiff's trade dress.

9     22.    Defendant **WALGREENS, INC.,** is an Illinois corporation with its principal

10 place of business at 200 Wilmot Road, Deerfield, Illinois.

11     23.    Defendant **CVS, INC.,** is a Delaware corporation headquartered at One CVS

12 Drive, Woonsocket, Rhode Island 02895.

13     24.    Defendant **TARGET CORPORATION,** is a Minnesota corporation with its

14 headquarters at 1000 Nicollet Mall, Minneapolis, Minnesota 55403.

15     25.    Defendant **BED, BATH & BEYOND, INC.,** is a New York Corporation,

16 headquartered at 650 Liberty Avenue, Union, New Jersey 07083.

17     26.    Defendant **LINENS 'N THINGS, INC.,** is a Delaware corporation,

18 headquartered at 6 Brighton Road, Clifton, New Jersey 07015.

19     27.    Defendant **WAL-MART STORES, INC.,** is a Delaware corporation

20 headquartered at 702 S.W. 8th Street; Bentonville, Arkansas 72716.

21     28.    Defendant **HARRIET CARTER GIFTS, INC.,** is a Pennsylvania corporation.

1    On information and belief, its headquarters is located on Stump Road, in Montgomeryville,

2    Pennsylvania 18936.

3         29.    Defendant **DR. LEONARD'S HEALTHCARE CORPORATION**, is a

4    Delaware corporation with its principal place of business at  100 Nixon Lane, Edison New

5    Jersey 0883.

6                    <u>**PLAINTIFF'S INTELLECTUAL PROPERTY**</u>

7         30.    Plaintiff manufactures and sells in commerce a patented cleaning wand device

8    that assists in the cleaning of glass and other surfaces. The product looks like this:



19    Plaintiff's cleaning wand product has been sold for several years under the trademark

20    GlassMaster®. Plaintiff's GlassMaster® product has been advertised on television in many

21    major media markets. The trademark for the product has become widely-recognized by

1    customers, nationwide, and has become exclusively and firmly associated with a single

2    source of high-quality products.

3        31.    The GlassMaster® cleaning wand is protected (without limitation) by the

4    patents alleged in Paragraph 16 (the '999 Patent;[4] the '153 Patent; the '213 Patent;[5] and the

5    '584 Patent), which patents are attached to this Complaint and are incorporated herein by

6    reference.

7        32.    These patents have all been allowed and published by the U.S. Patent &

8    Trademark Office, and are in good standing, with full legal force and effect.

9        33.    In particular, for purposes of the count for literal infringement, we draw the

10   Court's attention to Claim One of the '999 Patent:

11           What is claimed is:

12           1. A cleaning apparatus comprising:

13           a paddle, the paddle having a peripheral edge defined in part by first
             and second opposed ends, the paddle having a concave shape between
14           the first and second ends;

15           a cleaning element removably affixed to the paddle, the cleaning
             element including a body having a first surface aligned with the paddle,
16           and side edges disposed over the peripheral edge of the paddle, and
             means, mounted on the side edges of the cleaning element, for
17           elastically and removably securing the cleaning element to the paddle;

18           a handle having opposed outwardly extending end pins; and

---

19
         [4]The '999 Patent is a continuation of the '213 Patent, which in turn is a
20   continuation-in-part of the '584 patent, for purposes of the priority date of the '999
     Patent. See Waldemar Link, GmbH v. Osteonics Corp., 32 F.3d 556, 558-60 (Fed. Cir.
21   1994).

         [5]The '213 Patent is a continuation-in-part of the '584 Patent.

first and second receivers spacedly carried on the paddle, each of the first and second receivers pivotally receiving one pin on the handle to pivotally connect the handle and the paddle for pivotal movement with respect to each other only about an axis extending between the first and second receivers, wherein the pivot axis is disposed at an angle to the axis of the paddle extending between the first and second ends.

34.    In addition to functional and patented aspects of the GlassMaster® cleaning wand, several non-functional design elements of the GlassMaster®, and its product packaging, serve as distinctive trade dress of the Plaintiff's cleaning wand, and have come to be associated in the public mind as identifying the source or origin of the GlassMaster®.[6]

35.    In addition to Claim One of the '999 Patent, the other patents and other Claims are also germane, because of the Doctrine of Equivalents, and/or literal infringement.

36.    At all times since November 28, 2000, Plaintiff has actively and consistently used the GlassMaster® trademark, in interstate commerce, on and in connection with its cleaning product. The GlassMaster® mark has consistently been used on and affixed to all product packaging of the Plaintiff's cleaning device.

37.    The GlassMaster® cleaning wand has evolved in functionality and design, over time, but the basic non-functional and source-identifying design elements have remained identifiably and recognizably consistent over time.

38.    Collectively, these elements generate and have generated a unique and distinctive product presentation and trade dress, that serves a source-identifying function to

_____

[6]See, e.g., X-It Prods. v. Walter Kidde Portable Equip., 155 F. Supp. 2d 577, 617-24 (E.D. Va. 2001) (addressing very similar trade dress claim based on packaging design), *subsequent proceeding*, 227 F. Supp. 2d 494 (E.D. Va. 2002), *appeal dismissed due to settlement*.

Page -11-

1  customers.

2      39.    Plaintiff's GLASSMASTER® trademark, because of a trademark registration,

3  is presumptively distinctive and strong.

4      40.    Plaintiff's GLASSMASTER® mark, beyond any presumptions, is inherently

5  distinctive and strong as a trademark.

6      41.    Plaintiff's GLASSMASTER® mark, through six years of advertisement and

7  promotion in markets all over the country, has been strengthened and has acquired additional

8  secondary meaning in the minds of customers and potential customers, and serves an

9  unmistakable source-identifying function to customers.

10     42.    Plaintiff's trade dress is also distinctive of this product (and of Plaintiff's

11 identity as the unique source and origin of the product). This trade dress signifies that a

12 product with the same or closely similar trade dress, comes from a single, unique, source

13 (namely, the maker of the Plaintiff's product) – even if customers do not know the name or

14 identity of the source.

15     43.    Plaintiff's trade dress, including product packaging and display, is inherently

16 distinctive.

17     44.    Plaintiff's trade dress – through six years of advertisement and promotion in

18 markets all over the country – has been strengthened and has acquired additional secondary

19 meaning in the minds of customers and potential customers, thereby serving an unmistakable

20 source-identifying function to customers.

21     45.    Plaintiff has invested considerable amounts advertising and promoting the

1  GlassMaster® trademark, and the product's unique trade dress. In the course of this

2  advertising and promotion, the trademark and trade dress have become strongly associated

3  in the minds of the purchasing public with the Plaintiff's surface-cleaning system.

4  ## ONTEL PRODUCTS CORPORATION

5     46.    Ontel Products Corporation has a well-known and somewhat notorious

6  litigation history, arising out of its sales of products (and product packaging) that closely

7  imitate the original products and product ideas of others (generally, the original ideas of

8  startup companies who are promoting their products on television). A partial list of cases in

9  which Ontel has been sued for intellectual property infringement, is listed in the Amended

10  Complaint in Civil Action No. C.A. No. 2:04-CV-72297-JF-DAS, pending before the U.S.

11  District Court for the Eastern District of Michigan.

12     47.    On information and belief, Ontel has represented to third-parties, and tried to

13  create the belief in others that it "owns," or has some kind of exclusive right to, the slogan

14  "as seen on television." Ontel, to the contrary, is neither the only company to use this

15  designation, nor does it have any legally-enforceable right to exclude others from using it.

16     48.    Moreover, Ontel in the past marked some of its products with slogans and

17  logos such as "similar to products seen on television," to create the misleading impression

18  that Ontel's products (imitations of the products of small start-ups – who advertised on

19  television) are or were the same ones that people saw in television advertising – when, in

20  fact, Ontel's products are and were not the same ones seen by customers on TV.

21     49.    More recently, because of legal problems with the strategy summarized in

Page -13-

Paragraphs 47 and 48, Ontel has taken to producing its own "infomercials" for knock-off products (so that both the knock-off and the original product are both seen on television, but at different times, in different commercials, produced by different companies), and then using the "as seen on TV" logo to create the false impression that Ontel is the source or origin of someone else's product that Ontel has knocked-off.

50.    From the various infringement lawsuits against Ontel, an evident pattern of conduct emerges. Ontel has an advantage over smaller start-up companies (which companies generally have one product and must establish retail relationships from scratch) because Ontel has for many years developed an extensive network of retail outlets, to which it ships its wares. Because of this advantage from an installed base of retailers, Ontel is able to put essentially any small first-mover out of business, by saturating the market with a cheaper knock-off with reduced functionality – before moving on to the next product and the next victim.

51.    Ontel learns of smaller competitors' good product ideas from television or other public sources, or from Ontel-affiliated retailers, and then obtains a sample of any product(s) it wants to knock-off. Ontel then makes minor, cosmetic, changes to the product and to the product packaging – so that Ontel's version is not identical (just confusingly similar) to the original product.

52.    Ontel then sends its re-designs overseas (generally, to mainland China), where each such knock-off can be manufactured in huge quantities at very low cost. Thus, at just the time when the hard work of an entreprenurial American company – priming the market

to recognize and accept a new and useful product – is just about to pay off, Ontel jumps into the market with inferior, imitation knock-off devices, and floods the market with them, thereby profiting handsomely from the work and original ideas of others.

53.     The reason that Ontel sometimes gets away with it is essentially a numbers game – not all instances of infringement are detected, and for many instances that are, by the time the victim sees what is coming, it is often too late.

54.     Moreover, even when the victim of infringement has the opportunity to do something about it, a significant percentage elect not to sue.  As explained succinctly in Carlye Adler, *SPECIAL FEATURE: Can you spot the knockoff? If you're a designer, big retailers want your ideas. They just don't want to pay for them.*, FORTUNE SMALL BUSINESS (Mar. 12, 2002), Tab A:

> Taking on a big company can be expensive, though.  In intellectual-property lawsuits in which less than $1 million is at stake, attorneys' fees and costs average $400,000, according to Penta Advisory Services in Washington, D.C., a consulting company. When $1 million to $10 million is at stake, the fees average $1 million. Most small businesses can't afford that, especially when the outcome is so uncertain. Aldo DiBelardino, co-founder and director of X-IT, had to remortgage his house and dip into his retirement savings to cover his legal costs for the lawsuit against Kidde.  And even though his company won in court, he says some bills still remain unpaid, as X-IT

1        hasn't yet received the check for damages.

2    Thus, even if Ontel is required to disgorge all the profits from 1/3 of the products and devices

3    it knocks-off, Ontel still winds up making a handsome profit on all the infringement that it

4    gets away with – unchallenged.

5        55.    At least three of the other Named Defendants in this lawsuit also each have a

6    somewhat notorious history of exploiting the original ideas of small entrepreneurs, without

7    paying fair compensation for the intellectual property that they or their suppliers have stolen.

8        56.    Moreover, even in those cases in which victims of Ontel's knock-off scheme

9    elect to go to court, Ontel tends to use its financial resources and distribution advantages to

10   buy them off.

11       57.    Even when companies use Ontel as a distribution channel, however, on

12   information and belief, Ontel nevertheless takes advantage of their product ideas, their trust,

13   and confidence, without treating its "partners" fairly.

14       58.    In many cases, Ontel will pay off those who sue it by offering an amount of

15   money to make the infringement lawsuit go away, but not enough to fully compensate the

16   settling party for all the lost business and harm the infringement has caused.  Even after

17   paying off the percentage of victims who sue, Ontel is left with enormous profits and a big

18   enough war-chest to threaten anyone who does not take their deal, that the alternative will

19   be unpleasant and costly.

20       59.    The end result of Ontel's business practices is significant harm to small

21   manufacturers – and their workers – in the United States and Canada, as well as significant

1    financial harm to creative persons, inventors, and designers in the United States.

2        60.     The beneficiaries appear to be the owners of Ontel, and the owners of the

3    Chinese factories in which Ontel's knock-offs are made by low-wage workers who have no

4    rights to organize, no health benefits, and little of the protections that would result were

5    China to adopt adequate regulations to govern workplace safety, hours, and other conditions.

6                              **ONTEL'S INFRINGEMENT**

7        61.     In this instance, Ontel has started flooding the market with a product called the

8    Glass Wizard, which it has started advertising on television and is shipping to many retailers

9    in various locations:



62.   **Literal Infringement:** The "Wedge-shaped pivoting head" and the concave paddle design prominently featured on the Ontel "Glass Master" packaging and advertisements, literally infringe Claim One of the '999 Patent, set forth verbatim in Paragraph 33, *supra*. Therefore the sale of the "Glass Wizard" by anyone in the United States, without Plaintiff's permission, violates Title 35 of the United States Code.

63.   **Doctrine of Equivalents:** Despite the obvious, literal copying of the GlassMaster® product design in other respects, the receptacles, by which the "Glass Wizard" cleaning paddle is attached to the handle, are noticeably shallower than the handle receptacles for the GlassMaster®. This is not an accident. The handle of the Glass Wizard is not as easily detachable from the handle, as is the paddle of the GlassMaster®, but the "Glass Wizard" components still are not that difficult to detach. Ontel has attempted to circumvent Plaintiff's patent protection by selling only one detachable paddle (instead of two) with each handle, and by encouraging customers to purchase the "Glass Wizard" in pairs. However, that scheme clearly violates the Doctrine of Equivalents, and infringes a number of claims under all four of the Plaintiff's patents alleged in this Complaint – because what Ontel is really selling is the functional equivalent (in fact, a complete and total knock-off) of Plaintiff's patented ideas.

64.   The Ontel Glass Wizard directly copies and infringes each and all of the specific non-patented aspects of the GlassMaster® trade dress of Plaintiff's cleaning wand. The Glass Wizard is not protected by any patent or by any trademark registration with the U.S. Patent & Trademark Office.

65.    It is probably understandable why Ontel has not sought to register "Glass Wizard" as a trademark for this product – because Ontel is already on statutory notice (and also on actual notice – because Ontel has admitted it had a copy of Plaintiff's device, when it pirated Plaintiff's intellectual property) that Plaintiff has exclusive, nationwide, right to the trademark GlassMaster®, which means that anybody who uses a mark so similar as to be likely to deceive, or to cause mistake, or to cause confusion, cannot obtain a registration (such as for the mark "Glass Wizard").

66.    "Glass Wizard" is, in fact, confusingly similar to Plaintiff's GlassMaster® trademark, under the eight-factor test established for "likelihood of confusion," in trademark cases, in the Sixth Circuit. See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, 670 F.2d 642, 648 (6th Cir.), *cert. denied*, 459 US 916 (1982).

67.    Strength of Senior Mark: GlassMaster® is a strong mark, both because of inherent distinctiveness, and due to additional acquired distinctiveness and secondary meaning resulting from several years of promotion, and widespread advertisement in nationwide commerce.

68.    Relatedness of the Goods or Services: The GlassMaster® and the Glass Wizard are directly competitive products, that do the same thing, that Ontel has intentionally caused to look alike, and that are sold to the same customers.

69.    Similarity of the Marks: Under the traditional "sight, sound, and meaning"

test,[7] the marks are indistinguishable and are highly likely to cause confusion when singly presented. Both are pronounced with the same rhythm, have the same number of syllables, and the same number of letters. Both marks look alike, and both begin with the word "Glass." The remainder of each mark is a term – "Master" or "Wizard" – that conveys masculine dominance over a task, masculine power, and superior skill at accomplishing a task. In short, the marks are identical for all practical purposes.

70.    Evidence of Actual Confusion: Since the introduction of the knock-off Glass Wizard product, significant numbers of confused persons (both retailers who purchase large numbers of units, and end-users) have come to light.

71.    Marketing Channels Used: These products are marketed and sold through essentially the same channels – both direct sales through television advertising, and retail sales to end-users in stores carrying both general and specialty merchandise.

72.    Likely Degree of Purchaser Care and Sophistication: These are not complicated technical devices, or customized goods -- and, therefore, purchasers are unlikely to exercise much care to make sure that the cleaning wand they purchase is the same GlassMaster® product that they actually wanted to purchase after they saw GlassMaster® on television.

---

[7]Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1188 (6th Cir. 1988) (*citing* James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 275 (7th Cir. 1976)).

73.   <u>Intent of the Defendant in Selecting the Mark</u>: Active copying of the mark and trade dress – which is evident in this instance, and which Ontel has not denied (OnTel could have used a much different trade dress and a non-confusing trademark such as "Auto Shine," or "Miracle Paddle," but OnTel didn't) – creates a presumption that the infringer intended to cause the public to confuse the competing products;

74.   <u>Likelihood of Expansion of the Product Lines</u>: Since the products already directly overlap, they cannot possibly come any closer in the future, through expansion of product lines.

75.   Moreover, the Glass Wizard is an inferior product because the pivot mechanism of the Glass Wizard does not allow paddles to be interchanged with the same ease as paddles can be interchanged on a genuine GlassMaster® cleaning wand.

76.   Ontel does not use an appropriate disclaimer or warning label to inform customers of this glaring defect in product design.

77.   Interchanging paddles for an Ontel Glass Wizard (say, if one saturates the first paddle with a solvent and then needs a "dry" paddle) is much more difficult and potentially hazardous to customers with the Glass Wizard, than with the GlassMaster®'s patented paddle-change, and pivot device.

78.   The Glass Wizard is not consistent with the quality standards that the public has come to associate and expect from genuine GlassMaster® products.

79.   The same eight-factor test applies to trade dress infringement, as to trademark

1   infringement, and under the same test, Ontel is equally guilty of trade dress infringement, as

2   a matter of law.

3         80.   Under the analysis set forth in <u>PACCAR, Inc. v. Telescan Techs.</u>, 319 F.3d 243

4   (6th Cir. 2003) ("First, if the parties compete directly by offering their goods or services,

5   confusion is likely if the marks are sufficiently similar; second, if the goods or services are

6   somewhat related but not competitive, the likelihood of confusion will turn on other factors;

7   third, if the goods or services are totally unrelated, confusion is unlikely."), a likelihood of

8   confusion, and trademark infringement, as well as trade dress infringement, are established

9   as a matter of law.

10           **COUNT ONE – LITERAL INFRIGEMENT OF PATENT**

11         81.   Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-81, as

12   though set forth herein verbatim.

13         82.   The "Glass Wizard" cleaning device literally infringes Claim One of the '999

14   Patent, and sales of the product without Plaintiff's permission violate Plaintiff's intellectual

15   property rights.  35 U.S.C. § 271(a).

16         83.   Each and all of the Named Defendants are guilty of literal infringement, and

17   are subject to an injunction against continued sales, and must pay damages for their

18   unlicensed sales on and after the publication date of the '999 Patent.

19         84.   Additional claims under the four patents are also literally infringed, in addition

20   to Claim One of the '999 Patent.

21           **COUNT TWO – DOCTRINE OF EQUIVALENTS**

85.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-85, as though set forth herein verbatim.

86.     Under the Doctrine of Equivalents, the Ontel Glass Wizard infringes multiple claims under each of the Plaintiff's four patents alleged in, and attached to, this Complaint.

87.     Each and all of the Named Defendants are guilty of infringement of all four patents, and are subject to an injunction against continued sales, and must pay damages for their unlicensed sales on and after the publication date of the '584 Patent.

## COUNT THREE – FALSE DESIGNATION OF ORIGIN
**(Against all Defendants but Ontel and Khubani, who have already been sued)**

88.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-88 as though set forth verbatim herein.

89.     Plaintiff is the exclusive owner of the federally-registered GlassMaster® trademark and brand name.

90.     The mark is distinctive and/or has acquired secondary meaning as an identification that products (pivot-head surface-cleaning wands, in particular) come from the Plaintiff.

91.     Quite recently, Defendants (including, without limitation, Defendant Ontel), have been using a confusingly similar trademark on a directly-competing but inferior product, and causing actual confusion in the marketplace, even though none of the Defendants-Infringers is the source of genuine GlassMaster® cleaning wands, and none of them has ever been properly authorized or licensed by the Plaintiff to do so.

92.     In so doing, in connection with the sale of goods or services in commerce,

1  Defendants-Infringers (or one or more or all of them), has falsely used in commerce (and

2  published falsely to customers) one or more words, terms, symbols, names or devices,

3  and/orone or more combination(s) thereof, and/or one or more false designation(s) of origin,

4  and/or a false or misleading description of fact, and/or misleading representation of fact.

5      93.    Defendants'-Infringers' use in commerce (and publication falsely to customers)

6  of words, terms, symbols, names or devices, and/or one or more combination(s) thereof,

7  and/or one or more false designation(s) of origin, and/or one or more false or misleading

8  description(s) of fact, and/or misleading representation(s) of fact are likely to cause

9  confusion, or to cause mistake, or to deceive as to the affiliation, or connection, or

10  association of Defendants-Infringers (or one or more or all of them) as to the origin,

11  sponsorship, or approval of the Plaintiff.

12      94.    Defendants-Infringers (or one or more or all of them – especially Ontel) have

13  willfully engaged in the falsification of designations of origin and/or representations or

14  descriptions of fact concerning such goods and/or services.

15      95.    Plaintiff, and the goodwill associated with Plaintiff's mark, has been materially

16  injured by the foregoing misconduct of the Defendants-Infringers.

17  **COUNT FOUR – TRADEMARK INFRINGEMENT**
   **IN VIOLATION OF 15 U.S.C. § 1114**

18  **(Against all Defendants but Ontel and Khubani, who have already been sued)**

19      96.    Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-96 as

20  though set forth verbatim herein.

21      97.    Plaintiff is the exclusive owner of the federally-registered GlassMaster®

Page -24-

1  trademark and brand name.

2      98.    The mark is (presumptively and actually) distinctive and/or has acquired

3  secondary meaning as an identification that products (pivot-head surface-cleaning wands, in

4  particular) come from the Plaintiff.

5      99.    Quite recently, Defendants (including Defendant Ontel), have unlawfully been

6  using in commerce a reproduction, counterfeit, copy, or colorable imitation of Plaintiff's

7  registered mark – on or in connection with the sale, offering for sale, distribution, or

8  advertising of Defendants goods or services.

9      100.   Defendants' use of said reproduction, counterfeit, copy, or colorable imitation

10  of Plaintiff's registered mark – on or in connection with Defendants' goods -- is (due to the

11  nature of such goods) highly likely to cause confusion, or to cause mistake, or to deceive, and

12  therefore violates 15 U.S.C. section 1114(1)(a), of the Lanham Trademark Act.

13      101.   Defendants' violation of Plaintiff's registered trademark, specifically, involves

14  a directly-competing but inferior product.

15      102.   Defendants' infringement of the registered trademark is causing actual

16  confusion in the marketplace.

17      103.   None of the Defendants-Infringers is the source of genuine GlassMaster®

18  cleaning wands, and none of them has ever been properly authorized or licensed by the

19  Plaintiff to do so.

20      104.   Defendants-Infringers (or one or more or all of them – especially Ontel) have

21  willfully engaged in the falsification of designations of origin and/or representations or

Page -25-

1   descriptions of fact concerning such goods and/or services.

2   105.   Plaintiff, and the goodwill associated with Plaintiff's mark, has been materially

3   injured by the foregoing misconduct of the Defendants-Infringers.

4   **COUNT FIVE -- TRADEMARK INFRINGEMENT**
    **IN VIOLATION OF 15 U.S.C. § 1125(a)**
5   **(Against all Defendants but Ontel and Khubani, who have already been sued)**

6   106.   Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-106 as

7   though set forth verbatim herein.

8   107.   Plaintiff is the exclusive owner of the federally-registered GlassMaster®

9   trademark and brand name.

10   108.   The mark is distinctive and/or has acquired secondary meaning as an

11   identification that products (pivot-head surface-cleaning wands, in particular) come from the

12   Plaintiff.

13   109.   Quite recently, Defendants (including Defendant Ontel), have been using a

14   confusingly similar trademark on a directly-competing but inferior product, and causing

15   actual confusion in the marketplace, even though none of the Defendants-Infringers is the

16   source of genuine GlassMaster® cleaning wands, and none of them has ever been properly

17   authorized or licensed by the Plaintiff to do so.

18   110.   In so doing, in connection with the sale of goods or services in commerce,

19   Defendants-Infringers (or one or more or all of them), has falsely used in commerce (and

20   published falsely to customers) one or more words, terms, symbols, names or devices, and/or

21   one or more combination(s) thereof, and/or one or more false designation(s) of origin, and/or

Page -26-

1    a false or misleading description of fact, and/or misleading representation of fact.

2    111.   Defendants'-Infringers' use in commerce (and publication falsely to customers)

3    of words, terms, symbols, names or devices, and/or one or more combination(s) thereof,

4    and/or one or more false designation(s) of origin, and/or one or more false or misleading

5    description(s) of fact, and/or misleading representation(s) of fact are likely to cause

6    confusion, or to cause mistake, or to deceive as to the affiliation, or connection, or

7    association of Defendants-Infringers (or one or more or all of them) as to the origin,

8    sponsorship, or approval of the Plaintiff.

9    112.   The actions of Defendants-Infringers (or one or more or all of them), as set

10   forth above, infringe the trademark of the Plaintiff, and cause deception or mistake or

11   confusion of customers in the marketplace, in violation of 15 U.S.C. § 1125(a).

12   113.   The actions of Defendants-Infringers (or one or more or all of them), as set

13   forth above, are intentional and willful, and are calculated to cause deception or mistake or

14   confusion of customers in the marketplace.

15   114.   Defendants-Infringers have willfully infringed the Plaintiff's trademark.

16   **COUNT SIX – TRADE DRESS INFRINGEMENT**
**(Against all Defendants but Ontel and Khubani, who have already been sued)**

17   115.   Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-115 as

18   though set forth verbatim herein.

19   115.   Plaintiff is the exclusive owner of the distinctive and original trade dress of the

20   GlassMaster® pivot-head surface-cleaning wand.

21   116. The trade dress is distinctive and/or has acquired secondary meaning as an

Page -27-

1 identification that the products (pivot-head surface-cleaning wands) come from the Plaintiff.

2  117. Quite recently, Defendants (including Defendant Ontel), have been using a

3 confusingly similar trade dress on and in connection with a directly-competing but inferior

4 product, and causing actual confusion in the marketplace, even though none of the

5 Defendants-Infringers is the source of genuine GlassMaster® cleaning wands, and none of

6 them has ever been authorized or properlicensed by Plaintiff to do so.

7  118. In so doing, in connection with the sale of goods or services in commerce,

8 Defendants-Infringers (or one or more or all of them), has falsely used in commerce (and

9 published falsely to customers) one or more words, terms, symbols, names or devices, and/or

10 one or more combination(s) thereof (i.e., the knock-off trade dress) and/or one or more false

11 designation(s) of origin, and/or false or misleading descriptions of fact, and/or misleading

12 representations of fact.

13  119. Defendants'-Infringers' use in commerce (and publication falsely to customers)

14 of the infringing trade dress is likely to cause confusion, or to cause mistake, or to deceive

15 as to the affiliation, or connection, or association of Defendants-Infringers (or one or more

16 or all of them) as to the origin, sponsorship, or approval of the Plaintiff.

17  120. Defendants-Infringers (or one or more or all of them – especially Ontel) have

18 willfully engaged (through a misleading and deceptive trade dress) in the falsification of

19 designations of origin and/or representations or descriptions of fact concerning such goods

20 and/or services, and are liable for trade dress infringement.

21  121. Plaintiff, and the goodwill associated with Plaintiff's mark, has been materially

1  injured by the foregoing misconduct of the Defendants-Infringers.

2  ### COUNT SEVEN – UNFAIR COMPETITION
**(Against all Defendants but Ontel and Khubani, who have already been sued)**

3  122.   Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-122 as

4  though set forth verbatim herein.

5  123.   The actions of Defendants-Infringers, as set forth above, also constitute unfair

6  competition, which is separately actionable under federal trademark law.

7  124.   Defendants-Infringers have willfully engaged in unfair competition.

8  ### COUNT EIGHT – UNFAIR COMPETITION (STATE LAW)
9  **(Against all Defendants but Ontel and Khubani, who have already been sued)**

10  125. Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-125 as

11  though set forth verbatim herein.

12  126.   The actions of Defendants-Infringers, as set forth above, also constitute unfair

13  competition, which is separately actionable under Michigan state law.

14  127.   Defendants-Infringers have willfully engaged in unfair competition.

15  ### COUNT NINE – TRADEMARK INFRINGEMENT (STATE LAW)
**(Against all Defendants but Ontel and Khubani, who have already been sued)**

16  128. Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-128 as

17  though set forth verbatim herein.

18  129.   The actions of Defendants-Infringers, as set forth above, infringe the trademark

19  of the Plaintiff, and are calculated to cause deception or mistake or confusion of customers

20  in the marketplace, which is separately actionable under Michigan state law.

21  131.   Defendants-Infringers have willfully infringed the Plaintiff's trademark.

Page -29-

1    **CONCLUSION AND PRAYER FOR RELIEF**

2    Wherefore, based on the foregoing claims and causes of action, Plaintiff prays for the

3    following specific relief:

4    1.    That this honorable Court issue a Temporary Restraining Order, prohibiting

5    any infringement of any of the four patents alleged in this Complaint, or any infringement

6    of Plaintiff's trademark or trade dress, and specifically prohibiting all sales of the "Glass

7    Wizard" because it literally infringes Claim One of the '999 patent, and because it infringes

8    Plaintiff's trademark and trade dress.  15 U.S.C. § 1116; 35 U.S.C. § 283.

9    2.    That this honorable Court issue a Preliminary Injunction, prohibiting the same

10   infringing conduct, including patent infringement, infringement of Plaintiff's registered

11   GlassMaster® trademark, or of Plaintiff's distinctive trade dress, by any and all of the

12   Defendants-Infringers, or by anyone in active concert or participation with them, for the

13   duration of the lawsuit.  15 U.S.C. § 1116; 35 U.S.C. § 283.

14   3.    That this honorable Court issue a permanent injunction, permanently

15   prohibiting infringement of Plaintiff's patents, Plaintiff's registered GlassMaster® trademark,

16   or of Plaintiff's distinctive trade dress (or unfair competition, or false designation of origin,

17   using the Plaintiff's trademark or trade dress or coloroable imitation thereof) by the

18   Defendants- Infringers, or by anyone in active concert or participation with them.  15 U.S.C.

19   § 1116; 35 U.S.C. § 283.

20   4.    That Ontel Products Corporation be required to offer up and deliver all tooling,

21   dies, moulds, and other devices used to manufacture the Infringing product, along with all

Page -30-

1  inventory, marketing materials, video and audio recordings, and advertising materials,

2  generated or used in connection with the promotion of the Infringing Product.

3      5.      That the Defendants-Infringers be permanently enjoined from using in

4  commerce any device, name, word, symbol, or designation of origin (including, without

5  limitation, any Internet domain name) that is confusingly similar to Plaintiff's registered

6  GlassMaster® trademark, or of Plaintiff's distinctive trade dress, on or in connection with

7  any cleaning tools or devices. 15 U.S.C. § 1116.

8      6.      That the Defendants-Infringers be permanently be enjoined from taking any

9  action that is likely to infringe, or that is calculated or intended to infringe, or to result in

10  unfair competition with, the Plaintiff and/or Plaintiff's registered GlassMaster® trademark,

11  and/or Plaintiff's distinctive trade dress.

12      7.      That the Defendants-Infringers be required to make a full accounting of

13  revenues and profits to the Plaintiff.  15 U.S.C. § 1117.

14      8.      That the Defendants-Infringers be required to disgorge their profits – 15

15  U.S.C.§ 1117(a)(1).

16      9.      That the Plaintiff recover the Plaintiff's actual damages from the Defendants-

17  Infringers – 15 U.S.C. § 1117(a)(2); 35 U.S.C. § 284, including a reasonable royalty (such

18  as would have been paid had trademark and patent licenses been properly obtained);

19      10.     That Defendants-Infringers be required to pay the costs of the action.

20      11.     That Defendants-Infringers be required to pay statutory damages as set forth

21  in 15 U.S.C. § 1117, and 35 U.S.C. § 284.

1        12.    That the amount of the judgment for profits, damages and disgorgement be

2    trebled, as permitted in 15 U.S.C. § 1117(a) and 35 U.S.C. § 284, to assure full and complete

3    compensation to the Plaintiff.

4        13.    That Defendants-Infringers be held to pay the reasonable attorney's fees of the

5    prevailing Plaintiff.  15 U.S.C. § 1117; 35 U.S.C. § 285.

6        14.    That Plaintiff be granted such other and further relief, whether in law, equity,

7    or otherwise, as to which Plaintiff may be justly entitled.

8    **JURY DEMAND**

9        Plaintiff demands a trial by jury for all issues so triable.

10                      Respectfully submitted,

11                      **K & R INDUSTRIES, INC.,**

12                      By counsel,

13   October 18, 2004

                   Eric C. Grimm (P58990)

14                      **CALLIGARO & MEYERING, P.C.**

                   20600 Eureka Road, Ste. 900

15                      Taylor, MI  48180

                   734.283.2727

16                      Fax 734.246.8635

17                      *COUNSEL FOR PLAINTIFF.*

18

19

20

21

Page -32-





· Try 3 Issues Free
· Magazine Customer Service
· Subscribe to FORTUNE

GO

· Archive   · Current Issue




Add a phone line for just $14.99/month.
Get 500 minutes anywhere in the U.S. and Canada.

**RANKINGS**

Companies | CEOs | Investing | Careers | Technology | Small Business | PDFs

**FSB**
FORTUNE SMALL BUSINESS

The FSB 100
· 25 Richest Entrepreneurs

50 Small-Cap Stocks

The Best Bosses

How They Got Started

MBA Showdown

Classic Companies

Ultimate Resource Guide
· Starting Up

· Subscribe to FSB

SPECIAL FEATURE
Can You Spot the Knockoff?
If you're a designer, big retailers want your ideas. They just don't want to pay for them.
By Carlye Adler

Keri Beyer had every reason to think pottery Barn Kids would continue to treat her fairly. Back in 1995, Beyer had launched a children's furniture company in Stillwater, Minn., called Wigglestix. In her first few years she sold mostly to mom-and-pop furniture stores, but fulfilling small orders from a tiny bed-and-breakfast town on the Wisconsin border wasn't getting her anywhere. In 1999 she hit her first home run, when Pottery Barn Kids placed an order for $400,000 worth of furniture, more than Beyer's first three years of revenue combined.

· Send to a friend
· Print
· Reprints
· Current Issue

So when Jennifer Kellor, a rep from Pottery Barn Kids, checked in a year and a half later to ask about new products at Wigglestix, Beyer was thrilled and says she anticipated another big order. Kellor twice flew out to Minnesota from Pottery Barn's headquarters in San Francisco and took digital photos of Beyer's latest pieces, including a scalloped bookshelf, a farmer's bench, and a wooden desk with a hutch. Kellor also wanted to know Beyer's thoughts on future lines and upcoming trends in the business. Back on the West Coast, Kellor phoned to ask for product samples, and Beyer enthusiastically complied. She had to pay her ten employees overtime to get everything finished, but says she figured it was worth it, as it allowed her to ship thousands of dollars' worth of merchandise overnight, including the bookshelf, the desk, two coat racks, a lemonade stand, and eight footstools (one in each color available).

For the next few months, Beyer heard nothing. She tried to check in, but all her e-mails and phone calls to Kellor went unreturned. When she reached other people at the company, she says, she was given excuses why they no longer seemed interested. "The price is too high," one person told her. "We still have footstools left over from last season," another explained.

Then the 2001 Pottery Barn Kids catalog came out. In it was a scalloped bookshelf that looked suspiciously like the Wigglestix bookshelf -- smaller but with the same basic design. There was also a desk-and-hutch set strikingly similar to Beyer's, though it was priced almost $100 cheaper. Beyer says she was ashamed and

**FREE TRIAL OFFER**
Get 3 FREE Trial Issues of FORTUNE Magazine
Name

Address

City

State/Prov.    Zip/Postal

E-mail

**CONTINUE**
Outside US & CAN, click here



**AOL**

Real

Estate

Property Type ▼

GO

angry, and thought about taking some kind of legal action but ultimately didn't. "It's not like I invented 'The Desk,' " she says. "And they changed the legs, so I couldn't be totally sure." Ironically enough, a different rep from Pottery Barn Kids contacted Beyer months after that, again asking if she might be willing to show the company some of her newer products. Of course Beyer refused.

Tracy Brown, the director of public relations for Williams-Sonoma, which owns Pottery Barn, disputes this version of events. "Wigglestix was unable to keep up with production, and we experienced serious quality issues with their products," Brown wrote in an e-mail. "We lost sales, and were disappointed that we were unable to continue doing business with them." Beyer acknowledges some production glitches but says that still doesn't justify what happened. "The fact is, they took my ideas and my products and ripped me off."

Her experience, although alarming, is not all that unusual, say many independent designers who have shown products to big companies and then seen similar versions suddenly appear in catalogs and stores. John McCarthy, president of a kids' clothing company called Mack & Moore, sold a unique $75 fuchsia coat made of fleece with flowers and stripes on it. He sent the coat to Kmart, along with a few other samples, in hopes of getting a contract, but Kmart said it wasn't signing any new vendors. A year later one of Mack & Moore's sales reps happened to be shopping in Kmart and found a knock-off of the fuchsia coat selling for less than $20. Similarly, Karen Krieger, who sells metal jewelry and frames to galleries, couldn't believe it when her cousin found a "cheapened and uglified" version of her signature "Change of Heart" picture frame, which she sells wholesale for $41, on the shelves at Target for $9.99. Some of the galleries Krieger dealt with dropped the suddenly less exclusive product, and her frame sales plummeted from $90,000 to $30,000.

Calls to Kmart, which is currently in bankruptcy proceedings, were not returned. A spokesman from Target, Douglas Kline, says that he's not aware of the incident with Krieger and her picture frames, but that the company has a huge reservoir of design partners and resources.

Experts say there's no way to quantify the monetary losses from this type of intellectual-property theft, since so much of it goes undetected and unreported. U.S. businesses as a whole lose some $200 billion a year because of counterfeit consumer goods, according to the International Anti-Counterfeiting Coalition. Most of that comes from big companies -- particularly in the fashion business -- having their stuff copied by small-timers (like those Chanel bags you see selling on city street corners for $15). But a growing component comes from knockoffs in the other direction -- when big companies copy goods made by entrepreneurs. The problem is clearly getting worse, says Joel D. Joseph, the chairman and general counsel of the Made in the USA Foundation, which helps represent craftspeople in intellectual-property lawsuits against big retailers. One explanation has to do with simple

economics -- it's expensive for retail chains to come up with their own ideas, and much cheaper to simply borrow them from outsiders.

"In-house designers continue to develop the standard product line while the company looks outside for innovative ideas that they will license -- or steal," says Krystina Castella, a designer and consultant who teaches at the Art Center College of Design in Pasadena. After that, the companies can get the products made cheaply overseas and undercut the original entrepreneurs on price.

Unfortunately, the people who see their work replicated elsewhere often say it's tough to stop. "As a small business person, there's only so many things you can do," says Beyer at Wigglestix. "Taking on Pottery Barn Kids seemed like it would use a lot of the resources that I don't have -- time and money. I let go of the fact that there was not much I could or wanted to do to address their ripping me off."

What Pottery Barn, Kmart, and Target are accused of may be unethical, but is it illegal? After all, companies borrow from one another all the time. Different designers might hit on the same idea, and often the products in question aren't identical. "A crate is a crate, honey," Mitchell Salzman told his wife, Susan, when Pottery Barn Kids introduced a storage line similar to the one she'd come up with for their store, Little Folk Art, based in Santa Monica, Calif.

In fact, the precise difference between borrowing and stealing is often hard to pin down. "There is no bright-line rule," says Paul R. Levenson, an attorney who handles intellectual-property cases at Kaplan Gottbetter & Levenson in New York. "It's a case-by-case decision." Most entrepreneurs have long thought that infringement boils down to numbers -- that if a company alters, say, 30% or more of an existing design it can avoid being sued. But Levenson says the percentage rule isn't legally valid. (And besides, the math can get fuzzy; what's 30% of a crate?) When pressed for specifics, Levenson explains that an infringer can't change the color of a design and call it his own. He can't change the size and call it his either. But can he change the proportion? Maybe. The shape? Yes.

Even if design theft isn't always black-and-white, however, some recent incidents seem pretty egregious, less like the sincerest form of flattery and more like flat-out copying. When Judi Boisson, owner of Judi Boisson American Home Collection, a home-furnishings company in Southampton, N.Y., recently sent a cease-and-desist letter to Lillian Vernon Corp. for copying one of her quilts, the company asked if it could continue selling the knockoff for another six months. Ingo Williams' company, Bedford/Downing Glass, had been successfully selling glass picture frames to upscale retailers, including Bloomingdale's and Barneys, for years before his idea started to be knocked off by everyone from Pottery Barn to Z Gallerie. "My frames are made by the Chinese army, Mexican Peyotes, Inuit Eskimos, and Indian children," he says. "But they are no longer my frames." One corporation, Fetco International, bought up a type of textured glass

Williams used and shipped it to a Chinese manufacturer, so he had to stop making them for nearly six months.

David Hochberg, vice president of public affairs at Lillian Vernon Corp. in Rye, N.Y., says that the company never knowingly or willfully infringes on copyrighted artwork and immediately stops shipping any items in dispute until the dispute gets resolved. "Ninety-nine percent of the time these issues are settled out of court and amicably, with a royalty agreement for the designer," he adds. Fetco did not return calls by press time.

One of the most extreme examples involved X-IT, a tiny company started by two Harvard Business School students who came up with a collapsible fire-escape ladder for homes. They launched the company on a shoestring and even used a photograph of their own family members on the box because they couldn't afford models. Then Walter Kidde Portable Equipment, the largest U.S. maker of home-safety products, considered buying X-IT. Kidde signed a confidentiality agreement and looked at plans for the ladder, among other things, but then announced it wouldn't buy the company after all. A few months later Kidde introduced a ladder that not only was similar to X-IT's but came in identical packaging, with the same photograph of X-IT family members on the box.

Most of the several dozen designers interviewed for this story say the company with the worst reputation for knocking off original products is Pottery Barn. People are allegedly so spooked by the company that its buyers have taken to hiding their nametags at trade shows just to get designers to talk to them, according to Richard Stim, a California attorney who sued Pottery Barn for a client.

In some cases the company borrows not only the design of a product but the name as well. Jasmine Redfern designed a "Gumball Lamp" with a unique base of beads for her company, Whimsy Designs, based in Wesley Hills, N.Y. Redfern displayed her lamp at a big trade show but never sold it to Pottery Barn Kids. Yet a "Bubblegum Lamp" with a similar design appeared in the company's winter 2002 catalog. And Salzman, the designer in California, made an armoire with fabric on the inside of the doors and named it the "Samantha" armoire, after a young client who was the original benefactor of the piece. A "Samantha Armoire," also with fabric lining the inside of the doors, started appearing in the Pottery Barn Kids' winter 1999 catalog and is still available.

"We often take inspiration from antiques, classic designs, forms, and historical styles (none of which are patented or under any copyright)," responded Brown, the PR woman for Williams-Sonoma and Pottery Barn, in an e-mail. "These ideas are then evolved into unique and stylish products by our own team."

But some entrepreneurs don't see it that way, and they're trying to fight back. Judi Boisson, the quilt designer, says she'll go to any length to stop copyright infringers. She sued Pottery Barn Kids in 1999 for copying her "galaxy" quilt; that case was settled out of court and Boisson is restricted from discussing the outcome. She

has also won more than $1 million from other big retailers, including QVC, Target, and Burlington Coat Factory.

"There's no basis for this outrage," says Stacy J. Haigney, the general attorney for the Burlington Coat Factory Warehouse. "If by chance we do infringe, there are judicial remedies for the copyright holder. In this case the manufacturer paid for the damages." A QVC spokesman declined to comment.

Even more striking, X-IT, the tiny company that made the fire-escape ladder, sued Kidde last year and won the biggest civil jury verdict in Virginia history: $116 million (it will probably be reduced by the judge). Kidde declined to comment.

Taking on a big company can be expensive, though. In intellectual-property lawsuits in which less than $1 million is at stake, attorneys' fees and costs average $400,000, according to Penta Advisory Services in Washington, D.C., a consulting company. When $1 million to $10 million is at stake, the fees average $1 million. Most small businesses can't afford that, especially when the outcome is so uncertain. Aldo DiBelardino, co-founder and director of X-IT, had to remortgage his house and dip into his retirement savings to cover his legal costs for the lawsuit against Kidde. And even though his company won in court, he says some bills still remain unpaid, as X-IT hasn't yet received the check for damages.

Entrepreneurs who can't afford a prolonged legal battle often have to come up with more creative ways to retaliate. "Their lawyers can eat my lawyers," says Michael Craig, co-owner and designer at furniture company M. Craig & Co. in Columbia, S.C. His alternative plan: Humiliate them. In Craig's most brazen retaliation, he invited the trade press to watch as he dumped lacquer thinner on a knockoff of his flagship product, the Railroad Baron's bed (an opulent piece made of Honduras mahogany with hidden compartments), and then set it on fire. Another time he took out an advertisement in a trade paper and invited people to M. Craig's fictitious "semiannual knockoff sale," where he advertised that shop drawings would be given out at the door.

There are a few bright spots, however. A few organizations have stepped in to help. Karen Krieger, who had her picture frames copied by Target and was unable to foot steep attorneys' bills or risk her company's financial future, contacted the Made in the USA Foundation, a nonprofit based in Bethesda, Md., for help. In 1999 the foundation created the American Crafts Project, which has since represented more than 50 crafts designers pro bono and filed 20 lawsuits in federal court against stores and distributors (including Wal-Mart, Target, and Kohl's) that were selling foreign-made knockoffs of U.S. designs. The group has a decent track record so far: Courts have granted three injunctions to stop illegal copying, and a dozen accused companies have agreed voluntarily to stop.

Some designers remain fatalistic about the problem, however. Ingo Williams, the designer who makes picture frames in Brooklyn,

steadfastly refuses to patent his products or sue. "Intellectual property is not a retirement fund," he says, adding that he wonders whether getting knocked off is the natural evolution of a good idea. His somewhat stoic strategy is to always stay ahead of the big companies and keep coming up with better products.

Others simply give up. Lisa Graves, owner of a jewelry and home accessories company in Oakland called Asil (that's "Lisa" spelled backward), says she repeatedly had her best stuff stolen. She sued Pottery Barn in 1995 to force the company to stop copying her bird-nest napkin rings (the case was ultimately settled out of court). She came up with intricate, aluminum wire-wrapped Christmas lights that miraculously appeared in Target soon after. And at a trade show once, one of her sales reps noticed a woman wearing earrings in a distinctive heart-shaped pattern identical to the set Graves had come up with. Graves says she did some digging and found out her earrings were being sold at stores like Express, owned by the Limited, and Contempo Casuals. She did a little more digging and found out that the knockoff earrings literally had her fingerprints on them -- three manufacturers had made a mold of her original bronze version, which included an incidental thumbmark, and used it to reproduce their own copy. (Graves filed cease-and-desist letters against the retailers and manufacturers, and all cases were settled out of court.)

After 15 years in the business, Graves says, she's decided to change careers and do landscape design instead. "Things have really changed," she says. "It's more and more of a struggle to be a small designer. You can't compete."

*Feedback? Write to fsb_mail@timeinc.com*

Read the current issue of FSB Magazine

SEARCH FORTUNE [    ]
Go [    ]

GET 6 MONTHS FREE : Get an EXTRA 6 months FREE when you subscribe to FORTUNE Magazine.

| Name: | Address: | City: |
| St./Prov. | Zip/Po | Email: |

Continue

Outside U.S. & Canada, click here.



ABSOLUTE VERSATILITY
2004 DODGE SPRINTER
LEARN MORE ▶

DODGE

SUBSCRIBER LOGIN | HOME | COMPANIES | CEOs | INVESTING | CAREERS | TECHNOLOGY | SMALL BUSINESS | PDF

Services: Customer Service | Conferences | Special Sections | Downloads | Free Product Info | FORTUNE Education Program
Information: Current Issue | Archive | FAQ | Contact FSB | Press Center | Advertising Info

10/18/2004 10:38 AM

© Copyright 2004 Time Inc. All rights reserved. Reproduction in whole or in part without permission is prohibited.
Privacy Policy Terms of Use Disclaimer Contact Fortune



# Loislaw Federal District Court Opinions

X-IT PRODUCTS v. WALTER KIDDE PORTABLE EQUIPMENT., (E.D.Va. 2002)

*227 F. Supp.2d 494*

X-IT PRODUCTS, L.L.C., Plaintiff, v. WALTER KIDDE PORTABLE EQUIPMENT,

INC., Defendant.

No. Civ.A. 2:00cv513.

United States District Court, E.D. Virginia, Norfolk Division

June 25, 2002.

West Page 495

[EDITORS' NOTE: THIS PAGE CONTAINED HEADNOTES AND HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
West Page 496

[EDITORS' NOTE: THIS PAGE CONTAINED HEADNOTES AND HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
West Page 497

[EDITORS' NOTE: THIS PAGE CONTAINED HEADNOTES AND HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
West Page 498

Gregory N. Stillman, Robert M. Tata, Hunton & Williams, Norfolk, VA, for Plaintiff.

Beth Hirsch Berman, William F. Devine, Hofheimer Nusbaum, PC, Norfolk, VA, Laura B. Luger, Moore & Van Allen, PLLC, Durham, NC, John Christopher Filosa, Baker & McKenzie, Chicago, IL, for Defendant.

### ORDER

DOUMAR, District Judge.

After a four week trial, a verdict was rendered by a jury in this matter on August 17, 2001 in favor of the Plaintiff, X-It Products, L.L.C., Inc. ("X-It") for in excess of $116 million dollars. X-It and Defendant, Walter Kidde Portable Equipment, Inc., ("Kidde") have filed numerous post trial motions regarding the propriety of this verdict including: X-It's Motion for Order Granting Permanent Injunction,[fn1] Kidde's Motion for Transcript Portions to Remain Under Seal,[fn2] Kidde's Motion for Post Verdict Relief, X-It's Motion for Finding of Unfair Competition and Trade Practices and for Prejudgment Interest, and X-It's Motion to Strike Kidde's Post Trial Offer of Evidence.[fn3] The Parties have fully briefed the issues, and have inundated the Court with extraneous briefs, cases, and documents. The Court held a hearing on December 17, 2001, the main focus of which was the issue of
West Page 499
damages, both compensatory and punitive. The Court heard oral argument on the issues.

Although the suit contains ten different courts, this case is composed of just two major issues. First, it is a copyright case and a trade dress case in that one company, Kidde, replicated the copyrighted picture and trade dress of X-It and used it. Second, it is a case where a company. Kidde, unfairly and fraudulently appropriated the trade secret patent application of X-It, to market a competing product, while breaching its contract which prohibited its disclosure and use. A confusing factor in the case requires the Court to state what this case is not. THIS CASE IS NO A PATENT INFRINGEMENT CASE, but it necessarily involves and centers around patents.

The damages are elated first to the copyright and trade dress violation,[fn4] and second to the sum of money the Plaintiff would reasonable nave received for the Defendant to be able to utilize the trade secret information which it fraudulently appropriated at the time and place of obtaining it. Also, this fraudulent appropriation of the trade secret was a clear breach of contract. On this second aspect of damages. relating to the fraudulent appropriation of the trade secret patent application, and breach of contract, the jury clearly awarded multiplicatus compensatory damage awards for several causes of action on the same facts. The jury was fully instructed on each of the counts with sixty-eight interrogatory questions, including subparts, concerning' the matter. Indeed, the jury instructions clearly stated without objection that, "[t]he total amount of compensatory damages may not exceed the value found for any one violation, except for the copyright violation, if any." (Tr. pg. 4300). There were no objections to this instruction, and this instruction is the law of the case. For this reason, as well as the common law, the Court now Orders the Plaintiff, X-It Products, L.L.C. ("X-It"), to elect the remedy for which it desires judgment. and the corresponding verdict, under which it wishes to recover compensatory dam ages for the Defendant's fraudulent actions in fraudulently appropriating the trade secret patent application or the breach of contract. This amount will be awarded in addition to any damages for the copyright violation if appropriate plus any punitive damages, and/or attorney's fees, if appropriate to the elected remedy, in addition pre-judgment interest on the amount of compensatory damages will be awarded from August 15, 1999 at the rate of 8% per annum on any and all awards except contract judgment, if arty, until date of judgment,[fn5] and from August 15, 1999, at 9% per annum until date of judgment on the contract action.[fn6] The federal judgment rate of interest will begin on date of judgment. The Plaintiff cannot recover for both contract and tort. Depending on the remedy elected, the copyright damages may be subsumed in the damages for the breach of contract and/or the damages for fraud. A new trial is **DENIED.**Y

## I. Introduction

It is always helpful to understand the posture of a suit at the time of trial. This suit centers around X-It's product, packaging, and patent application and the supposed proposed purchase of X-It by Kidde.
West Page 500
In the nearly fifty years that the undersigned has been a member of the bar, working almost always in litigation, of which twenty years have been on the bench, the undersigned has never seen a case which entailed more rancor between attorneys handling a case or involved in the case. Never have so many objections, obstructions, and motions been put forward by both sides than in any prior case seen by the undersigned during those almost fifty years.[fn7]

Case 2:04-cv-74055-JF-DAS Document 1 Filed 10/18/04 Page 44 of 50

X-It claims that actions taken by Kidde and its agents entitle X-It to recovery on several counts. Specifically, X-It seeks recovery under the following theories: 1) copyright infringement, 2) false designations in violation of Section 43(a) of the Lanham Act, 3) false advertising in violation of Section 43(a) of the Lanham Act, 4) breach of contract, 5) misappropriation of trade secrets in violation of the Illinois Trade Secrets Act, 6) misappropriation of trade secrets in violation of the North Carolina Trade Secrets Act, 7) breach of the North Carolina Unfair Trade Practices Act, 8) breach of the Illinois Consumer Fraus and Deceptive Business Practices Act, 9) breach of Illinois Common Law through unfair competition, and 10) breach of Virginia Common Law though unfair competition. The Court's concern is that, but for the theory of recovery based on copyright infringement, the same theory of damages was presented by the Plaintiff on all counts except for the copyright violation.

## II. The Jury Awards and Damages

To award damages in this case, the jury needed to determine what would have taken place, monetarily speaking, but for the wrongful acts of the Defendant. The jury necessarily determined that Kidde would have had to buy X-It, as it had set out to do, because it was clearly going to put out a web-type ladder in August 1999. Kidde realized that X-It's ladder was a revolutionary and exceedingly practical product. Indeed, Kidde sold 100,000 of the copy web ladder in a very short time — much better sales than for the old style chain ladders they had previously sold. In July and August, 1999, Kidde was faced with X-It being in a position to capture the prime market for such products, especially with retailers such as Home Depot. It chose to prevent this by presenting essentially the same product and packaging to its vast distribution system. In order to determine the damages to X-It, one must look at what would have happened had Kidde not stolen its patent information, copyright, and trade dress. In this case, Kidde would have had to purchase X-It entirely, which its officers had planned to do some time prior to their introduction of the copies of X-It's ladder and packaging at the 1999 Hardware Show. In fact, Kidde had done little or no research on packaging or ladder design; it had merely copied and slightly modified X-It's product by causing a new hook to be devised in a contest some 20 days before their first presentation of their prototype ladder. This presentation was done at a pre show meeting in Chicago on August 14, 1999, the day before the National Hardware Show, which began on August 15, 1999. The only substantial difference between the ladder that Kidde displayed as its own at the Show and X-It's ladder was the hook. The packaging was substantially the same except Kidde used its name instead of X-IT's. Since Kidde would not market a product which infringed another's patent, Kidde could not introduce a copy ladder without having knowledge of what was in the pending patent application or buying or licensing the product
West Page 501
or company. It chose through deceit to obtain the secret patent application and modify a ladder based thereon to avoid patent infringement. It also appropriated X-It's copyrighted packaging.

In essence, Kidde pulled the rug out from under X-IT, a promising young company with an innovative product, package, and an aggressive marketing plan. In the aftermath of Kidde's having stolen both X-IT's product, package, and its marketing, as well as having willfully deceived X-IT's management, X-IT lost all its forward momentum and began to fall apart. Absent the intervention of the courts, Kidde had succeeded in its scheme

to practically destroy an up and coming rival through deceit.

    As far as sales were concerned, Ive, X-IT's former president, testified
that while in 1999 X-IT had sold 13,000 ladders, a 350% increase on its
sales for the prior year, in 2000, following Kidde's actions, sales
dropped to 8,800 ladders. (Tr. 403). Additionally, prior to the 1999
Hardware Show X-IT had fifteen different companies handling sales
covering the entire country. (Tr. 404). After the show "it was somewhat
like we had a disease. People were not calling us any more. And we were
not getting our phone calls r turned." (Tr. 404). Sales representatives
who managed X-IT's accounts with Target and Wal-Mart, two giant
retailers, actually saw the Kidde display at the 1999 Hardware Show and
accused X-IT of trying to undercut them. (Tr. 404). At the time of the
trial, those fifteen marketing firms handling X-IT sales had been reduced
to two, (Tr. 463). Moreover, given that X-IT was the first company to
produce a web ladder. prior to the 1999 Hardware Show it commanded nearly
100% of that market for web ladders. (Tr. 463). As a result of Kidde's
wrongdoing, at the time of trial X-IT had been reduced to 10% of the
market. (Tr. 464). One example of this trend is Home Depot. Prior to the
Show, Home Depot had expressed an interest in expanding its distribution
of X-IT's ladder nationally following its successful test marketing of
the ladder in one region. (Tr. 433-34). As has become clear in subsequent
hearings on the Injunction issued against Kidde in this case, X-IT's
relationship with Home Depot has failed to mature while Kidde has flooded
Home Depot and dozens of other retailers with knock-off ladders and
infringing packaging. As DiBelardino testified, "the playing field X-IT
must operate on has been irrevocably tilted." (Tr. 1795).

    As X-IT's sales receded, so did its ability to raise additional capital
from its investors. According to Ive, calls for additional capital to
keep the already lean start-up in business went unheeded after it became
clear what Kidde had done and the danger that posed to X-IT's survival.
(Tr. 464).

    The fallout from Kidde's wrongdoing also had severe repercussions for
X-IT's previously close-knit management team. Ive and DiBelardino, the
two Harvard MBA students who had come up with the idea of the web ladder
and founded the company saw their relationship deteriorate to the point
where Ive eventually left the company altogether. (Tr. 465). As a result
of his seeing the handwriting on the wall after the August 16, 1999,
confrontational meeting with Apperson and Oslakovic, X-IT's Chief
Financial Officer, Kevin Dodge, left the company in September, 1999.
(Tr. 1607-08). In short, DiBelardino described the scene at X-IT
subsequent to the 1999 Hardware Show as "chaos." (Tr. 1662). As of the
date of trial, X-IT consisted of only DiBelardino and one part time
assistant. (Tr. 1691).

    The question, therefore, is what would Kidde have paid had it not
wrongfully acquired the information. This is where
West Page 502
the jury completely accepted the testimony of X-It's expert, Richard
Troxel, that damages for X-It would amount to a present value of
$3,151,654. (Tr. 1204). This calculation was based on a $1 million lump
sum payment, plus a $3.50 running royalty on all units sold over a
projected five year period, discounted to present value. (Tr. 1211-12).

    On the other hand, Marc Sherman, the Defendant's expert, testified that
$300,000 was the total damages suffered by X-It based on no dollar value
down and a royalty of $2.30 on each ladder (calling for only 130,434

ladders to be sold). (Tr. 3724). However, this was substantially less
than the $600,000 offered by Kidde to X-It as a lump sum payment plus the
$2.00 royalty offered to X-It prior to the fraud, as an "opening offer."
The jury reached a verdict on sixty-five interrogatory questions on
August 17, 2001. It was greatly less than the $6,000,000 figure that
Kevin Dodge felt was the value of X-It at the time of the Hardware Show.
(Tr. 1601).

   On Count One, the Copyright Infringement Claim, the jury found that the
total dollar amount of damages to X-It as a result of Kidde's copyright
infringement was $842,556.00; representing $200,000.00 for copyright
infringement at the 1999 Show and $642,556.00 after the 1999 Show for a
total of $842,556.[fn8] On Count Two, the Lanham Act Count, the jury
found the same damages of $842,556.00; representing $100,000.00 for trade
dress violation, $500,000.00 for false advertising at the 1999 Show, and
$242,556.00 for false advertising after the 1999 Show. The $842,556 was
the net profit Kidde made from sale of the copy ladder in the copy
packaging. On Count Four, the Breach of Contract Claim, the jury awarded
$3,151,654.00.[fn9] On Count Five, the Misappropriation of Trade Secrets
Claim, the jury awarded the following: $3,994,210.00 under the Illinois
Trade Secrets Act (representing $842,556.00, the net profit of Kidde,
plus $3,151,654.00, the value of X-It), $3,151,654.00 under the North
Carolina Trade Secrets Protection Act, and punitive damages of
$25,000,000.00 under the North Carolina Trade Secrets Protection Act. On
Count Six, the Unfair Competition Claim, the jury awarded the following:
$3,151,654.00 for unfair competition under the North Carolina Unfair
Trade Practices Act, $25,000,000.00 in punitive damages under North
Carolina Common Law, $3,151,654.00 for unfair competition under the
Illinois Consumer Fraud and Deceptive Business Practices Act,
$45,000,000.00 in punitive damages under the Illinois Consumer Fraud and
Deceptive Business Practices Act and Illinois Common Law, and
$3,151,654.00 for unfair competition under Virginia Law. The
$3,151,654.00 was the testified expert value of X-It.[fn10] These damages
awards are based on the same actions by the Defendant, which will be
discussed below, and are clearly duplicative in several respects.
Finally, as a total verdict, the jury awarded $116,437,592.00 composed of
compensatory damages of $21,437,592.00 and punitive damages of
$95,000,000.00. This is the total sum of all the separate damage awards
and cannot stand as such.
West Page 503

III. Facts

   Aldo DiBelardino ("DiBelardino") and Andrew Ive ("Ive") were students
together at Harvard Business School in the 1990s. Ive was from England,
where his undergraduate education took place, while DiBelardino was from
Virginia Beach, Virginia, and had been educated in the United States
before attending Harvard Business School. While at Harvard, they came up
with the idea for an escape ladder which utilized webbing, was
lightweight, could be easily deployed in an emergency situation, and
occupied a minimum of space. While still in school, they desired to begin
a company to produce and distribute these ladders. The company they
formed was X-It Products, L.L.C., the Plaintiff herein. DiBelardino did
not finish at Harvard, but Ive did graduate and upon doing so became
president of X-It.

   X-It was initially financed by small investments from Ive and
DiBelardino themselves, their friends and families, totaling between
$200,000 and $250,000, (Tr. 268). Later, some investors, including

professors at Harvard and Harvard Business School graduates, helped to finance X-It. With that money they designed their packaging and ladder and developed a manufacturing process in a factory in China, taking several trips to China and making many changes in design of the ladder and in the box containing the ladder in the process. They also focused their attention on a marketing strategy, one which would concentrate on the physical presentation of their product rather than on advertising. As a start-up company, they lacked sufficient capital to launch an effective advertising campaign. This meant that the design of the box was all important and they spent a great deal of time and money developing it. X-It received national attention on television as well as other media, and extensive recognition for what was perceived to be a new, practical, and efficient emergency escape ladder.

The box design included bullet points of the attributes of the ladder and a photograph of the ladder purportedly in use. As models on the ladder for the photograph on the box, DiBelardino recruited his nephew and sister-in-law. (Tr. 1640). X-It spent $7,000 to $8,000 on a focus group to evaluate the packaging. (Tr. 1641). They spent $750 to build the wall in the photograph. (Tr. 1693). They spent about $4,000 working with the photographer, Mr. Becker. *Id.* They spent $10,000 combining the photo with their packaging, working with Mr. Maffini. *Id.* X-It then spent between $100,000 and $150,000 on its total marketing plan, revolving around the packaging. *Id.* This was in addition to the salaries Ive and other paid employees received. There were several trips to China and several prototypes produced before finalizing the product. Ire indicated that they had expended $525,000 in start up costs. In August 1999, X-It had a total of three employees. (Tr. 324). Its sales were handled through independent sales representatives and on the internet. Its shipping was handled through independent contractors.

X-It began manufacturing their final design of the ladder in China and began distributing it on the Internet and with independent sales representatives subsequent to the National Hardware Show of 1998. That was the year before the incidents made the basis for this suit occurred. Various publicity was accorded to the production of this ladder, including nationally televised programs, since it was so revolutionary as far as the public was concerned. X-It began delivering these ladders, called an "Emergency Escape Ladder" in the latter part of 1998, or early 1999, after introducing the ladder at the August 1998
West Page 504
National Hardware Show. The National Hardware Show is an annual show which is well known as the largest hardware show for representatives in the industry to see new products as well as existing products and takes place in Chicago. X-It had a small booth in a secondary location at the show in comparison to the large booth in a prominent location that Kidde had.

Kidde, the largest producer, distributor, and manufacturer of fire protection equipment, became aware of the existence of this ladder and realized its proficiency over Kidde's "Fire Escape Ladder" which was a steel chain type ladder of considerable weight and bulk. In October 1998, Carl Tomeo ("Tomeo"), Vice President of Kidde, having learned about X-It's "Emergency Escape Ladder" as a result of the 1998 Hardware Show, contacted Ive about the X-It "Emergency Escape Ladder" and requested one. In response, Ive sent Tomeo a confidentiality agreement on October 30, 1998, which Tomeo filed and ignored. Sometime thereafter, Tomeo ordered an X-It "Emergency Escape Ladder" off the Internet. In late 1998 or early 1999, Tomeo sent an X-It ladder to Jane Chen at Fenwick

Development in China ("Fenwick"), asking her, in China, to have Fenwick copy the ladder "to the best of their ability" in order to test Fenwick's ability to make such a strap ladder. (Tr. 1161).

In April of 1999, Tomeo, Vice President of Kidde, contacted Ive, president of X-It. Kidde's facility for production and its offices in the United States were located in Mebane, North Carolina. Tomeo asked whether X-It would consider either selling its new "Emergency Escape Ladder" to Kidde, or entering into a business alliance allowing Kidde to market the ladder in a joint manufacturing or distribution arrangement. Meanwhile, on May 21, 1999, Fenwick shipped, from China, the first two copies of the X-It ladder to Tomeo. (Tr. 1158). They also discovered that Kidde could produce the ladder cheaper than X-It.[fn11] (D.Ex. 713). Ive, president of X-It, was invited to, and attended, a meeting on June 1, 1999, in Mebane, North Carolina, which was Kidde's headquarters. Michael Apperson ("Apperson"), president of Kidde, stated that Kidde would prefer to buy X-It rather than enter into a business alliance in order to manufacture and sell the ladder. *This possible purchase of X-It is the focal point of the damages in this case.* The initial meeting between the parties was held in Mebane, North Carolina, on June 1, 1999. The preferred course of conduct was to buy X-It. On June 4, 1999, four more copies of the X-It ladder were shipped from China by Fenwick to Tomeo for Kidde in North Carolina. (Tr. 1158). Thus, after June 4, 1999, Kidde had six copies of the X-It ladder made by their Chinese manufacturer. There was no evidence that Kidde had any other web ladder of any type or description being manufactured except the copied X-It ladder and the original X-It ladders it had obtained. Since Kidde had determined that it could manufacture and deliver the ladder to the United States for one dollar per ladder cheaper than X-It, Kidde was in a good position to offer a continuing royalty. (T. Ex. 713).

On June 8, 1999, Mark Schiefer, Vice President of Marketing for the parent company, who worked under Apperson, the President of the Defendant, at Appersons request prepared a memo for Apperson.[fn12] Apperson in turn sent this memo to
West Page 505
John Michael Harper, Chef Executive Officer of the parent company. (Ex. 368, pg. 735). The document set forth that the ladder market was 300,000 in 1998 with a steady growth of 3-4% annually. Speaking of X-It it said, "[t]his start — up company (toes not have good distribution, but is generating significant interest in the market place." It then provided as follows;

*Acquisition Rational:*

KIDDE safety recommends continuing the discussions towards acquisition of the X-IT Fire Escape Ladder. The X-IT ladder is the strongest, safest, and smallest emergency escape ladder available, The design is clearly superior to any other design currently distributed through retail channels, with expectations to be priced at the same levels as current, inferior ladder.

Combining the superior X-IT ladder design with KIDDE branded instore merchandising and local market advertising focusing on NFPA's, Fire Drills: "The Great Escape", will provide the best opportunity for KIDDE Safety to dominate market share in the escape

> ladder category. Share potential is estimated to be
> 65%. Further, working to obtain dominant share in the
> ladder category will fortify the growth KIDDE safety
> is experiencing in the entire home safety product
> segment.

Thus on June 8, 1999, the Defendant clearly believed that X-It had a
fabulous product. If their predictions were true and they acquired Kidde
and 65% of the market, they would sell upward of 195,000 ladders in the
first year with a steady growth of 3-4% annually.

On June 8, 1999, X-It and Kidde executed a Confidentiality Agreement
written in the form of a letter, drawn in North Carolina by Sam Solomon
("Solomon"), chief financial officer of Kidde, acknowledging that X-It
and Kidde were in the process of "discussions concerning a potential
transaction." (Tr. 319). The parties agreed that X-It. would furnish
Kidde with "Confidential Information" including information concerning
the business, financial condition, operations, assets and liabilities of
X-It that may be "confidential" or "proprietary." The Confidentiality
Agreement also set forth certain restrictions that Kidde agreed to accept
as conditions to X-It's disclosure of confidential information. Namely
Kidde, who drew the document, agreed to four sped me articles designated
by roman numerals from one to four as follows:

> (i) it and its representatives will use the
> Confidential Information only for the purposes of
> evaluating the potential transaction with [X-It]; (ii)
> it will provide the Confidential Information only to
> its employees involved in the potential transaction
> with [X-It] or outside advisors retained by [Kidde] in
> connection with such potential transaction and who
> agree to keep such information confidential, (iii) it
> will not disclose, in whole or in part, any
> Confidential Information (except to the extent [X-It]
> gives its prior written consent or other than as
> specifically provided for herein); and (iv) it will
> promptly return to [X-It], upon [X-It's] request. all
> copies of any Confidential Information provided to
> [Kidde].

> *   *   *   *   *   *

> For purposes of this agreement "Confidential
> Information" shall not, in any event, include any
> information that (i) is in the public domain (other
> than through a breach of this agreement by Buyer or
> any of its representatives) at the time of its
> disclosure to or use by Buyer, (ii) is

West Page 506
> in Buyer's possession prior to its disclosure by
> Seller or is independently developed by Buyer
> (provided that the source of such Confidential
> Information was no bound by a confidentiality
> agreement with Seller or otherwise subject to any
> applicable restriction on the use of such
> information), (iii) is obtained by Buyer from a third
> party without any applicable restriction on use,
> including, without limitation, a confidentiality
> agreement with Seller or (iv) is disclosed pursuant to

the order or requirement of a court, administrative
agency or other governmental body.

(Ex. 117) (Tr. 1809).

   The June 8, 1999, Agreement in conclusion provided that the Agreement
would be construed under North Carolina state law. The Confidentiality
Agreement was prepared by Sam Solomon, Kidde's Chief Financial Officer,
on behalf of Kidde, and executed by Ive on behalf of X-It. Solomon
testified that on or about June 19, 1999, he made an offer on behalf of
Kidde to X-It for $600,000 plus a $2.00 royalty per ladder.[fn13] In a
deposition prior to trial Solomon indicated that the $600,000 figure was
the "starting point." At trial Solomon indicated that the "starting
point" was actually $400,000. Then, after being confronted with his
deposition statement, he stated at trial that the deposition statement
that $600,000 was the "starting point" was correct. (Tr. 2019).

   Sometime between June 8, 1999, and June 23, 1999, Ive complained to
Apperson that someone from Kidde had informed a Home Depot buyer, Andy
Slanina ("Slanina"), that X-It and Kidde were in negotiations. Apperson
denied that Kidde was leaking any such information. It is clear that, at
that time, X-It knew — as reflected in the 1998 X-It Case Study
— that Kidde possessed established distribution outlets, including
many of the same national retailers. Moreover, X-It knew in 1998 that
Kidde, along with First Alert, "dominated" the market in the area of fire
protection. X-It was trying to get Home Depot to buy the X-It Emergency
Escape Ladder.

   Simultaneous to Kidde's discussions with X-It regarding the possible
acquisition of X-It, Kidde was to explore the possibility of developing
an escape ladder. On June 28, in a memo from Mark Schiefer ("Schiefer"),
Vice President of Kidde Portable, to Henry Arnette ("Arnette"), Kidde's
project engineer, Schiefer directed Arnette to compare the ladders
received from Fenwick with the X-It ladders, and to "develop new
attributes." Kidde at that time had only the chain ladder, called the
"Fire Escape Ladder," which was heavy and bulky.

   At the meeting held on June 29, 1999, at which X-It gave to Kidde
information on X-It's accounts and customers and 2 or 3 days later a call
came from Texas asking why X-It was selling the company to Kidde. (Tr.
336). At this meeting, according to Ive, Apperson made X-It an offer to
buy X-It of $600,000 plus $2.00 as a royalty for every ladder sold.
Apperson confirmed that an offer was made by Kidde but states the offer
was not made by him. Tomeo could not answer whether Apperson made such an
offer. (Tr. 1174). Apperson stated at trial that the offer was for
$500,000 to $600,000 plus a $2.00 royalty per ladder. (Tr. 1883). As
previously set forth, Solomon, Defendant's CFO, indicated his starting
offer was $600,000 plus $2.00 royalty per ladder. Ive felt X-It was more
valuable and informed Apperson that
West Page 507
X-It had already expended $535,000 in producing and marketing the
ladder. (Tr. 341 et seq.).

   On June 29, 1999. Arnette, Kidde's project engineer, indicated concern
about claims on X-It's box indicating that X-It's ladder design was
protected by international patents and trademarks. (Tr. 2311-15). Schiefer
stated that Arnette should continue with development. Id. There are no
dated documents to verify Arnette's work. However, Arnette claims he was
working on the project in the early part of June. There are no dated