Case 2:04-cv-74055-JF-DAS Document 1-2 Filed 10/18/04 Page 1 of 50

computer printouts, no dated notes, no dated diagrams to support this claim other than the direction from Schiefer to Arnette directing him to start, which memo was dated June 28, 1999. Arnette testified clearly that the ladder displayed by Kidde at the National Hardware Show on August 15, 1999 was substantially similar in all regards to the X-It ladder except the hinged window hook. (Tr. 2309). Indeed Arnette's "Fire Ladder Diary" indicates that plant wide competition was stared July 19, 1999 and that the "hinged window hook prototype was started July 29, 1999. (Ex. 314). Indeed, Ortiz, the Director of Engineering for Kidde, who was in charge through June 30, 1999 (Tr. 1329), stated clearly and unequivocally, speaking of web ladders. that "Kidde never had one under design during my tenure." (Tr. 1334). This, it would appear that the first attempt at any design changes occurred on or after July 19, 1999.

It is Important in this case to set forth the facts in the period from June 29 or June 30, 1999 through July, 1999, and prior to August 14, 1999, or some 45 days. The shipping of material from North Carolina to the National Hardware Show in Illinois must have been done before August 14, 1999, since on that date it was presented by Kidde to a pie show group in Chicago. It was slated o arrive at the show on August 13, 1999, for that was the setup day. (Ex. 314). Apperson discussed the matter of Kidde developing its own version of the ladder with J. Michael Harper ("Harper"), president of Kidde's parent company, Kidde Safety, Inc. C' Kidde Safety").[fn14] Harper testified that he had previously indicated to those in North Carolina that approximately $500,000 plus a royalty was the range for a possible buy from X-It.

On Friday July 16, 1999, Harper, president of Kidde Safety (the parent company) and Apperson, president of Kidde (the subsidiary) had a conversation. As a result of that conversation, harper made a note in his own handwriting noting that Apperson was "to explore whether Kidde
West Page 508
was able to produce its own version [of the ladder] as of July 16, 1999." (Tr. 2254). The National Hardware Show was only weeks away. July 16, 1999 was a Friday. The next business day, Monday, July 19, 1999, a plant wide window attachment contest was begun at Kidde's North Carolina facility. (Tr. 2303). Thus, as of July 19, 1999, development of what appeared to be a type of hooking arrangement for a ladder was begun. This was the first evidence of any design by Kidde of anything concerning the ladders except for conversation. This hooking device was for attachment of the ladder to a window.

Thus on Monday morning, July 19, 1999, Apperson, president of Kidde. was faced with developing Kidde's own ladder after the Friday conversation with Harper, his boss. Although Schiefer, Vice President of Marketing of Kidde Safety (the parent company), who was working for Apperson in North Carolina,[fn15] and Arnette, Kidde's project engineer, knew that there were potential patent problems in producing a copy of X-It's ladder. (Tr. 2311). The patent application of X-It was secret and unknown to Kidde on July 19, 1999.

Apperson testified unequivocally as follows: "we as a company will not sell a product that is directly infringing somebody else's product." (Tr. 1835). Moreover, Apperson testified concerning his conversations with Harper, that Harper indicated that if "we could just make our own ladder *without violating way protection*, meaning patent or intellectual property protection, which he (Harper) knew we had going as a product development, why would we acquire X-It." (Tr. 1809) (emphasis added). Thus, the problem that Apperson faced was how to sell a non-infringing

product without knowing what the potential patent was on the product Kidde
was copying. Since Kidde would not sell a product that infringed
another's patent and since Kidde was going to market its own copy, it
logically and necessarily followed that it have to determine what was
contained in the secret patent application of the product to be copied in
order to avoid a patent infringement suit since it would not market an
infringing product. As Apperson testified you either design around the
patent or buy the rights on the company with the patent. (Tr. 833).

On the same business day, Monday, July 29, 1999, the first business day
after Harper, the CEO of the parent, noted that Apperson was "to explore
whether Kidde was able to produce its own version," and the day the
window attachment contest was started, Ive, of X-It, was contacted by
Apperson, of Kidde, to see if Kidde could see its secret patent
application of X-It. Accordingly, on or about July 19, 1999, Kidde
indicated to Ive, president of X-It, that it may be willing to raise its
offer ($600,000 plus $2.00 royalty on every ladder sold) to acquire X-It
if Kidde found X-It's intellectual property rights in the X-It ladder to
be strong. (Tr. 344). This was done when Apperson knew that the *maximum
offer* indicated by Harper, president of the parent corporation of Kidde,
had already been exceeded by $100,000, and rejected. Harper had to
approve any buy-out, and had never indicated that the $500,000 approval
would be raised. Harper's notes clearly indicated his desire: for Kidde
to make the ladder without infringing.

Nonetheless, Apperson indicated that Kidde desired to examine X-It's
patent application with regard to the ladder for purposes of raising the
offer. Patent applications are secret, are not public records, and may be
amended. Apperson indicated to Ive that, in accordance with
West Page 509
the June 8, 1999 Confidentiality Agreement, X-It should submit its patent
application to an "outside" patent attorney for review and evaluation of
its value, then the prior offer of $600,000 plus $2.00 really might be
raised. (Tr. 344). This was said even though there was no evidence that
Harper would ever give approval for more than $500,000 plus $2.00
royalty.

During this time Fenwick, in China, was continuing to make copies or of
the "same design" as the X-It ladder. In fact, on July 30, 1999, twelve
more copy ladders were shipped from Fenwick in China to Carl Tomeo in
North Carolina purporting to be of the "same design as [the] competitor."
(Tr. 2307) (Ex. 314).[fn16] Thus, in August 1999, Kidde had on hand at
most eighteen web ladders, all of which were copies of the X-It ladder
from China. There was no showing of any other ladder of any nature being
produced by, or on behalf of, Kidde. The only thing being done was
development of a window hooking arrangement for the ladder copied in
China from X-It. There was no design for the hooking arrangement as of
July 19, 1999, when the contest was started for such a design by Kidde.
This hooking arrangement was being done in North Carolina and not started
to be attached until July 29, 1999. (Ex. 314). No specifications for any
Kidde ladder were in evidence or shown by the evidence until well after
the hardware show on August 15, 16, and 17, 1999.[fn17] The first drawing
of a ladder by Kidde was dated September 1999. Regardless, or because of
its efforts to put a ladder on the market, Kidde needed access to X-It's
patent application. (Tr. 344).

There was no evidence indicating that any progress on developing any
ladder was actually done by Kidde between June 28 and July 16, 1999. In
fact, the evidence was clear that the Kidde employees believed that right

up until a confrontation at the National Hardware Show, on August 16,
1999, between Kidde and X-It, that Kidde would acquire X-It. (Tr.
851-53). As Hoover, creative designer for Kidde testified:

> Question: How did you become aware of X-It prior to
>           the National Hardware Show?
>
> Answer: We were told that we are introducing this X-It
>         ladder. We were to acquire the company and
>         this would be a product that we would be
>         selling.
>
>    . . .
>
> Question: So up until that time (time of lawsuit) it
>           was your understanding that Kidde Safety was
>           going to acquire X-It products?
>
> Answer: It was not certain that they would acquire
>         X-It products based on the incidents at the
>         hardware show.

(Tr. 853). "Indeed Apperson in the period between June 29, 1999 and July
told Dodge, of X-It, that he, Apperson, wanted to see if we could wrap up
our discussions in time for the Hardware Show so we could display our
products jointly at the show." (Tr. 1599). Moreover, he told Ive that the
goal was to sell X-It before the Hardware Show. (Tr. 324).
West Page 510

   Regarding Kidde's desire to examine X-It's patent application, on or
about August 5, 1999, Apperson stated that, "John Angrez our V.P. in
Colorado Springs is contacting [Charles Oslakovic] to let him know that
you will be sending something and how we will work it to keep the
information separate and reasonably protected." Ive, of X-It, had the
clear understanding that disclosing the trade secret material in the
patent application was to "value" the patent and increase the offer that
Kidde would make. (Tr. 344). X-It then made arrangements to share its
U.S. patent application with Kidde's "outside" patent attorney, Charles
S. Oslakovic, Esq. ("Oslakovic"). Ive told Apperson that he would give it
to an "outside attorney" and that all that the attorney would ultimately
be able to share was whether the patent was "weak or strong." (Tr. 352)
Specifically Ive stated that he and Apperson:

> agreed together that we would send it to somebody else
> outside the company, and that that person wouldn't be
> able to share claims with Mr. Apperson. He [the
> outside attorney] wouldn't be able to share
> specifications. By specifications I meant . . .
> drawings. All he [the outside attorney] would be able
> to tell Mr. Apperson is weak or strong. And we [X-It's
> executives] were hoping obviously that he [the outside
> attorney] would come back and say strong. And Apperson
> agreed to that. (Tr. 353).

This statement was never rebutted or denied by Apperson. Thus it is clear
that the agreement was that "all he would be able to tell Mr. Apperson is
weak or strong."

   In fact, Apperson testified that the agreement between himself and

Ive, prior to the 1999 Hardware show, was that Oslakovic was not allowed
to discuss claims in the X-IT patent application with anyone at Kidde.
Specifically, Apperson characterized his agreement with Ive as follows:

> Question: You understood that the information that was
>           sent to your patent attorney, Charles
>           Oslakovic, was information that was to be
>           treated as confidential pursuant to the June
>           8, 1999 confidentiality agreement?
>
> Answer: I understand, yes, that that was to be treated
>         as confidential.
>
> Question: Now, the additional terms and conditions.
>           What were the additional terms and
>           conditions that would apply to the treatment
>           of the patent information that was shared
>           with Mr. Oslakovic?
>
> Answer: Mr. Oslakovic was not to share the claims with
>         Kidde Safety.
>
> Question: And that was the agreement you reached with
>           who? Answer: Andrew [Ive].
>
> *    *    *    *    *    *
>
> Question: I mean he [Oslakovic] couldn't read the
>           document and then orally share information
>           with Kidde regarding the claims, could he?
>
> Answer: Could not share information with us, no.

(Tr. 837-39). Apperson's testimony is clearly at odds with the conduct in
this case since it is clear that the claims could not be shared yet they
were.

   X-It asserts that it shared its patent application with Oslakovic
pursuant to the June 8, 1999 Confidentiality Agreement as well as
"additional oral commitments" between the two parties and Oslakovic. Ive
was dealing with Oslakovic without the benefit of an attorney for himself
or X-It.
West Page 511
Additionally, X-It contends that, the "oral commitments" also concern
Kidde and Oslakovic's alleged promise to X-It that Oslakovic would not
share the details of X-It's patent application with Kidde. Ive testified
that he spoke with Oslakovic and stated, "I'm going to send you this. As
per Mr. Apperson, you can't share claims. You can't share specifications.
*All you can do "is to let him know strong or weak to the strength or not
of the patent. And he agreed to that."* (Tr. 354) (emphasis added).
Oslakovic never denied this. Ive believed and understood that Oslakovic
was "neutral." (Tr. 353). Oslakovic did not remember the conversation
with Ive, or even that a call was made to him by Ive. (Tr. 1090, 3193).
However, the letter sending the patent application and the affidavit of
Oslakovic, both of which are sent forth on the following pages, clearly
refer to the conversation and the understanding prior to the receipt of
the patent. Schiefer, vice president of Kidde, testified that as late as
August 16, 1999, at the confrontation, Oslakovic had indicated that,
"Oslakovic would act as some sort of intermediary or neutral type

person. (Tr. 2728). Thus Oslakovic was trying to indicate his disinterest
to Ive, even as late as August 16, 1999, at the confrontational meeting
of the parties at the National Hardware Show. *Id.*

   Pursuant to the various agreements and understandings clearly shown and
unrebutted, on August 9, 1999, Ive forwarded the patent application to
Oslakovic, which he received on August 10, 1999. Concerned with
protecting the trade secret information contained in the patent
application, Ive enclosed the following letter to Oslakovic:

   Dear Charles:

   Please find enclosed a copy of our patent relating to
   the X-It emergency escape ladder in which we are
   discussion with Kidde safety.

   As per out telephone conversation we are attempting to
   ensure that the specific of the patent and the info
   contained within it are kept separate and not shared
   with Kidde Safety. Kidde and X-It Products have agreed
   to have you and your organization give feedback on the
   patent without giving specific wording or diagrams
   from the patent if possible. We would like to get your
   thoughts on its strength and the potential it has to
   protect the product from infringement when awarded.

   It is quite possible we may share the patent with
   Kidde Safety at a later date when we have permission
   to do so from our board.

   Many thanks, and please do not hesitate to contact me
   if you have any questions or concerns.

   Sincerely,

   Andrew Ive

   On August 9, 1999, Ive sent an e-mail to Oslakovic telling him the
product would arrive by 10:30 am. Tuesday, August 10, 1999, adding
"looking forward to your thoughts and feedback." Again on August 10, Ive
asked sent another e-mail which asked for feedback. Oslakovic, in his
affidavit which testimony he adopted at trial, stated as follows:

   *After I agreed to maintain the patent application in
   confidence, and not to disclose its content to Kidde
   Safety, X-It sent we a copy of its patent application
   as it was filed with the U.S. Patent and Trademark
   Office. It was my understanding that X-It gave me
   access to the application so that I could advice Kidde
   Safety on the scope of protection being sought. but
   without revealing the patent application details. The
   CIT ladder itself was already in the market and*
West Page 512
   *was known to Kidde Safety. I was also provided a
   sample of the X-It product.*

(Tr. 1088) (Emphasis added).

   After hearing the witness testify about the circumstances at the time,

a reading of the letter of August 9, 1999, from Ive to Oslakovic, is
clear and unambiguous. Although Oslakovic maintained a bizarre and
clearly unwarranted interpretation. The only patent application pending
and contemplated by anyone to be "awarded" was the X-It patent
application. Kidde had no patent application even remotely contemplated on
August 9 or 10, 1999. The "thoughts" Oslakovic had on "its" strength and
the potential "it" had to protect the "product from infringement when
awarded." It was to protect the product "from" infringement when
awarded. The only product referred to in the letter or that anyone,
including Oslakovic, had was an X-It Product or a copy of it. The only
patent application was the X-It patent. Oslakovic's affidavit which he
adopted as true states that he had an X-It ladder. Reading this in
connection with the testimony is clear and unambiguous and is susceptible
of only one interpretation. The only "product" to be "protected" was the
X-It product by the X-It patent.

   The patent wasn't to protect the Kidde product which wasn't even in
existence on August 9, 1999. It was to protect the X-It product.
Oslakovic, a suave, sophisticated witness, spun a tale. He claimed that
the "product" referred to in X-It's letter was the "Kidde" product which
was unknown to X-It and non-existent at that time. He said he couldn't
remember his conversations with Ive before the letter. However, his
affidavit states, "after I agreed to maintain the patent application in
confidence and not to disclose its content to Kidde Safety, X-It sent me
a copy . . . . Clearly it was only after he "agreed" to maintain the patent
application in confidence by his own statement that the patent was sent to
him by Ive who believed that Oslakovic was neutral.

   Oslakovic was entrusted with the secret property of X-It for X-It's
benefit not for Kidde's benefit. He was to advice "both" X-It and Kidde
by giving "feedback" to X-It and to advise Kidde if the patent was weak
or strong. He was to determine if the X-It product he had would be
protected from infringement by the X-It patent which he had. He gave Kidde
feedback on August 13 but gave no feedback to X-It.

   Indeed Oslakovic was a "trustee" having been entrusted with the secret
property of X-It in trust under specific instructions from X-It before
accepting the trust res.[fn18] He chose to ignore the duties and
instructions on either the 12th or the 13th of August. Oslakovic
discussed the "overwrap" claim with Apperson of Kidde according to his
own testimony. This was admittedly a claim in X-It's patent application.
Moreover, at the same time, he sent the "Luckey" patent to Apperson at
X-It to discuss. This was a "specific" from the secret patent
application. On August 13, 1999, the Kidde display arrived in Chicago.
Oslakovic did not see any of it until August 16, 1999. On August 14,
1999, Kidde presented its X-It copy ladder with copy packaging and sell
sheets with Kidde's name instead of X-It with a slide presentation to
some 50 to 70 sales representatives. (Tr. 1802). On Sunday, August 15,
1999, at the hardware show, the X-It copy ladder
West Page 513
and the X-It copied packages were displayed. Apperson speaking of
photographing the X-It box, "again this was just to Kidde's eyes an X-It
box, assuming X-It would be owned by Kidde." (Tr. 1823). Later Apperson
further testified: "Mark Schiefer made the decision to use the scanned
and altered images from the X-It product and the prototype Kidde box at
the show and on the power point slide that was at the show." As Henry
Arnette, project engineer of Kidde, admitted that the ladder Kidde had
displayed at the show was "substantially similar in all regards except
the window hook" to the X-It ladder. (Tr. 2309).

When Ive saw the display he was very angry. Apperson agreed to meet with Kidde the next day, Monday August 16, at the show. Oslakovic met with Apperson for one an a half hours before the show. Oslakovic testified that he explained to Ive at the confrontation that he was "representing" Kidde. He never indicated to Ive that he was anything but independent prior to the confrontation. Indeed, contrary to Oslakovic, Schiefer, of Kidde, testified that at the confrontation that Oslakovic held himself out as a "neutral." Ive had no attorney. The jury clearly believed Schiefer, vice president of Kidde, and not Oslakovic. Oslakovic says that he began describing what was in the patent application and comparing those matters with Kidde's "proposed" ladder not the X-It ladder. Oslakovic's duty of loyalty was to X-It whether as a client, a beneficiary of a trust, or pursuant to a specific and unambiguous contract.[fn19] He violated all of these duties.

Oslakovic testified that he started the conversation at the confrontation by stating that he was Kidde's attorney. He further claims that he was given "permission" to disclose the claims in the application by Ive not stopping him as Kidde's lawyer from disclosing details of the X-It patent application and claims. No oral or written permission was given to Oslakovic. Since "they didn't tell me to stop," Oslakovic claims that this gave him permission to disclose the details and claims of the patent application. (Tr. 3318, 3339, 3403). Ive strongly denies this. Oslakovic asserts he discussed in detail the claims in the patent application with Kidde on August 16, 1999, at the confrontation.

Schiefer, Vice President of Marketing of Kidde, was the person who decided to use the photography of the X-It box in the slide show presentation with the Kidde name substituted, and to use the copy box at the hardware show. (Tr. 1836). It was this same Schiefer who testified contrary to Oslakovic concerning the confrontational meeting on August 16. He stated that Oslakovic offered his services as a "neutral" to compare the "proposed" Kidde product to the X-It patent application. (Tr. 2728). Thus Oslakovic was persuading not only X-It but his own people that he was a "neutral" mediator. Oslakovic admitted that the original letter he received clearly stated that Ive could reveal the information from the patent only when "we have got permission from our board" and Oslakovic knew that Ive did not have permission from the board. (Tr. 3462).

After the confrontation on August 18, 1999, Oslakovic received two copies of a communication from Ive to Apperson both of which came early in the morning. One of these came directly from Ive, and subsequently a copy was sent by Apperson to
West Page 514
Oslakovic at 7:40 a.m. the same day. The communication was as follows:

> to reiterate a prior agreement, X-It does not give
> Charles S. Oslakovic, Leydig, Voit & Mayer, Ltd.,
> or any other party, permission to share X-It's pending
> patent application with anyone without our prior
> *written permission*.

(Emphasis added). Apperson sent a copy of this same e-mail to Oslakovic on the early morning of August 18, 1999, at 7:40 a.m. and included additional language as follows:

Chuck,

I know you were copied on this reply, but I thought I
would send one as well. Clearly, X-It wants to dig in
and fight. Can you please summarize for our files an
opinion that documents that the Kidde ladder is
covered by prior art so that we have things buttoned
up if this thing gets ugly which I suspect it will . . .

By this time, under any and all circumstances, Oslakovic knew he had to
have "written permission" to disclose any information. Unfortunately
Apperson wanted chapter and verse. Oslakovic proceeded to answer Apperson
without either written permission or oral permission. He sent a fax
purporting to be a memorandum of what occurred at the Hardware Show. On
August 18, 1999, only three and a half hours after receiving the second
copy of the admonition not to share the patent without prior "written
permission." He totally disregarded the requirement of written
permission. The relevant portion of this memorandum of conference is as
follows:

. . . .

   Also by way of background I had advised Kidde Safety
that there was a group of claims which attempted to
cover a ladder structure, but which did not appear to
cover what was intending to be the commercial version
of the Kidde Safety product. An expired U.S. patent
(Luckey, # 4,098,372) disclosed a slat-type ladder
with a cross-section which was the same from
step-to-step, and the Kidde Safety product was the
same in this respect as the expired patent.

   There was a second group of claims which covered the
wrap and the method of deployment, and the wrap which
Kidde Safety used and the method by which the ladder
was deployed were different than what appeared to be
claimed in the patent application.

   Prior to the meeting, it was conveyed to Mr. Ive
that Kidde did not see the patent application as a
valuable asset, and it appeared that it was not useful
to go forward with acquisition negotiations.

AT THE MEETING

   This will simply attempt to recount the points that
were made by the various attendees, without trying to
give a sense to the give and take of the discussion.

   Mr. Apperson expressed the view that the product
Kidde safety had developed was outside the patent
(based on my advice) and therefore the primary asset
of X-It was not valuable to Kidde. He asked Mr. Ive to
correct him if he had missed any points.

   Mr Ive said that he believed that the patent covered
the product, and when into explanations about the
nylon webbing, the manner at which it was looped over
the treads, and the general nature of the carrier.

I mention that there appear to be two sets of claims
in the patent. The basic ladder claims required a
structure which was not in the Kidde product. The
Kidde product insofar as the treads were concerned,
was like the prior art. The second group of claims
dealt with the overwrap in which Kidde had no

West Page 515

expressed interest. There appeared to be no claims
directed to the nylon webbing, manner of looping, and
the like.

Mr. Ive brought up the Kidde Safety packaging which
used a photograph which he contended was copied, in
part, from the X-It packaging, creating a copyright
infringement, and also accused Kidde Safety of copying
the trade dress of the X-It product.

Mi. Schiefer explained that the packaging was only
temporary, intended to show the size of the box, and
that tho overall style of the packaging was in keeping
with the other style elements in the Kidde Safety
packaging program. The artwork on the packaging was a
temporary expedient and did not represent what Kidde
Safety intended to bring to market. At the conclusion
of the meeting steps were taken to mask the
photographs on the packaging.

Mr. Ive made much of the fact that X-It had been
dealing in good faith with Kidde Safety and was very
upset at the trade dress issue and copyright issue. He
also stated he firmly believed that the Kidde Safety
product was encompassed in his patent.

Mr. Apperson stated that he was trying to apportion
a value to X-It so that he could make a recommendation
to his managers on the price to be paid, and he saw
the main value as being in the possible patent
property. He asked the open question of whether there
was anything more which should be valued, and the
issues seemed to come back to the patent property.

In the end, Mr. Apperson proposed that the X-It
lawyers and the Kidde Safety lawyers independently or
jointly evaluate that patent application against the
Kidde Safety product to determine whether the patent
application would cover the product. As a condition
for providing a sample of the product to be
evaluated, he asked that X-It agree not to amend their
patent application based on information obtained from
study of the sample or consultation between the
lawyers or the lawyers and the parties during the
course of the evaluation exercise. If the evaluation
proved that the patent had value, that could serve as
a basis for a recommendation for the purchase of
X-It. If the evaluation determined that the patent did
not apply to the product, there appeared to be no
basis for a deal.

Mr. Dodge seemed to agree that the evaluation

proposal put forth by Mr. Apperson was the best way to
move matters forward.

Mr. Ive also seemed in the end to agree that we
would proceed in that fashion.

Later in the day I visited Mr. Ive at his booth. H
again went into the trade dress and copyright issues.
I told him that as I heard Kidde Safety that morning,
they were interested in the value of the company and
if the patent application had value, things might move
forward in a positive direction. But I sold him that
the value of the patent was strongly affected by how
difficult or how easy it was to design around it. If
the independent Kidde Safety design, without even
knowledge of the patent application managed to avoid
scope of the patent claims, that suggests that even
inadvertent design around is straight-forward,
suggesting a rather low value to the patent. Mr. Ive
said, however, that he was inclined to go forward with
the evaluation and asked that I call his lawyer Mr.
Wolf of the Wolf, Greenfield firm in Boston. I
undertook to do that and did indeed complete the call
on Wednesday at the time of dictating this
memorandum.

West Page 516

This clearly disclosed claims, which was forbidden. It is interesting
to note that the memorandum also refers to there being: "no claims
directed to the nylon, webbing, manner of looping, and the like." There
was a diagram in the X-It patent application showing the "manner of
looping." This is significant in the fact that a patent application may
be amended before granted adding claims for that which is shown in the
drawings. There was no contention by anyone that written permission to
discuss claims was given or obtained by Oslakovic or Kidde. Oslakovic
says that he discussed claims. (Tr. 3407).

The creative designer for Kidde, Kurt Hoover, believed up until the
August 1999 Hardware show that Kidde would acquire X-It as he had been
told this at a meeting. (Tr. 853). That is why he and others at the
National Hardware Show felt no qualms about exhibiting the little changed
X-It product and packaging as Kidde's own. Hoover was the person
responsible for shipping the exhibit and its products to and from
Mebane, North Carolina. In returning the products, he destroyed all of
the boxes at the show because it would be too costly to ship back empty
boxes. The ladder Kidde had at the Hardware Show on August 15, 1999, had
an overwrap. The strap had not been developed yet. (Tr. 870). The change
from an overwrap to a strap occurred after the Hardware Show at "the end
of August, [or in] September" according to Hoover. (Tr. 870). Clearly
done after learning of the overwrap claims from Oslakovic.

As Jackson, the patent and expert consultant withe extensive business
background, testified about Oslakovic's disclosure, "he shared sufficient
information that a businessman could operate on it an coming out with a
complete product." (Tr. 1961). It is clear that beyond any doubt that
changes were made to the X-It copy ladder received from China pursuant to
the information furnished by Oslakovic concerning the X-It patent
application after the Hardware Show.

Thus the overwrap, which was one of the prevalent claims in the X-It patent, was eliminated from the Kidde ladder after disclosure by Oslakovic. Other changes were made but there were no drawings by Kidde done until September 1999. On September 19 or 20, 1999, a Kidde sample was sent to Oslakovic without the overwrap.

Hoover personally packed the ladder shown at the 1999 National Hardware Show and personally returned it to Mebane, North Carolina. He gave the Show ladder, in Mebane, North Carolina, to Pamela Calderwood, the engineering supervisor. (Tr. 865). Indeed, Hoover saw one or two copy ladders after the show which he turned over to Arnette. (Tr. 869-70, 2344). The ladder at the Kidde booth at the 1999 Hardware show was a sample copy of X-It's ladder from China, only the hook was different. (Tr. 1166). Apperson claimed in his deposition testimony that the ladder at the show never came back. Hoover testified unequivocally to the contrary. Someone destroyed all of the X-It copy ladders — some 18 of them. This had to be done after August 16, 1999 and well after the return of the show ladder to North Carolina. Moreover, it was done when the suit by X-It was contemplated by Kidde as a possibility.

The conversation at the Hardware Show and the correspondence after the show indicated that Kidde and X-It wanted someone to analyze the patent application of X-It with the proposed Kidde ladder.

After Oslakovic received a Kidde prototype ladder without an overwrap on September 20, 1999, he provided the following report to Kidde:
West Page 517

There are two "sets" of claims in the application which I reviewed. The basic ladder claims require the cross-section of the tread to differ from tread to tread. By way of contrast, in the Kidde product (as well as in the X-IT product) the cross-section of the tread is the same for each tread.

It was my own conclusion that the tread claims were drafted as they were in order to avoid the Luckey 4,098,372 patent. That patent showed the basic inverted C-shaped channel for a tread, and discloses that the length of wire or other material which separates the treads is packaged between the treads when they are collapsed to, ether for storage.

The second set of claims is the overwrap claims. With the rather small attachment hook used by X-IT, the overwrap has a two-stage fastener (e.g. Velcro), in which one stag of the Velcro ties the overwrap around the stacked treads, and the second stage of the overwrap velcro ties the book to the tread package. The claims deal with both aspects of the overwrap. and related method claims, as was discussed at the meeting, deal with deploying the ladder by first releasing the hook and hooking it to the wall, then dropping the remainder of the package to release the treads. This is the method summarized right on the X-Tt overwrap itself.

In our opinion those claims do not cover the Kidde

structure. First of all, the Kidde structure uses much
bigger attachment hooks. and there is no practical way
to tie them to the package of treads. This, the second
stage of the claimed overwrap, i.e., that of releasing
that stage to release the hooks, is not present in the
Kidde product. The hoods are completely separate from
(although attached by the tape straps to) the stacked
tread package.

With respect to the deployment of the ladder, there
is a single Velcro strap around the stacked treads in
the Kidde product. The strap has a large tab at one
end which says "PULL HERE TO RELEASE LADDER." I expect
the instructions on the box will direct the user to
pull the tab after hooking the attachment hooks to the
appropriate wall section.

It appears that dropping the package if treads with
the loop having its Velcro fastener attached,
sometimes will cause the fastener to release and
deploy the treads. We would caution that no
instruction to use it in that way be provided, first
of all, because it is not [fool] proof. and secondly
because it is no the intended use of the product.
Thus, if the instructions are to pull the tab in order
to release the treads, there should be no difficulty
with any claim which might issue which requires
dropping the package to break the grip of the fastener
and release the tabs. If method coverage of that sort
is obtained, and Kidde customers are cautioned to use
the ladder in a different way, i.e., by pulling the
tab to release the treads, Kidde should have no
liability for inducement of infringement of such
claims.

*POSSIBLE BROADER CLAIMS*

It is entirely possible that X-It, having now had
information on the Kidde product, will now attempt to
amend its claims to broaden them sufficiently to cover
the Kidde product. We can offer some general guidance
on what might happen, although we clearly cannot
predict all scenarios or their outcomes.

As noted above, it is my best guess that the tread
claims have the limitation that individual treads are
of different cross-section, because it was thought
West Page 518
that was a fair way to get around the Luckey prior art
patent which has treads of uniform cross-section. IF
that limitation were removed from the claims, and the
limitation on stand-offs inserted, superficially the
claims would not read directly on Luckey, because
Luckey had no stand-offs. Stand-offs are a readily
available expedient in this art as shown, for example
by Douglas, U.S. Patent 5.605.205 (owned by BRK) or
the old Eriksson, U.S. Patent 4,298,097. Thus, it does
not seem to us that inclusion of stand-offs and
elimination of the non-uniform cross-section

limitation will result in a claim likely to be
patentable. It is also possible, that X-It may amend
the claims to specify apertures in the tread and woven
straps for connecting the treads. Rope is typically
knotted. Wire is affixed in some other manner. We have
not seen the labyrinthine threading of a strap through
he apertures in the tread, nor have we seen a prior
art reference which specifically discloses use of
woven webbing. The patents are broad enough to suggest
its use. For example, Luckey talks in terms of "cable
or strip elements between the rungs." Luckey also
says: "It will be obvious that instead of using a
metal wire, a metal strip or other noncombustible
metal could be used for the rungs and for the cable or
strip-like elements, for example, plastics."

    We have not exhaustively searched the art to be able
to render a well-rounded opinion on this aspect, but
on the one hand, strip-like material is suggested as
an equivalent for the conventional wire or rope, and
art could very likely be found showing a two aperture
labyrinthine passage, much like a belt buckle, for
stabilizing a strip-like member. We have not made that
search, and are left to conclude that we would expect
X-It will have a difficult time securing such a
claim. However, at this point they have no shown any
intention of attempting to secure a claim of that
nature, without the other limitations discussed
above.

    With respect to the overwrap, it might be possible
for X-IT to amend the claims to eliminate the
requirement that the overwrap secure the hook. They
might also further broaden to amend claims to allow a
Velcro fastener which binds the rungs to be released
by hand. In doing so, however, they would likely run
afoul of the Douglas patent mentioned above. That
patent describes and claims a storage wrap using a
Velcro fastener at column 4, lines 60 et seq. to
retain the wrap in place around the rungs. A pull-tab
is held in a channel in the top rung and is adapted to
be pulled to release the Velcro and thereby the treads
after the ladder is partly deployed. Insofar as
pulling the tab to release the rungs, this is exactly
what is intended in the Kidde product. This, to the
extent it is disclosed in the '205 patent, that patent
should prevent X-It from getting claims sufficiently
broad to cover that aspect. We also note that the
claims in BRK's '205 patent require the handle to have
a neck portion which extends through a slot in the top
step. This should prevent infringement of the '205
patent by the Kidde product, while still providing a
basic broad disclosure of a Velcro secured strip
around the treads releasable by hand, which would
prevent X-It from broadening its claims to that
extent.

Well after the show and after the thorough analysis by Oslakovic, on or
about September 28, 1999, Ive and Apperson reached a tentative agreement

to allow the X-It patent application to be compared to the Kidde
prototype ladder subject to certain terms which were not agreed upon.
West Page 519
Apperson was confronted with this in the testimony as follows:

> If on September 28, you an Mr. Ive reached an
> agreement whether to compare the X-It patent
> application to the Kidde prototype ladder product,
> wouldn't that indicate to you that you had not had
> that agreement before?
>
> Answer: As stated yes

(Tr. 1821). Obviously Oslakovic had already done this. This quite clearly
was a farce designed to disguise the prior conduct of Oslakovic and
Kidde.

   Clearly what had transpired was a breach of the contract between Ive
and Apperson. A breach of the entrustment agreement between Ive and
Oslakovic. It was a clear fraud penetrated against X-It. It was brought
about by Harper's conversation on July 16, 1999. It is interesting that a
note of a conversation between Harper and Apperson indicates as follows:
"Check any confidentiality agreement signed on or about July 16, 1999."
(Ex. 137, Tr. 1812). Also, Harper made an inquiry: "If we could just make
our own ladder without violating any protection, meaning patent or
intellectual property protection which he knew we had going on as a
product development why would we acquire X-It?"

   Apperson took these directives to heart. First, there was no product
being developed until after the July 16 conversation with Harper. In
essence Harper (1) wanted Kidde to develop its own product similar to
X-It's; (2) to find out if there are any patent problems; and (3) to
check your confidentiality agreement. In plain talk — try to get
the information but watch your step around any agreements of confidence.
Thus on Monday, July 19, 1999, the first business day after the
conversation with Harper, the contest was started by Kidde to design a
ladder window hook and the request made to X-It that Kidde wanted to
"Evaluate" the X-It secret patent application.

   Meanwhile, both Ive and Dodge, of X-It, believed that Kidde wanted to
finalize the purchase of X-It prior to August 16. Dodge, the former
financial officer of X-IT, testified that Apperson "wanted to see if we
could wrap up our discussions in time for the hardware show so he could
display our products jointly at the show." (Tr. 1599). Ive testified
concerning photography of the X-It box, "again this was just. . . . this
was just to Kidde's eyes an X-It box, assuming X-It would be owned by
Kidde." (Tr. 1823). Ive testified: "we were told by Mr. Apperson that the
goal was to get this (X-It) sold before the hardware show so that is
could be a Kidde product at the hardware show." (Tr. 324).

   Mr. Oslakovic further compromised his credibility when he had trouble
understanding Mr. Ive's clear directive that X-It's patent application
not be disclosed to Kidde portable without the permission of X-It's
board. (Tr. 3461). Finally, Oslakovic knew he was dealing with Ive
directly, and that Ive had no attorney to protect his interests.
Oslakovic had a clear duty if he did not understand something to request
an explanation.[fn20] For instance, he had trouble understanding what the
word "similar" meant, but he had no hesitation asking that it be
defined. (Tr. 1046-7). Under the rules of professional responsibility

clearly Oslakovic knew exactly what was happening as he was a lawyer who
represented many corporations and has testified
West Page 520
in over 50 depositions prior to this case. The Court is unwilling to
accept any explanation which would indicate that he has no knowledge of
that which even the most novice of lawyers would understand. In
addition, according to Mark Schiefer ("Schiefer"), Vice President of
Kidde Portable, Oslakovic held himself out as "neutral" as late as August
17, 1999. (Tr. 3541). Ive believed that Oslakovic was acting as an
"outside" evaluator. (Tr. 353). Oslakovic never led Ive to any other
conclusion, nor did Oslakovic make inquiry. Oslakovic did not dispute
what Ive told him in the various conversations before shipping the patent
applications. Rather, Oslakovic said he did not remember. He even ignored
Ive's request in the letter to contact him with "any questions or
concerns." Moreover, through August 16, 1999, Oslakovic knew that Ive was
acting without an attorney and he made no attempt to clarify the weird
interpretations which Oslakovic claims he believed. Moreover, he clearly
was indicating to Ive that he was a neutral as late as August 16, 1999.
All of this was an apparent violation of the Rules of Professional
Conduct, Rules 4.3 and 2.10.

   When Oslakovic received a copy of X-It's patent application, according
to his deposition which was read into evidence, he understood "at that
time that the patent application was shared with [him] pursuant to the
terms of a confidentiality agreement." (Tr. 1028-29) Oslakovic, however,
indicates that he never actually received a copy of the June 8, 1999
Confidentiality Agreement, nor did he ever read it. (Tr. 1033). However,
the e-mail from Ive to Oslakovic after the confrontation dated and
delivered August 20 1999, quoting from the confidentiality agreement,
provided as follows:

   Charles

   As per the confidentiality agreement between Kidde
   Safety and X-It Products, LLC. please promptly return
   the patent information we recently forwarded to you
   along with confirmation that no copies have been
   retained.

   This request is in accordance with the 2nd paragraph,
   section (iv) as follows: it (buyer and
   representatives) will promptly return to seller, upon
   seller's request, all copies of any confidential
   information provided to buyer. In this case we would
   like the entire patent information that we passed
   through to you and any copies made by you and your
   company.

   . . . .

   Andrew Ive

   By August 20, 1999, any lawyer reading such a letter would have been
aware of the confidentiality agreement and that the reference to the 2nd
paragraph section (iv) had to refer to such an agreement. Only a fool
would not have been aware of the confidentiality agreement since the
references were to the specific portions and paragraphs of the
agreement. Even a novice attorney of any intelligence would have read or
at least made an inquiry concerning the confidentiality agreement.

Oslakovic testified that he never read it at all, and that he had no knowledge of the agreement, nor did he make any inquiries concerning it. (Tr. 3200).

Oslakovic, however, was the opposite of neutral. Although he did not quote the specific wording and diagrams from the patent, that is probably the only thing that he did not do. He ultimately disclosed chapter and verse in his subsequent correspondence which was withheld from disclosure on a claimed "attorney-client privilege." He disclosed information in the diagrams concerning the looping method of attaching the rings. He had several conversations with Apperson in Mid-August 1999, yet never, in any correspondence,
West Page 521
gave any views about the strength or the potential of the X-It patent application to protect the X-It product from patent infringement which was the contract he and X-It entered, and X-It and Kidde entered. The Court finds as a matter of law that giving his opinion about the strength or weakness of the X-It patent to protect the X-It product was Oslakovic's *only* contractual duty. Instead, he analyzed the patent application from the standpoint of how it would effect the separate and independent ladder supposedly being produced by Kidde Safety, a product that did not exist when he received the instruction, or when he received the secret patent application and the X-It ladder. The Kidde Safety Product was produced by virtue of Oslakovic s improper disclosure. The only product Kidde had as late as August 18, 1999, was the X-It copy with the hook device similar to the chain ladder of Kidde. (Tr. 873). Copies of arty Kidde prototype ladder were not shipped to Oslakovic until September 15, 1999, and September 20, 1999, well after design drawings were made, and disclosures were made by Oslakovic concerning X-It's patent claims.

In essence Oslakovic provided to Kidde Safety, an analysis not of the strength and potential that the X-It ladder had to be protected from infringement, but rather whether Kidde could produce a ladder without any interference from the patent application of X-It. Anyone reading the correspondence would conclude that a massive breach of contract took place. In this manner, Oslakovic clearly and deliberately chose to act solely on Kidde's behalf, and misled Ive into trusting that he was neutral or a trustee of X-It's property. Oslakovic deliberately misinterpreted the clear wording of the instruction and the clear wording of the Confidentiality Agreement. He therefore participated in the fraud and clearly breached the contract embodied in the Confidentiality Agreement and subsequent oral commitments. He totally and clearly violated the terms of the entrustment of X-It's secret property.

Kidde continued to develop its own ladder from copies of the X-It ladder. To wit, on August 27, 1999, a ladder prototype was sent from Fenwick to Tomeo. (Tr. 1158). Again, on September 9, 1999, twelve ladders were shipped from Fenwick to Tomeo. *Id*. On September 26, 1999, well after Oslakovic has seen the X-It patent application and after the 1999 Show, Kidde prepared its first production drawing of a ladder. (Tr. 2349). This first production drawing showed the securing strap, also referred to as the "overwrap" changed to a T-strap. *Id*. Prior to September 15, 1999, Oslakovic had only an X-It ladder. It is interesting to note that all the X-It ladders as well as all X-It copy ladders in possession of Kidde were discarded or destroyed by Kidde prior to discovery in this litigation when litigation was contemplated by Kidde. Drawings which were called the "first set of production drawings and were dated on October 8, 1999." (Tr. 2347-9). The only Kidde ladder available to be tested in the instant litigation was produced on or after September 1999, according to the

Case 2:04-cv-74055-JF-DAS   Document 1-2   Filed 10/18/04   Page 17 of 50

dates on the rungs on Exhibit 311, which were in Oslakovic's office. The
rungs were dated September 1999. Although X-It and Kidde remained in
communication concerning what Ive thought was a possible deal throughout
most of this period, the correspondence indicates that Kidde was
Preparing for a fight or suit and seeking to prevent X-It from amending
its patent application.

   In connection with the June 8, 1999, Confidentiality Agreement, Kidde
has acknowledged that the "only legitimate use" of X-It's confidential
information was "to evaluate the potential transaction." (Tr. 2110).
Therefore, Kidde was not authorized
West Page 522
to use confidential information for any other purpose and certainly not
to introduce a competitive product to X-It's ladder. In reliance on the
confidentiality agreement, as well as the additional agreement between
the parties concerning the scope of Oslakovic's review of X-It's patent
application, X-It shared with Kidde (or Oslakovic, Kidde's representative
patent attorney) confidential information about X-It and the X-It ladder
including X-It's account list and X-It's patent application.
Nonetheless, despite the confidentiality agreements, and the letter
contract forwarding the patent application, Oslakovic read the X-It
patent application and then initially orally shared information with Kidde
concerning X-It's overwrap claims in total breach of the contract.
Oslakovic admitted to advising Kidde of X-It's patent claims concerning
the X-It ladder's overwrap or cover prior to the 1999 National Hardware
Show and the specifics as shown in his correspondence subsequent to
August 15, 1999. On August 15, 1999, Ive confronted Kidde people at the
National Hardware Show about the fact that X-It packages were coped with
the insertion of the Kidde name and that the ladder was an exact copy of
the X-It ladder except for the hooks. On August 16, 1999, before the
Saturday meeting between Ice of X-It and Apperson of Kidde, Oslakovic met
with Apperson for one and a half hours preparing for the so called
"neutral" meeting to follow.

   The correspondence between Oslakovic, the "neutral" lawyer, and
Apperson then proceeded to try to get X-It to agree "not to amend its
patent application." (Ex. 217). Oslakovic was fearful that X-It would
amend its patent application as it could based on its drawings and
indicating that manner of attachment of the rungs to the ladder. He and
Apperson wanted to fool X-it into believing that it was still possible for
Kidde to buy X-It but one thing they wanted was to prevent any amendment
of the patent application. Further correspondence indicated that Kidde
should agree to X-It's conditions for examining the patent application
with Kidde's product not for the purpose of any possible purchase but for
Kidde to look good in the litigation that was sure to follow. (Ex. 217).
There really wasn't any need to compare Kidde's product to X-It's patent
application since Oslakovic had already secretly done it. This latter
correspondence is additional substantial evidence of Kidde's prior intent
to deceive. Kidde has sold in the hundreds of thousands of units of its
web-style ladder since November 1999. On June 15, 2001, Kidde informed
X-It that it would cease selling its current model ladder sometime after
all the current production was used up.

### IV. Under Relevant Law Plaintiff Must Make an Election of Remedies

   Where multiple causes of action result in the same damages and are
based on the same facts, the question arises as to whether and how there
must be an election of remedies. Generally such is a procedural matter
which invokes the forum state law. In federal question cases, the federal

choice of law rules apply. *Union of Flight Attendants v. Air Micronesia,*
684 F. Supp. 1520 (D. Hawai'i 1988) affirmed 902 F.2d 1579, 1990 WL 61982
(9th Cir. 1990) (applying federal common law choice of law rules while
noting that in deciding where a court should look to find conflict of law
principles applicable in a federal case there is little authority); *accord
Pfeiffer v. Wm. Wrigley Jr. Co.,* 755 F.2d 554, 557 (7th Cir. 1985)
(citing Curie, FEDERAL COURTS 447 (3d ed. 1982)); *Edelmann v. Chase
Manhattan Bank,* 861 F.2d 1291, 1293 (1st Cir. 1988) (holding that where
jurisdiction was based on presence
West Page 523
of federal question, conflict of law principles were a matter of federal
common law). When using federal choice of law rules, some courts rely on
the Restatement (Second) of Conflicts. *Id.; Harris v. Polskie Linie
Lotnicze,* 820 F.2d 1000, 1003 (9th Cir. 1987) (relying on the Restatement
as a source for federal common law); *Corporacion Venezolana de Fomento
v. Vintero Sales Corp.,* 629 F.2d 786, 795 (2d Cir. 1980) (noting that a
federal court may resort to federal common law choice of law rules in
federal question cases).

   Traditionally, no matter what choice of law rules apply, matters of
procedure are governed by forum state law. *Keeton v. Hustler Magazine,
Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); RESTATEMENT
(SECOND) OF CONFLICT OF LAWS § 122 (1971). A court will apply foreign
law only to the effect that it deals with the substance of the case, but
will rely on the forum law to deal with the procedural aspects of the
case. *See e.g., Witter v. Torbett,* 604 F. Supp. 298 (W.D.Va. 1984). The
issue of election of remedies is generally considered a procedural
matter. *Myzel v. Fields,* 386 F.2d 718, 741 (8th Cir. 1967) (noting that
in federal diversity cases the doctrine of election of remedies is
considered procedural, and implying that, based on Federal Rule of Civil
Procedure 8, in federal question cases where federal law controls, the
doctrine is applied as procedural if multiple remedies would be
prejudicial t the defendant). Since the election of remedies is a
procedural matter, the law of the forum should apply, and Virginia law
would be the appropriate law to apply to this issue.

   It is well settled under Virginia law that a plaintiff may not recover
in both Tort and Contract for the same course of the Defendant. *Michigan
Mutual Insurance Co. v. Smoot,* 149 F. Supp.2d 229, 234 (E.D.Va. 2001)
(holding that under Virginia Law it would be improper for a plaintiff in
a workman's compensation action to recover in both tort and contract).
The plaintiff may, as X-It did in the case at bar, pursue more than one
theory of recovery, but is entitled to only one full recovery. *See e.g.,
Jennings v. Realty Developers, Inc.,* 210 Va. 476, 171 S.E.2d 829, 834
(1970) (holding that there can be only one recovery where a cause of
action involves that same parties and touches the same subject matter);
*Wood v. Candle-Hyatt Inc.,* 18 Va. App. 391, 444 S.E.2d 3, 8 (1994)
(holding that in the workman's compensation context a plaintiff is
entitled to one full recovery and no more); *Pollard & Bagby v. Morton
G. Thalhimer, Inc.,* 169 Va. 529, 194 S.E. 701, 703 (1938) (holding that a
cause of action can have only one satisfaction).

   Were the Court to determine that North Carolina law should apply on
this issue due to the fact that the Confidentiality Agreement at issue in
this case is governed by North Carolina law, since North Carolina has the
most significant relationship to the contract as well as the wrong, the
results are the same. Under North Carolina law, as under Virginia law, a
plaintiff may not recover on more than one theory for the same course of
conduct. *Poor v. Hill,* 138 N.C. App. 19, 530 S.E.2d 838, 848 (2000)

(holding that in the consumer protection context, should the same course
of conduct give rise to plaintiffs' breach of contract claim and
plaintiffs claims under a consumer protection statute, plaintiffs may
recover damages either for the breach of contract, or for violation of
the statute, butt not for both); *Mehovic v. Mehovic,* 133 N.C. App. 131,
514 S.E.2d 730 (1999) (noting that the purpose of the "election of
remedies doctrine" is to prevent double redress for a single wrong);
*Marshall v. Miller,* 47 N.C. App. 530, 268 S.E.2d 97, 103 (1980), *modified
and aff'd,* 302 N.C. 539,
West Page 524
276 S.E.2d 397 (1981) (holding that where the same course of conduct
gives rise to a traditionally recognized cause of action, as, for
example, an action for breach of contract, and as well gives rise to a
cause of action for violation of a consumer protection statute (in this
case North Carolina Statute G.S. 75-1.1), damages may be recovered either
for the breach of contract, or for violation of the statute, but not for
both); *Mapp v. Toyota World, Inc.,* 81 N.C. App. 421, 344 S.E.2d 297, 301
(1986), *disc. review denied,* 318 N.C. 283, 347 S.E.2d 464 (1986) (holding
that upon a damage verdict favorable to plaintiffs at retrial on their
statutory claim and the trial court's determination that the "same course
of conduct" gave rise to plaintiffs' breach of contract as well,
plaintiffs must elect their damages remedy).

Federal law also prohibits multiple recovery for one cause of action or
set of injuries. Election of remedies is "the legal version of the idea
that a plaintiff may not have his cake and eat it too." D. Dobbs,
REMEDIES § 1.5 at 14 (1973). The doctrine is remedial in nature and
does no more than prevent double recovery. *Id.* at 16. Although the
doctrine has been interpreted many ways, what it means in this case is
that X-It is entitled to the greatest amount recoverable under any single
theory pled that is supported by the evidence. *Hickson v. Norfolk
Southern Railway,* 260 F.3d 559, 566-7 (6th Cir. 2001); *Christopher's
Arizona Transportation Service, Inc. v. Duncan,* 217 F.3d 838, 2000 WL
895257 (4th Cir. 2000) (holding in an unpublished opinion that a jury
award that constituted double recovery was properly stricken). The Fourth
Circuit has held in an unpublished opinion that 'where a plaintiff seeks
recovery for the same damages under different legal theories, only a
single recovery is allowed.'" *McCune v. Xerox Corp.,* 225 F.3d 654, 2000
WL 1012962. *5 (4th Cir. July 24, 2000) (quoting *Conway v. Icahn &
Co., Inc.,* 16 F.3d 504, 511 (2d Cir. 1994)); *see also Transamerica
Occidental Life Ins. Co. v. Sanders,* 91 F.3d 134, 1996 WL 378310, *1 (4th
Cir. July 8, 1996) (per curiam) (vacating judgment and remanding for
plaintiffs election of remedies because plaintiff "is not entitled to
damages for both causes of action on the same conduct" in an unpublished
opinion); *Winant v. Bostic,* 5 F.3d 767, 775 (4th Cir. 1993) (stating that
"although a party may assert claims for money damages based on fraud,
breach of contract, and unfair and deceptive trade practices, he may
succeed on only one basis"); *Diaz Vicente v. Obenauer,* 736 F. Supp. 679,
696 (E.D.Va. 1990) (stating that "although plaintiffs are entitled to
damages under various legal theories, they are only entitled to receive
one recovery for their single injury").

Supreme Court jurisprudence also heavily disfavors double or
multiplicative recovery. As the Supreme Court has noted several times,
and most recently on January 15, 2002, "it goes without saying that the
courts can and should preclude double recovery." *Equal Employment
Opportunity Comm'n v. Waffle House,* 534 U.S. 279, 122 S.Ct. 754, 766, 151
L.Ed.2d 755 (2002) (quoting *General Telephone Company of the Northwest
v. Equal Employment Opportunity Comm'n,* 446 U.S. 318, 333, 100 S.Ct.

1698, 64 L.Ed.2d 319 (1980)).

In deciding procedural issues, the local law will apply, but in deciding matters concerning the contracts or wrongs, the state law of the state "with the most significant relationship" should apply. *See*, RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6, comment (c) at 12 (1971); *see*, *e.g.*, *New England Leather Co. v. Feuer Leather Corp.*, 942 F.2d 253, 255-56 (4th Cir. 1991). Here, this Court will apply the West Page 525 Virginia Law for procedural issues, specifically the election of remedies issue. North Carolina Law, as the state with the most significant contacts, will apply for substantive issues. Further, the Plaintiff must make an election of remedies since courts universally reject multiple recovery on the same cause of action. This result is the same whether Virginia, North Carolina, or Federal Common law is applicable.

## V. Contract Law

The Court found as a matter of law that two agreements existed in this case; the June 8, 1999 written Confidentiality Agreement executed by representatives of X-It and Kidde, and the supplemental agreement between X-It, Kidde, and Charles S. Oslakovic, Esquire. The Court further found that X-It proved that Kidde breached the agreements. The jury found that X-It suffered damages as a result of these breaches in the amount of $3,151,654.00.

When the parties use clear and unambiguous terms, the Court may interpret the contract as a matter of law, and it is given the interpretation the parties intended at the time of formation. *Martin v. Ray Lackey Enterprises, Inc.*, 100 N.C. App. 349, 396 S.E.2d 327 (1990). Where the terms are clear and unambiguous, they are given the ordinary meaning and whether a term is ambiguous is a question of law. *Hahn v. Hahn*, 324 Ill. App.3d 44, 257 Ill.Dec. 803, 754 N.E.2d 461 (2001). Further, "[w]hether a contract imposes a particular legal duty is a question of law rather than an issue of fact and where a tort is alleged by virtue of the breach of contract, the scope of the duty is determined by the terms of the contract." *Frederick v. Professional Truck Driver Training School, Inc.*, 328 Ill. App.3d 472, 262 Ill.Dec. 535, 765 N.E.2d 1143, 1151-52 (2002).

Here the contract was clear and unambiguous. The patent application which was secret was entrusted to Oslakovic to determine of the patent would protect the X-It ladder which was the product. He was only to advise whether the patent was "weak or strong." Under no circumstances was he to disclose "claims." He totally and completely breached the contractual agreement. He described the patent claims in order to allow Kidde to market a competing product. Kidde also breached the contract otherwise it would have purchased X-It.

## VI. Recovery Under Federal Copyright Law

In Count I of X-It's Amended Complaint, X-It asserted a claim against Kidde for violations of Section 106 of the Copyright Act by reproducing and displaying X-It's photograph and cover art on Kidde's packaging, sell sheets, and Power-Point presentations at the 1999 Show as well as on Kidde's commercially available packaging.[fn21] At trial it became apparent that Kidde had copied and usurped X-It's copyright and trade dress. First, the images on the two boxes were deceptively similar. X-It sold its ladder in a box depicting a young boy leaving a burning house

through a window, heading towards his mother waiting below. The models
for this picture were the relatives of Aldo DiBelardino, one of the
initial founders of X-It. This picture was at the Hardware
West Page 526
Show in the Kidde box, and being shown as a Kidde product. Kidde sold its
own ladder in a modified copy of the X-It box featuring the same
photograph without the DiBelardino relatives. Kidde began to sell its
ladder, now called the "Kidde Emergency Escape Ladder," (rather than
"X-It Emergency Escape Ladder") in a box depicting a young boy leaving a
burning house through a window, heading towards his mother waiting
below; the exact same template as X-It had used and copyrighted. Although
different models were used, this picture is of the exact same conception
"is X-It's.

   There are also similarities in the wording and placement of claims on
the two boxes, and Kidde copied the bullet points X-It presented which
did not apply to the Kidde product. While the similarities between the
two boxes, X-It's original trade dress and Kidde's imitation, are too
numerous to list, the following is a sampling of the egregious nature of
the similarities. First, X-It's box states that among the ladder's
"superior features" are the facts that the ladder is "easy to use,"
"tangle free," and "flame resistant"; these claims being made in bullet
points on the front of the box. Kidde's box stated the exact same
"superior features" in a similar format on its box, this despite the fact
the Kidde's ladder was later shown to be non flame resistant. In fact,
tests indicate it was not flame resistant. This was a false claim by
Kidde but copied from the X-It box. Also, X-It states on the side of its
box that the ladder rungs were tested to 1000 pounds. This same claim is
made on the side of Kidde's box despite the fact that Kidde's ladder was
never so tested and the evidence indicated it could not so sustain, and
evidence indicated that it would not pass such a test. This was a false
claim by Kidde copied from the X-It box. X-It included a paragraph on one
side of its box stating: "[e]ighty percent of all deaths from fire occur
in the home. Provide your family with a safe way out with X-It." Kidde
provided a strikingly similar paragraph on its box stating: "[e]ighty
percent of all deaths from fire occur in the home. Provide your family
with a safe way out with the Kidde Emergency Escape Ladder." Rather than
recommending the consumer to "Keep an X-It ladder in every upper floor
room!" Kidde recommends on its box for every consumer to "Place a Kidde
Escape Ladder in every upper floor room!" A final example, though by no
means the entirety of the sweep of infringement, is the fact that X-It
announced across the bottom of its box that the ladder was 13 feet long;
Kidde made this same claim, in the same position on its box, but the
Kidde ladder was not 13 feet long. This was another false assertion by
Kidde.

   Kidde previously had a "fire escape ladder." They, in copying, called
their ladder just as X-It, "Emergency Escape Ladder" not "fire escape
ladder." It is clear that rather than making substantiated claims
regarding its ladder, Kidde simply copied X-It's box, making a few thinly
disguised format changes, and in some cases only changing the name of the
ladder from the X-It box for use on the Kidde box.

   Copyright protection for original artwork is provided by
17 U.S.C. § 102 (a). That section states that:

   (a) Copyright protection subsists, in accordance with
   this title, in original works of authorship fixed in
   any tangible medium of expression, now known or later

developed, from which they can be perceived,
reproduced, or otherwise communicated, either directly
or with the aid of a machine or device. Works of
authorship include the following categories: (1)
literary works; (2) musical works, including any
accompanying

West Page 527

words; (3) dramatic works, including any accompanying
music; (4) pantomimes and choreographic works; (5)
pictorial, graphic, and sculptural works; (6) motion
pictures and other audiovisual works; (7) sound
recordings; and (8) architectural works.

17 U.S.C. § 102 (a).

Only the copyright owner, or the owner of exclusive rights under the
copyright, at the time the alleged acts of infringement occur, has
standing to bring an action for infringement of those rights. *See ABKCO
Music, Inc. v. Harrisongs Music, Ltd.,* 944 F.2d 971, 980 (2d Cir. 1991).
Moreover, the Copyright Act provides, in relevant part, that "[t]he legal
or beneficial owner of an exclusive right under a copyright is entitled
to institute an action for any infringement of that particular right
committed while he or she is the owner of it." 17 U.S.C. § 501 (b).
Therefore, in order to establish a claim of copyright infringement, a
plaintiff must prove both (1) ownership of a valid copyright; and (2)
copying of constituent element: of the work that are original. *See Feist
Publications v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282,
113 L.Ed.2d 358 (1991). Alternatively, copyright protection is denied to
so-called "functional" material on product labels or packaging. *See Gray
v. Eskimo Pie Corp.,* 244 F. Supp. 785, 788 (D.Del. 1965) (holding that
functional items such as "slogans, names, listing of ingredients or
contents," are not subject to copyright).

It is undisputed that on June 9, 2000 the U.S. Copyright Office issued
two certificates of registration to X-It covering both the photograph on
X-It's box and the cover art on X-It's packaging. The Court found in its
Opinion and Order on Summary Judgment that Kidde infringed X-It's
copyright in its photograph at the 1999 National Hardware Show. The Court
found that the undisputed evidence in this case made clear that X-It did
have standing to sue Kidde for Kidde's alleged infringement at the 1999
Show and Kidde's allegedly continuing infringement of X-It's copyright.
The Court held in this Opinion and Order, that in accordance with federal
Copyright Law X-It would be entitled to actual damages for lost profits,
but not to statutory damages.

At trial, the jury found that X-It had proved that it should recover
for Kidde's alleged copyright infringement of the photograph, and the
cover art as a whole, on the box after the 1999 Show. To wit, the jury
awarded $200,000.00 for damages proximately caused by Kidde's copyright
infringement at the 1999 show and $642,556.00 for damages proximately
caused by Kidde's copyright infringement after the 1999 Show for a total
of $842,556 in damages on the Copyright infringement Count. The total sum
was the profit that Kidde gained from the sale of the product which was
packaged and displayed in copyrighted material.

Although damages are not an element of the prima facie case for
copyright infringement, *see Davidov v. Tapemeasure Enters., Inc.,* 27
U.S.P.Q.2d 1382, 1386, 1993 WL 88234 (S.D.N.Y. 1993), the Court
nonetheless addressed some of the outstanding issues in an effort to

Case 2:04-cv-74055-JF-DAS    Document 1-2    Filed 10/18/04    Page 23 of 50

resolve these disputes prior to trial. The first issue that Kidde raises
is that, under the Copyright Act, statutory damages — an
alternative to actual damages and profits-are available to a plaintiff in
a copyright infringement action only where the plaintiff has registered
his or her copyright pursuant to the requirements of the Copyright Act.
*See* 17 U.S.C. § 412. More importantly, a plaintiff is not entitled to
recover statutory damages, which include costs and attorneys' fees, for
any infringement of plaintiffs copyright that
West Page 528
commenced prior to the effective date of copyright registration,
regardless of whether the infringement continues after the effective date
of copyright registration. *See id.; see also Johnson v. University of
Virginia,* 606 F. Supp. 321, 324 (W.D.Va. 1985) (holding that the recovery
of statutory damages and attorney fees is barred for an infringement of
photographs that occurred before the copyright was registered, and
continuing use of photographs after registration does not reestablish the
right to recover statutory damages and attorneys' fees).

In the instant case, it is undisputed that X-It's copyrights for the
artwork on its packaging were not registered with the U.S. Copyright
Office at the time of Kidde's infringement of those copyrights on August
15, 1999 at the trade show. Indeed, X-It's copyrights were not registered
until June 9, 2000 — more than six (6) months after the alleged
infringement of X-It's copyrights began with respect to Kidde's
commercially available packaging. Consequently, the Court finds that X-It
may not recover statutory damages under 17 U.S.C. § 504 and 505 for
either Kidde's infringement of X-It's copyrights at the 1999 Show or
Kidde's alleged infringement of X-It's copyrights with respect to Kidde's
commercially available packaging that went on the market during the last
quarter of 1999.

Once infringement is established, X-It is entitled to recover "the
actual damage suffered by [X-It] as a result of the infringement, and any
profits of the infringer that are attributable to the infringement and are
not taken into account in computing the actual damages."
17 U.S.C. § 504 (b). That section also provides that "[i]n
establishing the infringer's profits, the copyright owner is required to
present proof only of the infringer's gross revenue, and the infringer is
required to prove his or her deductible expenses and the elements of
profit attributable to factors other than the copyrighted work." *Id.*

Moreover, even if X-It had not been entitled to actual damages, X-It
may still be entitled to Kidde's profits that are earned as a result of
the alleged infringement. *See* 17 U.S.C. § 504 (b). Again, that
statute states that "[i]n establishing the infringer's profits, the
copyright owner is required to present proof only of the infringer's
gross revenue, and the infringer is required to prove his or her
deductible expenses and the elements of profit attributable to factors
other than the copyrighted work." *Id.* Thus, as the Fourth Circuit held in
*Konor Enterprises v. Eagle Publications,* 878 F.2d 138, 140 (4th Cir.
1989), "regardless of the magnitude of the infringement," once there is a
finding of copyright infringement and a demonstration by the plaintiff of
the defendant's revenues, the burden shifts to the defendant to prove
what portion of its revenue did not result from the infringement. *See
id.*

In conclusion, although X-It was not entitled to statutory damages
under 17 U.S.C. § 504 (c) or costs and attorneys' fees under
17 U.S.C. § 505, for violation prior to the registration, X-It put

forth enough evidence to support the jury award for the non-statutory,
actual damages. The Defendant failed to show any "deductible expenses and
elements of profit attributable to factors other than the copyrighted
work." Thus, the Plaintiff's claims concerning net profits of $842,556
are unrebutted and clearly appropriate.

## VII. Recovery Under the Lanham Act

Counts II and III of X-It's Amended Complaint alleged trade dress
infringement and false advertising in violation of
West Page 529
§ 43(a) of the Lanham Act, 15 U.S.C. § 1125 (a).

\*   \*   \*   \*   \*   \*

Section 43(a) of the Lanham Act relating to trade dress violations,
provides, in pertinent part:

> Any person who, on or in connection with any goods
> . . . uses in commerce any word, term, name, symbol,
> or device, or any combination thereof . . . which (A)
> is likely to cause confusion . . . or to deceive as
> to the affiliation, connection, or association of
> such person with another person as to the origin,
> sponsorship, or approval of his or her goods by
> another person . . . shall be liable in a civil action
> by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C. § 1125 (a).

In order to establish liability for trade dress infringement under the
Lanham Act, X-It must prove (1) that its trade dress is either (a)
inherently distinctive or (b) has acquired secondary meaning so that it
is perceived as identifying and distinguishing the source of the goods;
(2) that its trade dress is nonfunctional; and (3) that Kidde's trade
dress is likely to cause confusion among the relevant purchasing public.
*See, e.g., Prufrock Ltd. v. Lasater,* 781 F.2d 129 (8th Cir. 1986). As
discussed above, Kidde's infringement and use of trade dress that is
strikingly similar to X-It's was egregious.

On the Trade Dress Infringement issue, the jury found that X-It had
proven that its packaging trade dress was either inherently distinctive or
had acquired secondary meaning. The jury also found that X-It had proven
that its packaging trade dress was non-functional, and that Kidde's
packaging for its emergency escape ladder was likely to cause confusion.
These jury findings art supported by the facts, and one only need
consider the striking similarities between the two boxes to be satisfied
with the findings. Moreover, the testimony clearly indicated that the
Defendant made no independent research to arrive at the trade dress, but
merely copied, for the most part, the Plaintiff's trade dress.

Regarding damages available under the Lanham Act for Trade Dress
Infringement, the Court notes that the Lanham Act does not tie an award
of monetary relief into an assessment of the plaintiffs actual damages.
*See Wesco Mfg. Inc. v. Tropical Attractions of Palm Beach, Inc.,*
833 F.2d 1484 (11th Cir. 1987) (reversing the district court's denial of
an accounting and noting that a plaintiff need not prove actual damages
to obtain an accounting of the infringer's profits). Rather, the Lanham

Act provides that a plaintiff is entitled, subject to the principles of equity, to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117 (a). As Judge Cacheris wrote in Black & Decker, the "trial court's primary function is to make violations of the Lanham Act unprofitable to the [violating] party." *Black & Decker Inc. v. Pro-Tech Power, Inc.,* 26 F. Supp.2d 834, 855 (E.D.Va. 1998). To obtain an accounting of an infringer's profits under the Lanham Act, "[i]t is enough that the plaintiff proves the infringer's sales. The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales." *Wesco Mfg. Inc.,* 833 F.2d at 488. Consequently, the jury reasonably concluded that X-It has suffered actual damages due to Kidde's conduct, and X-It need not have shown actual damages to obtain an accounting of Kidde's profits.

Two separate incidents of alleged false advertising comprised X-It's allegations of false advertising under the Lanham Act.
West Page 530
First, X-It complained of Kidde's actions at the 1999 Show, where Kidde's packaging for its new emergency escape ladder stated that the new Kidde ladder was "flame resistant," "tested to 1,000 lbs.," "fit[s] any window," and that the new Kidde ladder was "the strongest, safest, smallest emergency escape ladder." X-It contends that all of these statements were literally false or misleading. Second, X-It complained that Kidde's then commercially available packaging also makes the following false claims: that the new Kidde ladder is "flame resistant," "tested to 1,000 pounds," "attaches quickly to any window," and is "safe" and is 13 feet long. All of these were false.

The Lanham Act provides that any "false or misleading description of fact" or "false or misleading representation of fact" is actionable. 15 U.S.C. § 1125. In order to establish a false advertising claim under the Lanham Act, the plaintiff must show that the defendant:

(1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff.

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 971 (7th Cir. 1999).

The jury found that Kidde's packaging at the 1999 Show constituted a Lanham Act Violation, and that Kidde violated the Lanham Act's prohibition against false advertising.

On the issue of damages relating to the false advertising issue, the Court found before trial that a Lanham Act plaintiff need not prove actual consumer confusion or lost sales because of the false or deceptive advertising to assert a Lanham Act claim; all that is required is the likelihood of deception. *See Balance Dynamics v. Schmitt Indus.,* 204 F.3d 683, 689 (6th Cir. 2000). In addition, as with X-It's Lanham Act trade-dress claim under Count II, X-It is not required to show actual damages to maintain its Lanham Act false-advertising claim under Count III and therefore recover the remedies provided in 15 U.S.C. § 1117, including an accounting of Kidde's profits. *See Wynn Oil Co. v. American*

*Way Serv. Corp.,* 943 F.2d 595, 606 (6th Cir. 1991); *Web Printing Controls, Co. v. Oxy-Dry Corp.,* 906 F.2d 1202, 1203 (7th Cir. 1990); *Wesco Mfg. Inc. v. Tropical Attractions of Palm Beach,* 833 F.2d 1484, 1487-88 (11th Cir. 1987). On this Lanham Act violation, the jury found damages of $842,556 representing $100,000 for trade dress violation, $500,000 for false advertising at the 1999 Show, and $242,556 for false advertising at the 1999 Show. The $842,556 was the net profit from the sale of the ladders in the falsely labeled packaging.

## VIII. North Carolina is the State with the Most Significant Relationship

   The Court finds that North Carolina is the state with the most significant relationship to the events in the instant case, and that North Carolina substantive law should apply. The Defendant, Kidde, is located in Mebane, North Carolina. Mebane, North Carolina is the distribution point from which Kidde products are placed in the stream of commerce. It is the center of the functions of Kidde. It is the location of the offices and officers of Kidde. Moreover, products at issue in the instant litigation, namely infringing products and packaging, were copied and initially produced in North Carolina. The ultimate ladders and packages were manufactured in China and shipped to North
West Page 531
Carolina from China. Subsequently they were shipped from North Carolina into the stream of commerce. Oslakovic, though located in Illinois, and others, offered advice to the officers of Kidde who were located in North Carolina, and breached the contract by conveying information to Kidde in North Carolina. However, the entrustment contract from X-It to Oslakovic was made in Illinois and the breach occurred in North Carolina when the information was transmitted by Oslakovic.

   A central issue of this case revolves around the Confidentiality Agreement executed by Ive, president of X-It, and Apperson, representing Kidde, and later flouted by Oslakovic. This Confidentiality Agreement, the details of which are embodied in the fact section of this opinion, had a clause stating that North Carolina law would govern all aspects of the Confidentiality Agreement, and that this contract would be construed under North Carolina law. The Confidentiality Agreement was an integral part of the negotiations for the possible purchase of X-It by Kidde. Likewise, the in person negotiations for the possible purchase of X-It by Kidde, which relied heavily on adherence to the Confidentiality Agreement, took place in North Carolina.

   In fact, the only substantial event to occur outside of North Carolina was the National Hardware Show in Illinois, and the fact that Oslakovic kept his offices in Illinois, and therefore the entrustment of the secret X-It patent application was made in Illinois. There were sales of the infringing packaging throughout the United States, but there was no effort by either party at trial to distinguish infringing sales which occurred in these separate states. The ladders in the infringing packaging that were displayed at the National Hardware Show were returned to Kidde offices in North Carolina. In fact, these, and all other sample ladders copied from X-It's ladder, were shipped from China directly to Kidde offices in North Carolina. After August 18, 2002, when it was obvious that X-It might sue Kidde, Kidde destroyed all copied samples of the X-It ladder, in bad faith, in North Carolina.

## IX. Recovery Under Illinois Law

   In its Complaint, X-It raises claims under the Illinois Trade Secrets

Act ("ITSA"), the Illinois Consumer Fraud and Deceptive Business
Practices Act or Illinois Consumer Fraud Act ("ICFA"), and Illinois
Common law. None of these causes of action is appropriate, and none would
render relief to X-It. Illinois Common law claims are preempted by ITSA
claims as discussed in part A below.

## A. The Illinois Trade Secrets Act

The purpose of the Illinois Trade Secrets Act is to safeguard
intellectual property and business information by codifying, and
eliminating inherent inconsistencies in existing common law relating to
trade' secrets. *Flavorchem Corp. v. Mission Flavors and Fragrances,
Inc.,* 939 F. Supp. 593 (N.D.Ill. 1996).

To establish a violation of the Illinois Trade Secrets Act ("ITSA") the
Plaintiff must prove three elements: 1) the existence of a "trade
secret", 2) the misappropriation of that trade secret, and 3) that the
secret is used in the defendant's business. ITSA §§ 2 and 3; *RKI Inc.
v. Grimes,* 177 F.Supp.2d 859 (N.D.Ill. 2001); *Labor Ready Inc. v.
Williams Staffing,* 149 F.Supp.2d 398 (N.D.Ill. 2001); *PepsiCo, Inc. v.
Redmond,* 54 F.3d 1262, 1268 (7th Cir. 1995). ITSA defines a trade secret
as:

> Information, including but not limited to, technical
> or non-technical data, a formula, pattern,
> compilation, program, device, method, technique,
> drawing, process, financial data, or list of actual or
> potential

West Page 532

> customers or suppliers that: (1) is sufficiently
> secret to derive economic value, actual or potential,
> from not being generally known to other persons who
> can obtain economic value from its disclosure or use;
> and (2) is the subject of efforts that are reasonable
> under the circumstances to maintain its secrecy or
> confidentiality.

The focus of the ITSA in determining whether information is a trade
secret is "on the secrecy of the information sought to be protected."
*Stampede Tool Warehouse, Inc. v. May,* 272 Ill. App.3d 580, 209 Ill.Dec.
281, 651 N.E.2d 209, 215 (1st Dist. 1995). The key factor to establishing
secrecy "is the case with which the information can be readily duplicated
without involving considerable time, effort or expense." *Id.* Where the
information is not "readily ascertainable" from a public source but,
rather, is developed over time with a substantial amount of effort and
expense, the information is "secret." *Id.,* 651 N.E.2d at 216.

In the case at bar, the Plaintiff has established, and the jury found,
the existence of a trade secret in the patent application of the X-It
ladder. Plaintiff also established, and the jury found, misappropriation
by the defendant. Illinois courts have defined misappropriated as
"stolen, rather than developed independently or obtained from a third
source." *Labor Ready Inc.,* 149 F. Supp.2d at 411. As discussed below,
X-It provided its patent and copyright information to Kidde in connection
with negotiations. However, the jury found that this did not prevent the
secrets from qualifying as "stolen." Thus, X-It has a valid claim under
the Illinois Trade Secrets Act, but as discussed, must elect its remedy.

Section 8(a) of the ITSA provides that: "This Act is intended to

displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of trade secret." 765 ILCS 1065/8(a). Therefore, the ITSA is the exclusive remedy for misappropriation of trade secrets. *See Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir. 1992); *AutoMed Tech., Inc. v. Eller,* 160 F.Supp.2d 915, 921 (N.D.Ill. 2001). However, Section 8(b) provides that the ITSA does not affect or displace contractual remedies, other civil remedies that are not based upon misappropriation of trade secrets, and criminal remedies. 765 ILCS 1065/8(b). Thus, common law claims that are based on different theories are permissible. *AntoMed,* 160 F. Supp.2d at 922. In the case at bar, X-It's common law claims are based on a similar theory as their ITSA claims. However, any common law claims are preempted by the Act, and any recovery to the Plaintiff must be under the act based on the same theory.

The jury established that the ITSA claims were appropriate in the case at bar, and the issue of punitive damages remains. Punitive damages are valid under ITSA only in certain cases. Under the statute, a plaintiff may recover exemplary damages for a competitor's **willful and malicious** misappropriation of plaintiffs trade secret. Such a finding of malicious misappropriation may be supported by evidence that defendant's corporate officer was unconcerned about employee's indications that use of misappropriated information might be "troublesome" and would likely prompt a lawsuit. *Mangren Research and Development Corp. v. National Chemical Co., Inc.,* 87 F.3d 937, 946 (7th Cir. 1996).

Willful and malicious misappropriation giving rise to punitive damages can arise under varying sets of facts, and the phrase "willful and malicious misappropriation" can include both an intentional misappropriation and a misappropriation resulting
West Page 533
from the conscious disregard of the rights of another. *Id.* The fact that defendant or defendant's agent knew he was acquiring trade secret information indicates willful and malicious misappropriation. and may justify a punitive damage award. However, a situation in which the defendant or defendant's agent did not know but should have known he was acquiring trade secret information lessens the degree of culpability, which may lessen or eliminate the award of punitive damages. *Chemetall v. ZR Energy,* 2002 WL 23826 (N.D.Ill 2002 slip op.). In this case, the jury did find that Kidde's behavior in misappropriating X-It's trade secret was willful and malicious under the Illinois Trade Secrets Act, but the jury did not award punitive damages under the Illinois Trade Secrets Act. Since the Illinois Trade Secrets Act preempts any common law claims based on misappropriation, no punitive damages will lie under Illinois common law for misappropriation. What makes this more complex is the factual situation concerning the misappropriation of the trade secret. The misappropriation of the information from the patent application did not take place until the communication of the information was received by Kidde in North Carolina from Oslakovic in Illinois. Thus, the "willful and malicious misappropriation' would have occurred in North Carolina, the Place of the injury. Thus, this action does not he and the jury award is set aside for this Count.

**B. The Illinois Consumer Fraud Act**

The purpose of the ICFA is to protect Illinois consumers, borrowers and businessmen, and Illinois has a legitimate interest in ensuring that businesses principally situated in its jurisdiction comply with its

laws. Neither the interest of Illinois in policing Illinois corporations, nor its interest in protecting Illinois consumers and businesses, is served by assessing damages against Kidde under Illinois law in this case.

Further, the jury should not have considered the request for punitive damages under the ICFA because Illinois law provides that there is no right to a jury trial under that Act. *Martin v. Heinold Commodities, Inc.,* 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734, 755 (1994); *but see Cellular Dynamics v. MCI Telecommunications Corp.,* 1997 WL 285830, *7-*8, 1997 U.S. Dist. LEXIS 7466 *24-*27 (N.D.Ill. 1997).

Under Illinois law, punitive damages are not a matter committed to the sound discretion of the jury, but rather are in the first instance a question of law. *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 259, 384 N.E.2d 353, 359 (1978). Thus although juries may receive the issue of punitive damages for consideration, it is the judge's responsibility to impose them, and the jury instructions on punitive damages under Illinois law were improper except for any advisory purpose.

Although the Illinois Consumer Fraud and Business Practices Act may apply to this case there were no damages shown from that particular violation. The first 16,000 ladders manufactured and sold by Kidde mostly in late 1999 or early 2000 were not flame resistant but were made from flammable polypropylene. These ladders. however, were advertised as "flame resistant," a claim copied directly from X-It's packaging. In addition these ladders were advertised as being 13 feet long when they were actually approximately 11 feet long. Again, this claim was copied directly from X-It's packaging. Subsequently this was changed as the Kidde ladders came in different sizes and were made from a different material. Fun her, Kidde claimed that these ladders had been tested to 1,000 pounds, another
West Page 534
claim copied from X-It's packaging, when in fact they had not. There was no showing of damages to consumers attributable to the sale of the initially offending ladders although one or more of such ladders may have been sold in Illinois. Damages were shown relating to copyright costs and expenses, to the profits of Kidde materially, and to the value of X-It at the time of the breach of contract or fraudulent misappropriation of trade secrets. Thus damages to consumers as envisioned by this act were not shown.

While the ICFA is not limited only to consumers, it is primarily for the protection of consumers. *Lake County Grading Co. of Libertyville Inc. v. Advance Mechanical Contractors, Inc.,* 275 Ill.App.3d 452, 211 Ill.Dec. 299, 654 N.E.2d 1109 (1995); *Industrial Specialty Chemicals, Inc. v. Cummins Engine Co., Inc.,* 902 F.Supp. 805 (N.D.Ill. 1995). Further, the act has been held inapplicable to consumers affected, or business conducted, outside the state of Illinois. *Alcar Group, Inc. v. Corporate Performance Systems Ltd.,* 109 F.Supp.2d 948 (N.D.Ill. 2000).

A business may fall under the ambit of the act if it meets the "consumer nexus test" by alleging that challenged conduct involves trade practices directed to consumer protection issues or the market generally, *3Com Corp. v. Electronics Recovery Specialists, Inc.,* 104 F. Supp.2d 932 (N.D.Ill. 2000); *Stepan v. Winter Panel Corp.,* 948 F.Supp. 802 (N.D.Ill. 1996). Where plaintiff attempts to allege violation of the Act in a case which appears on its face to involve only breach of contract,

relevant inquiry is whether the alleged conduct involves trade practices
addressed to the market generally or otherwise implicates consumer
protection concerns. *Lefebvre Intergraphics. Inc. v. Sanden Mach. Ltd.,*
946 F. Supp. 1358 (N.D. Ill. 1996). A plaintiff alleging violation of the
Illinois Consumer Fraud and Deceptive Business Practices Act must prove
by clear and convincing evidence that there is some nexus between the
conduct complained of and consumer protection concerns. *Brody v. Finch
University of Health Sciences/The Chicago Medical School,*
298 Ill. App.3d 146, 232 Ill.Dec. 419, 698 N.E.2d 257 (1998). Illinois
case law makes it clear that disputes between businessmen, who are not
consumers of each other's goods or services, do not fall within the act.
*Century Universal Enterprises, Inc. v. Triana Development Corp.,*
158 Ill. App.3d 182, 110 Ill.Dec. 229, 510 N.E.2d 1260 (1987) (overruled
on other grounds).

    In the case at bar, neither party is a consumer as conceived by the
statute, and neither party is entitled to the protection of the statute.
Further, although some infringing activity undoubtedly took place in
Illinois, at the National Hardware Show, the majority of, and most
egregious activity occurred in North Carolina. Thus, X-It, not having
shown compensatory damages attributable to the act, and not having shown
that it is a consumer, is not entitled to recover under the Illinois
Consumer Fraud and Deceptive Business Practices Act in this case.
Moreover, the "most significant relationship test" would indicate that
the appropriate law to apply is that of North Carolina and not that of
Illinois.

    Even if recovery were permissible under the ICFA, damages are limited
to the recovery of those "which might be reasonably expected to follow
from the character of the misrepresentation itself." *Martin v. Heinold
Commodities, Inc.,* 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734, 748
(1994). This has not been shown. Although X-It claims that its recovery
under the Illinois Consumer' Fraud and Deceptive Business Practices count
is permissible because that statute permits the recovery of "actual
economic damages or any
West Page 535
other relief which the court deems proper," this language is not broad
enough to encompass reasonable royalty damages. 815 Ill. Comp. Stat.
505/10a (2001). It might encompass the profits derived from the sales to
the consumers in Illinois, but theme was no showing of that. Moreover,
the jury should not have been instructed on this issue.

## X. Recovery Under North Carolina Law

    The Court has determined that North Carolina is the state with the most
significant relationship to this case. Thus, North Carolina substantive
law applies to the unfair trade practices issues raised by the Plaintiff
in the case at bar.[fn22] The Plaintiff invoked the North Carolina Trade
Secrets Protection Act, the North Carolina Unfair Trade Practices Act,
and unfair business practices under the common law of North Carolina. The
Confidentiality Agreement, a contractual obligation, itself was breached
under North Carolina law.

### A. The North Carolina Trade Secrets Protection Act

    In Count Five of their Complaint, X-It alleged that Kidde
misappropriated a trade secret in violation of the North Carolina Trade
Secrets Protection Act. The jury found for the Plaintiff on this claim
and awarded $3,151,654.00 in compensatory damages plus $25,000,000 in

punitive damages.

Under the North Carolina Trade Secrets Protection Act, "actual damages
may be recovered, measured by the economic loss or the unjust enrichment
caused by misappropriation of a trade secret, whichever is greater."
N.C. Gen. Stat. § 66-154(b). Further, "[i]f willful and malicious
misappropriation exists, the trier of fact also may award punitive
damages in its discretion." N.C. Gen.Stat. § 66-154(c).

The economic loss suffered by the Plaintiff was that which they would
have reasonably obtained had the Defendant not violated the Trade Secrets
Act. The jury found that the Plaintiff suffered $3,151,654.00 in damages
which was based on the testimony of the Plaintiff's expert, Troxel. This
was based on a $1,000,000 down payment and a $3.50 royalty for ladders
for five years discounted for present value of a lump sum payment. (Tr.
1211-12).

According to Solomon, the Chief Financial Officer of Kidde, the value
to Kidde of X-It's ladder business could be higher or lower than $6.5
million or greatly below that according to his testimony. (Tr. 3681).
Solomon initially made an offer of $600,000 plus $2.00 per ladder to X-It
for its business. (Tr. 3690). The damage figure of $3,151,654.00 was a
reasonable figure of the amount that would have ultimately been paid for
X-It by Kidde if it had not misappropriated the patent application
information discounted to August 16, 1999.

Any punitive damages to be awarded under this statute, however, must be
determined in accordance with North Carolina's general statute on
punitive damages which "applies to every claim for punitive damages,
regardless of whether the claim for relief is based on a statutory
West Page 536
or a common law might of action or based in equity. N.C. Gen. Stat §
1D-10. The statute provides that punitive damages are proper only where
the defendant is liable for compensatory damages and where the defendant
acted with fraud, malice, or willful or wanton conduct. N.C. Gen. Stat
§ 1D-15(a). The jury has determined that Kidde acted willfully and
maliciously, thus, punitive damages may be proper under the North
Carolina Trade Secrets Protection Act.

Under North Carolina's general statute regarding punitive damages, any
punitive damage award "shall not exceed three times the amount of
compensatory damages or two hundred fifty thousand dollars ($250,000),
whichever is greater". Thus, in the instant case, under North Carolina
Law, the Plaintiff's punitive damage recovery for their claim based on
Kidde's violation of the North Carolina Trade Secrets Protection Act
would be three times the amount of compensatory damages awarded on that
claim. The jury verdict was for $25,000,000.00 in punitive damages,
however, punitive damages are limited to $250,000 or three times the
amount of compensatory damages awarded on the North Carolina Trade
Secrets Protection Act, whichever is greater. Since compensatory damages
of $3,151,654 was awarded this would cause the punitive damages to be
capped at $9,454,962.00, and lead to a total allowable recovery of
$12,606,616.00.

## B. The North Carolina Unfair Trade Practices Act

X-It also made a claim under the North Carolina Unfair Trade Practices
Act. The jury returned a verdict based on Kidde's violation of the Unfair
Trade Practices Act and on violation of North Carolina Common Law. Thus,

the jury awarded compensatory damages for Count Six of the Complaint, phrased by the jury as unfair trade practices under North Carolina Law, in the amount of $3,151,654.00. The jury awarded punitive damages on this claim for $25,000,000.

The North Carolina Consumer Protection Statute provides guidance as to the proper remedy for violations of the North Carolina Unfair Trade Practices Act. This Act provides that:

> If any person shall be injured or the business of any
> person, firm or corporation shall be broken up or
> destroyed or injured by reason of any act or thing
> done by any other person, firm or corporation in
> violation of the provisions of this Chapter, such
> person or firm or corporation shall so injured shall
> have a right of action on account of such injury
> done, and if damages are assessed in such case
> judgment shall be rendered in favor of the plaintiff
> and against the defendant for treble the amount fixed
> by the verdict. N.C. Gen.Stat. § 75-16.

This statute does not have a punitive damages provision, and North Carolina courts have interpreted this to indicate that since the statute is punitive in nature, no additional punitive damages may be recovered for violations of the North Carolina Unfair Trade Practices Act. *United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F.Supp. 1049 (E.D.N.C. 1980), aff'd 649 F.2d 985, *cert denied* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981) (holding that the statute authorizing treble damages is punitive in nature); *Pinehurst, Inc. v. O'Leary Bros. Realty, Inc.*, 79 N.C. App. 51, 338 S.E.2d 918 (1986) (holding that punitive damages may not be recovered for unfair and deceptive trade practices in violation of North Carolina's Unfair Trade Practices Statute). Rather, courts have held that while Plaintiff's may recover punitive damages for tortious interference, Plaintiff's may not recover punitive damages for violations of the Unfair Trade Practices Statute; they must settle

West Page 537

for treble compensatory damages. *United Laboratories, Inc. v. Kuykendall*, 102 N.C. App. 484, 403 S.E.2d 104, 109-10 (1991) (holding that plaintiff was required to elect between punitive damages awarded on the tortious interference case and compensatory damages that would be trebled d for the Unfair Trade Practices Claim); *Pinehurst*, 338 S.E.2d at 918.

Under North Carolina Law, a party may seek both punitive damages on a common law tortious interference claim and treble damaged pursuant to the *North Carolina Unfair Trade Practices Statute Holloway v. Wachovia Bank & Trust Co.*, 339 N.C. 338, 452 S.E.2d 233 (1994). However, such a party may not recover punitive damages for both tortious conduct and recover treble damages for violation of the prohibition against unfair methods of competition based on the same conduct. *United Laboratories*, 403 S.E.2d at 109-10; *Pinehurst*, 338 S.E.2d at 918.

In the instant case X-It may not recover both punitive damages for tortious interference with its business under North Carolina common law and treble damages for violation of the North Carolina Unfair Trade Practices Act. Further, any compensatory award that X-It receives under the North Carolina Unfair Trade Practices act will be trebled according to statute, and no punitive damages will lie. The jury found that Kidde violated the North Carolina Unfair Trade Practices Act and was guilty of

unfair competition under North Carolina common law. In this case, under
the North Carolina Unfair Trade Practices Act. the jury verdict of
$3,151,654.00 shall be trebled which amount is $9,454,962.00, which
amount includes punitive damages. N.C. Gen.Stat. § 75-16.

### C. Unfair Competition Under the Common Law of North Carolina

   X-It also brought a claim against Kidde based on unfair competition in
violation of North Carolina Common law. The jury found that Kidde had
indeed violated the common law of North Carolina and awarded X-It
$3,151,654.00 on that claim. The jury also found that such violation was
willful and wanton and awarded $25,000,000 in punitive damages. Since
under North Carolina Law, punitive damages are limited to three times
compensatory, the punitive damages under this Count are limited to
$9,454,962.00 which would be awarded in addition to compensatory damages
of $3,151,654.00. for a total award of $12,606,616.00.

   In North Carolina the test for unfair competition under the common law
is "whether the public is likely to be deceived." *Carolina Aniline &
Extract Co. v. Ray,* 221 N.C. 269, 20 S.E.2d 59, 61 (1942). North Carolina
courts have interpreted this law broadly stating that" [u]nfair
competition in trade is not confined to the imitation of a trade mark,
but takes as many forms as the ingenuity of man can devise." *Id.* (quoting
*Benj. T. Crump Co. v. J.L. Lindsay, Inc.,* 130 Va. 144, 107 S.E. 679, 681
(1921)). Kidde's virtual recreation of X-It's packaging is clearly
deceptive to the public, and the jury so held.

   The North Carolina Supreme Court has recently echoed this sentiment,
holding again that unfair competition is not limited to "palming off" the
goods of another as one's own. *Henderson v. United States Fidelity &
Guaranty Co.,* 346 N.C. 741, 488 S.E.2d 234 (1997) (holding that wrongful
competition may be accomplished by other means or practices). The North
Carolina Supreme Court notes the importance of protecting trade secrets
stating that "the gravamen of unfair competition is the protection of a
business from misappropriation of its commercial advantage earned through
organization, skill, labor
West Page 538
and money." *Id.* (citing *International News Service v. Associated Press,*
248 U.S. 215, 239-40, 39 S.Ct. 68, 63 L.Ed. 211 (1918)). Indeed, the
North Carolina Supreme Court clearly stated the test for unfair
competition under the common law by posing the question, "[h]as the
plaintiffs legitimate business been damaged through acts of the defendants
which a court of equity would consider unfair?" *Charcoal Steak House of
Charlotte, Inc. v. Staley,* 263 N.C. 199, 139 S.E.2d 185, 189 (1964).

   In the case at bar, the facts clearly indicate, and the jury decided,
that Kidde's actions operated to deprive X-It of its commercial
advantage. The blatant imitation of X-It's packaging was a means of
unfair competition under North Carolina common law, and effectively
misappropriated X-It's commercial advantage. X-It's legitimate business,
that of selling emergency escape ladders, was damaged through the acts of
the Defendants constituting unfair competition. At trial it became
apparent that Kidde had copied and usurped X-It's trade dress. This
misappropriation resulted in a box for the Kidde Emergency Escape Ladder
that was deceptively similar to X-It's Emergency Escape Ladder Box.[fn23]
It is clear that rather than making substantiated claims regarding its
ladder, Kidde simply copied X-It's box, making a few thinly disguised
format changes, and in some cases only changing the name of the ladder
from the X-It box for use on the Kidde box. Such blatant similarities are

obviously deceptive to the public, and the jury so held. Such deception undoubtedly resulted in losses to X-It, as proved at trial.

In conclusion, regarding an award under North Carolina Law, the jury found that Kidde violated the North Carolina Unfair Trade Practices Act and was guilty of unfair competition under North Carolina common law. In this case, under the North Carolina Unfair Trade Practices Act, the jury verdict of $3,151,654.00 would be trebled, which amount is $9,454,962.00, which amount includes punitive damages. N.C. Gen.Stat. § 75-16. Under the North Carolina Trade Secrets Protection Act, the verdict for compensatory damages was $3,151,654.00 and for punitive damages of $25,000,000.00 with a cap of $9,454,962. Thus the total award under the North Carolina Trade Secrets Protection Act Count would be compensatory ($3,151,654.00) plus punitive ($9,454,962.00), for a total of $12,606,616.00. Finally, the jury awarded X-It $3,151,654 for unfair competition under the common law of North Carolina plus $25,000,000 in punitive damages under the common law of North Carolina. Since under North Carolina Law, punitive damages are limited to three times compensatory, the punitive damages under this Count are limited to $9,454,962.00 which would be awarded in addition to compensatory damages of $3,151,654.00.

**XI. Recovery Under Virginia Law**

X-It also made a claim of Unfair Competition and tortious interference with
West Page 539
business under Virginia Common Law. Under Virginia law, the following elements are required to establish a prima facie case of tortious interference: (1) the existence of business relationship or expectancy, with a probability of future economic benefit to X-It; (2) Kidde's knowledge of X-It's business relationship or expectancy; (3) intentional interference by Kidde inducing or causing a breach or termination of X-It's business relationship or expectancy; and (4) damages to X-It. *See Chaves v. Johnson,* 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985); *Glass v. Glass,* 228 Va. 39, 51-52, 321 S.E.2d 69, 76 (1984).

The jury found that Kiddes actions were likely to confuse purchasers, that purchasers were in fact deceived by Kidde, that Kidde profited from the sale of the infringing packages, and that X-It suffered damages as a result thereof. Thus, the jury found that the total damages suffered by X-It under this cause of action were $3,151,654.00. Moreover the most significant relationship test would require the utilization of North Carolina law rather than Virginia law; but this may be moot as will be seen.

**XII. Attorney's Fees**

In the instant case, the Court finds that the award of attorney's fees against Kidde in favor of X-It maybe proper depending on the cause of action and the verdict which is elected. Although, attorney's fees are not proper under Section 505 of the Copyright Act, the controlling law regarding Plaintiff's first cause of action for copyright infringement, the Court finds that attorney's fees may be justified under several other legal theories. First, attorney's fees are proper under general Fourth Circuit law. Second, attorney's fees are proper under North Carolina Law. Specifically, the North Carolina Unfair Trade Practices Act, and the North Carolina Trade Secrets Protection Act each may allow for the award of attorney's fees in certain cases.

## A. Under the Federal Copyright Statute

Beginning with X-It's copyright infringement claim, the Court finds that the award of attorney's fees is not proper. It is true that section 505 of the Copyright Act provides that "[i]n any action under this title, the court in its discretion may . . . award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. However, under section 412 of the Copyright Act, attorney's fees are prohibited in the instant case because registration is prerequisite to certain remedies for infringement as follows:

> In any action under this title, other than an action brought for a violation of the rights of the author under section 106A(a) or an action instituted under section 411(b), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for —
>
> (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
>
> (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412.

Under this section, courts have consistently held that attorney fee awards cannot apply to infringement of copyright not registered until after infringement began. *Evans Newton, Inc. v. Chicago Systems Software*, 793 F.2d 889 (C.A.7 Ill. 1986), *cert. denied* 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 383 (1986).
West Page 540

The determination that the Plaintiff cannot recover attorney's fees under Federal Copyright law may be irrelevant anyway because should the Plaintiff select the damages considering the value of the sale of X-It to Kidde in August of 1999 of $3,151,654 then X-It would have given its right to the copyright and patent to Kidde as part and parcel of the transaction because it would have sold its company to Kidde. Thus, the copyright damages would be subsumed in the compensatory damages of $3,151,654.

## B. Under Fourth Circuit Law

Fourth Circuit case law indicates that whether or not to award attorney's fees is in the Court's discretion. However, such an award must not be made as a matter of course. *Superior Form Builders v. Dan Chase Taxidermy Supply Co., Inc.*, 881 F. Supp., 1021, 1023 (E.D.Va. 1994) (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 1033, 127 L.Ed.2d 455 (1994)). In the Fourth Circuit, whether to award attorney's fees is determined under the four factor test set forth in *Diamond Star Building Corporation v. Freed*, 30 F.3d 503, 505 (4th Cir. 1994). In that case, the Fourth Circuit held that the Court should consider: 1) "the motivation of the parties," 2) "the objective reasonableness of the legal and factual positions advanced," 3) "the need in particular circumstances

to advance considerations of compensation and deterrence, and 4) any other relevant factor presented." *Id.* (*quoting Rosciszewski v. Arete Assocs., Inc.,* 1 F.3d 225, 233-34 (4th Cir. 1993)); *Superior Form Builders,* 881 F. Supp. at 1023.

In the instant case, award of attorney's fees to X-It is clearly warranted. The first factor of the above test, the motivation of the party from whom fees are sought, weighs heavily in favor of awarding attorney's fees to X-It. "While the finding of willful infringement or bad faith on the part of the opposing party may be considered by the district court, the presence or absence of motivation is not necessarily dispositive." *Superior Form Builders,* 881 F. Supp. at 1024 (*quoting Rosciszewski* 1 F.3d at 234). In the instant case, the jury found that Kidde had acted willfully and in bad faith, and this weighs heavily in favor of an attorney fee award. *Id.* The Court similarly so finds.

Next, if the legal and factual positions of the Defendants is not objectively reasonable, the Court is justified in giving this factor significant weight in the determination of whether or not to award attorney's fees. *Superior Form Builders,* 881 F. Supp. at 1024. In the instant case, as outlined in the fact section of this opinion, Defendant Kidde advanced several legally and factually preposterous theories. Thus, the second factor in the Diamond Star test is clearly met and weighs heavily in favor of an award of attorney's fees to X-It.

The third factor set forth above, the need for compensation and deterrence, is particularly relevant in the instant case given the relative size and prosperity of the Parties. The Plaintiff, X-It is a small company with few employees, and one major product. Kidde, on the other hand, is a large company with many offices, employees, and products, and a very high value. In fact, as outlined in the fact section of this opinion, Kidde and X-It were engaged in negotiations to buy and sell, respectively, X-It's company and assets to Kidde. Kidde used its size and value in negotiations to cause X-It to release its patent to Kidde's "neutral attorney" for evaluation, in short, and this fact should be clear from the discussion in the fact section, Kidde took advantage of X-It's small size and value. Thus, X-It is entitled to attorney's fees as a matter of compensation, and such an award will
West Page 541
conceivably act as a deterrent to Kidde from engaging in similar behavior in the future.

The fourth and final factor in the *Diamond Star* test is a catch all factor and allows the Court to consider any relevant factor in the decision whether to award attorney's fees. In the case at bar, the actions of Kidde over the course of the trial and the post trial period convinces the Court that an award of attorney's fees is proper. Kidde has repeatedly and pervasively evaded its responsibilities. In other Opinions promulgated in this matter, this Court has considered many of the factors which Kidde has utilized to drag the Plaintiff, X-It through protracted and costly litigation to defend its copyrighted material. Thus, the Court finds that an award of attorney's fees is proper in this case.

Once the Court has determined that attorney's fees are proper, the Court must determine a reasonable amount. The Supreme Court has stated that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonably hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The

Court should first determine what is known as the lodestar figure, or a
reference point, using several variables set forth by the Fifth Circuit
and adopted by the Fourth Circuit. *Johnson Georgia Highway Express,
Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (setting forth twelve factors
to be used in determining the reasonable rate and the reasonable hours):
*Daly v. Hill*, 790 F.2d 1071, 1077 (4th Cir. 1986) (determining that the
Johnson factors should be used to determine the lodestar figure and
partially overruling *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (1978) which
used the *Johnson* factors to enhance or decrease the award of attorney's
fees); *Superior Form Builders*, 881 F. Supp. at 1025 (using the *Johnson*
factors to define the variables of reasonable rate and reasonable hours
to be used ill calculating the lodestar figure). The factors used to
determine the reasonable rate and the reasonable hours include: 1) the
time and labor required, 2) the novelty and difficulty of the questions,
3) the skill requisite to properly perform the legal service, 4) the
preclusion of other employment by the attorney die to acceptance of the
case, 5) the customary fees, 6) whether the fee is fixed or contingent,
7) time limitation imposed by the client or the circumstances, 8) the
amount involved and the results obtained, 9 the experience, reputation,
and ability of the attorney's, 10) the "undesirability" of the case, 11)
the nature and length of the professional relationship with the client,
and 12) awards in similar cases. *Id.*

### C. Under North Carolina Law

Attorney's fees are appropriate under North Carolina Law. Under both
the North Carolina Trade Secrets Protection Act and the North Carolina
Unfair Trade Practices Act, attorney's fees may be awarded, although the
standards are slightly different. As determined earlier in this opinion,
North Carolina is the state with the most significant relations to the
case at bar. Thus, it would be proper for this Court to award attorney's
fees under North Carolina Law if appropriate to the Count or Counts and
verdict selected.

First, under the North Carolina Trade Secrets Protection Act, "[i]f
. . . willful and malicious misappropriation exists, the court may award
reasonable attorney's fees to the prevailing party." N.C. Gen. Stat.
§ 66-154(d). In the instant case, the jury found that Kidde's actions
constituted wilful and wanton misappropriation under North Carolina Law.
Thus, the Court may properly and within its discretion award reasonable
attorney's fees. In so far as it
West Page 542
may be necessary for the Court to so find, it also determines that the
Defendant willfully and maliciously and fraudulently misappropriated the
Plaintiff's trade secrets entrusted to its supposedly "neutral"
attorney.

Next, under the North Carolina Unfair Trade Practices Act the Court
may, in its discretion, award a reasonable attorney fee "upon a finding
by the presiding judge that (I) the party charged with the violation has
willfully engaged in the act or practice, and there was an unwarranted
refusal by such party to fully resolve the matter which constituted the
basis of such suit. . . ." N.C. Gen.Stat. § 75-16.1. The Defendant
failed to resolve the matter. In addition, the Court finds that the
Defendant willfully engaged in an unfair trade practice.

### XIII. X-It Must Choose Under Which Cause of Action it Wishes to Recover

As discussed above, X-It may not receive more than one recovery on its

tort claims and may not recover for both tort and contract. This was
clearly conveyed to the jury at trial in the instruction which stated,
"[t]he total amount of compensatory damages may not exceed the value
found for any one violation, except for the copyright violation, if any."
(Tr. 4300). There were no objections to this instruction, and this
instruction is the law of the case. It is apparent that the jury awarded
total compensatory damages for all counts in excess of the value for any
one violation, and thus the Plaintiff must elect only one cause of action
under which it wishes to recover, not including the copyright violation.

   Thus, the Plaintiff must choose a cause of action under which it wishes
to recover. The Plaintiff may not recover in both Contract and Tort, and
may not recover under multiple copyright, trade secrets, or trade
practices acts of multiple states where the damages presented are the
same. As indicated at the beginning of this Opinion, the damages are as
follows. On Count One, the Copyright Infringement Claim, the jury found
that the total dollar amount of damages to X-It as a result of Kidde's
copyright infringement was $842,556.00; representing $200,000.00 for
copyright infringement at the 1999 Show and $642,556.00 after the 1999
Show for a total of $842,556.[fn24] On Count Two, the Lanham Act Count,
the jury found that X-It had established damages of $842,556.00;
representing $100,000 for trade dress violation, $500,000.00 for false
advertising at the 1999 Show, and $242,556.00 for false advertising after
the 1999 Show. On Count Four, the Breach of Contract Claim, the jury
awarded $3,151,654.00.[fn25] On Count Five, the Misappropriation of Trade
Secrets Claim, the jury awarded the following: $3,994,210.00 under the
Illinois Trade Secrets Act (representing $842,556, the profit of Kidde
plus $3,151,654, the value of X-It), $3,151,654.00 under the North
Carolina Trade Secrets Protection Act, and punitive damages of
$25,000,000.00 under the North Carolina Trade Secrets Protection Act. On
Count
West Page 543
Six, the Unfair Competition Claim, the jury awarded the following:
$3,151,654.00 for unfair competition under the North Carolina Unfair
Trade Practices Act, $25,000,000.00 in punitive damages under North
Carolina Common Law, $3,151,654.00 for unfair competition under the
Illinois Consumer Fraud and Deceptive Business Practices Act,
$45,000,000.00 in punitive damages under the Illinois Consumer Fraud and
Deceptive Business Practices Act and Illinois Common Law, and
$3,151,654.00 for unfair competition under Virginia Law. Each of these
awards has been analyzed in this Opinion, and the Court has indicated
throughout this opinion which awards are applicable to the facts
presented at trial. Thus, the Plaintiff must elect its remedy indicating
under which state law it wishes to recover, and under which cause of
action — contract or tort. Depending on the selection, the
copyright award and trade dress award may be subsumed in the
$3,151,654.00 portion of the award since this would have bought X-It as
well as its patents and copyrights. Should the Plaintiff select the most
advantageous award, the maximum judgment that could be entered would be
$12,606,616.00 with interest at 8% per annum from August 15, 1999, until
date of judgment, plus reasonable attorney's fees and costs.

## XIV. Allegations of Bias

   In its memorandum entitled "Motion for Post Verdict Relief," Kidde
alleges that the trial judge in this matter gave the appearance of
partiality, and that as a result, Kidde is entitled to a new trial on all
issues. Kidde alleges that the Court displayed hostility and prejudice
against Kidde and Kidde witnesses in front of the jury. While it is true

that the undersigned is thoroughly disgusted with Kidde's defense in this
case, there is no evidence in the record to support a new trial. Indeed,
the undersigned showed great restraint and refrained from acting in a
prejudicial or impartial matter at trial and in front of the jury. However
ill-conceived Kidde's allegations are, in light of said allegations, the
Court feels compelled to address this issue.

Kidde's problems with the Court's actions center around questions
asked, or comments made, from the bench before and during trial.
Specifically, Kidde complains that the Court was hostile to Kidde during
pretrial motions, questioned certain Kidde witnesses excessively, and was
obvious in his belief that Oslakovic was untruthful. Kidde gives few
examples of biased comments, however, and focuses instead on what Kidde
considers to be an excessive number of questions. Questions or comments
from the bench, especially those that seek to clarify matters for the
jury, are permissible. In this case, there was no impermissible
appearance of partiality that would entitle Kidde to a new trial.

Kidde first claims that the Court's actions during motions hearings
before opening statements evidenced bias. and had a lasting effect on
Kidde counsel. This argument, however, does not support a motion for a
new trial. As will be seen below, the primary issue in the decision
whether to grant a new trial is prejudice to the jury. The alleged show
of bias at the pretrial stage would not prejudice a jury. Any hostility
that Kidde sensed towards its case at the pretrial phase is irrelevant to
the question of whether the Court prejudiced the jury against the
defense. The Court admits that it was exasperated with both parties at
the pretrial stage, as close to 2000 objections were lodged. However,
this exasperation did not translate to conduct at trial that prejudiced
the jury.
West Page 544

Next, Kidde states that the Court interrupted Kidde nearly 100 times
with questions, comments, or interjections that favored X-It. While this
may seem excessive on its face, it is of paramount importance to note
that this was a very complex trial, with many issues, lasting more than
twenty days. Further, the Court interrupted X-It witnesses over twice as
many times with questions, comments, clarifications, or interjections.
For example, the Court interrupted the testimony of Andrew Ive, one of
X-It's key witnesses, at least 78 times, and continued this practice of
interrupting for the purposes of clarification with at least ten other
X-It witnesses. All the Court's interruptions were done to clarify
complex issues in the case, for itself and for the jury, and did not
favor X-It or prejudice the jury against Kidde. The Court was required to
determine certain matters.

Kidde also complains that following examinations by counsel, the Court
continued to cross examine five of Kidde's witnesses, while examining
only one of X-It's witnesses. This allegation is not entirely
forthright. In fact, the Court questioned many of X-It's witnesses
extensively. It is true that the Court only questioned one X-It witness,
Troxel, after the Parties had finished examining him, but the Court
questioned at least eleven X-It witnesses, some extensively, during
direct and cross examination. The Court acknowledges that it questioned
Kidde's witnesses, but takes umbrage with the implication that judicial
questioning was reserved for Kidde witnesses only.[fn26] The Court
questioned many witnesses for both Kidde and X-It, in order to clarify
complex issues for itself and for the jury.

Kidde never objected at trial to the Court's questioning of its witnesses, and therefore may have waived this argument. Fed.R.Evid. 614(b) and (c); *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987) (stating that "the failure of Stillman's counsel to object to any of this questioning [by the court] precludes our review of this issue on appeal"). Under the federal rules of evidence the court may interrogate witnesses, whether called by itself or by a party, and objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present. *Id.* Even if Kidde had not waived this argument, a new trial is not justified based on extensive questioning by the trial judge. *United States v. Filani*, 74 F.3d 378, 386 (2d Cir. 1996) (stating that "asking numerous questions is not error per se; rather, the overriding consideration is whether the judge saw to it that the jury had all the admissible evidence and knew it was free to find the facts as it thought the evidence showed them to be").

Federal courts have wide latitude to question witnesses, and may actively ensure that facts are clear to jurors. Fed.R.Evid. 514(b); *United States v. Parodi,*
West Page 545
703 F.2d 768, 775 (4th Cir. 1983) (holding in a criminal trial that a trial judge has a duty to ensure facts "are clearly understood by the jury" and "should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other"). Further, when there is a "[necessity] to draw more information from reluctant witnesses or experts who are inarticulate or less than candid," the district judge can intervene with pertinent questions. *id.* In the case at bar, Oslakovic was just such a witness.[fn27] In determining whether such questioning by a judge is improper "it is necessary to look not merely at the challenged questions in isolation but also at the demeanor and conduct of the trial judge throughout the trial, to search the record for evidence of partiality or bias." *Id.* at 776. In the instant case, the Court questioned witnesses for both Kidde and X-It in an attempt to clarify the facts for itself and for the jury. In some cases, the Court's questioning was meant to elicit the truth from insincere or evasive witnesses. However, the Court did not overstep the bounds of propriety or exhibit partiality or bias in front of the jury.

The trial judge may also "comment on the evidence at trial." *Thompson v. Direct Impact Co.*, 63 F.Supp.2d 721, 727 (E.D.Va. 1998), *aff'd,* 188 F.3d 503 (4th Cir. 1999); *Virginian Ry. Co. v. Armentrout,* 166 F.2d 400, 405 (4th Cir. 1948) (stating that "[i]t was proper, of course, for the judge to array the evidence and comment upon it . . . [the judge] should not hesitate to exercise the power of comment t clear away false issues and lead the jury into a proper understanding of the facts"). A trial judge is also permitted to express "his opinion as to [the] credibility of a witness." *Montgomery v. General Accident Ins.*, 114 F.3d 1176, 1997 WL 314431 (4th Cir. 1997).

In cases where the trial judge comments on evidence or expresses opinions as to the credibility of witnesses, there is no impropriety if the jury is instructed that it is the ultimate arbiter of the facts, and that any comments are not evidence. *Thompson*, 63 F. Supp.2d at 727. In the instant case, the Court instructed the jury that:

[n]othing I say, nor any ruling of mine, nor any remark that I have made is to be taken as an

indication that I have any opinion of the facts of the
case or what that opinion is.

. . . .

The determination of facts is your function and your
recall of the testimony and the evidence, and that
will control your determination of the facts.

. . . .

As I've said, during the course of a trial I
occasionally ask questions of a witness in order to
bring out facts not then fully covered by the
testimony. Do not assume that I hold any opinions on
the matter to which my questions have related.
Remember at all times that you as jurors are at
liberty to disregard all comments of the Court in
arriving at your findings as to the facts. . . .

West Page 546
(Tr. 4229-30). Thus, the Court's instructions to the jury had a curative
effect if there was in fact any appearance of bias.[fn28]

   Kidde attempted, in its Motion for Post Verdict Relief, submitted
October 22, 2001, to introduce into the record an audio recording of
court proceedings. Kidde said it obtained said recording from the court
reporter, and altered the audio effect of the recording. Kidde seeks to
use this recording as evidence of the Court's bias. However, the Court
notes that such a recording was not authorized, and is not part of the
official record and know nothing of it. Only the official transcript is
part of the record. Further, the Court wishes to note that the
recordings, even as altered by Kidde, do not support Kidde's motion for
new trial. As discussed above, the Court's countenance and questioning
were at all times proper and helpful for clarification. Additionally, any
perceived favoritism was cured by the jury instructions.

   In conclusion, Kidde's quarrel with the perceived negative countenance
of the Court and the quantity of questions from the bench are not valid
grounds for a new trial. Careful scrutiny of the record, composed only of
the official transcript, indicate that in any event, the questioning
itself, due to the lengthy and complex nature of the litigation, was not
excessive. Next, in all the instances Kidde cites, the Court's questions
were proper to help develop the evidence so the jury could understand
complex issues. Finally, even if the Court's questions could be
interpreted as favorable to X-It, the curative instructions given to the
jury were sufficient to defeat a new trial motion.

**XV. Conclusion**

   This case is the very epitome of corporate governance in the last
decade of the twentieth century — where greed and the resultant
pressure on corporate officers to produce results out of line with the
actual value of the assets they manage turns those officers into
vultures, devouring the very businesses which they are trying to
enhance. Thus, greed and a lack of professionalism seems to have been the
key to the technological age of the last ten years. This case is just
another example of this process. Harper inasmuch as ordered Apperson to
usurp X-It's ideas by making the suggestion, during their almost daily

conversations, that Apperson not pay for the X-It ladder, or buy X-It, when Kidde could make a ladder itself. Apperson felt he had no choice, he was to produce a ladder or allow X-It to capture a very lucrative market. The end was to produce a copycat ladder and not get caught in patent infringement.[fn29]

To do this Apperson was forced to obtain the particulars of the patent application. Thus Apperson indicated to Ive of

West Page 547

X-it that Kidde wanted to increase its offer to buy X-It at a price which he knew he was not authorized nor did he request such. He maintained that such an offer was predicated on Kidde being allowed to examine X-It's patent application at a time when Kidde had decided to market its own ladder. Apperson said the patent application would be kept secret and an "outside" attorney would say whether the patent application was "strong or weak." Apperson called on Oslakovic, an attorney who bills over $100,000 a year to Kidde (we don't know how much over $100,000 per year). Oslakovic, the patent attorney, was a smooth, suave, and sophisticated person whose testimony was incredible and unprofessional. For example, he was given an X-It ladder and the X-It patent application to evaluate. Although the only "product" he had to evaluate was an X-It ladder, h stated that he was to assess not the ability of the X-It patent to protect the X-It ladder which he ad, and clearly was the contract, but whether Kidde could make a product (as Kidde had no product in August, 1999) that would not violate X-It's proposed patent. Such a preposterous construction of the letter sending him the application would be laughable if it were not so distressing.

Oslakovic indicated this by saying that he was evaluating the patent application with regard to the Kidde product not the X-It product which was given to him which was clearly contrary to his written instructions and the contracts. The affidavit by Oslakovic was given initially to prevent the correspondence from Oslakovic to Apperson from being disclosed. In essence he said he was hired to discuss the patent application in some detail with Apperson, president of Kidde. Thus, he marked several of the e-mails with "attorney-client privilege" so no one could get to them. Once the depositions were analyzed, it was beyond the shadow of a doubt something that Oslakovic was contractually and explicitly told and required not to do. Oslakovic claims when confronted at trial that he obtained "permission" to disclose by virtue of the fact that Ive, president of X-It, argued in front of him on August 16, 1999, at a meeting at the National Hardware Show, that Kidde had stolen X-It's ladder, its pictures, and its artwork and that he Oslakovic discussed claims and that there were no objections by X-It. Ive never gave any permission, nor could Oslakovic maintain that permission to breach a contract was granted by Ive's silence. of course, Ive denies Oslakovic's testimony.

Ive, who was not represented by counsel, sent to Oslakovic his valuable property, the patent application. At that point, Oslakovic became a trustee and fiduciary in relation to Ive and X-It. He was under a contractual duty and a professional duty. He was acting as a trustee of a valuable property belonging to X.-It.[fn30] Thus he was indeed a fiduciary. Oslakovic abused this trust when he behaved as if he owed his sole duty to Kidde when he shared X-It's patent claims with Apperson. Moreover, he claimed throughout the course of this litigation that words did not mean what they meant and that things were not so when they obviously were so. For instance, Oslakovic repeatedly maintained during his testimony that when Ive sent X-It's patent application to him, he

believed that the patent was to be compared to Kidde's ladder which he
did not have and not to the "X-It product ladder" which
West Page 548
he did have. He totally ignores any fiduciary duties either as a lawyer
or a trustee. Clearly he breached his and Kidde's agreement.

   This supposed belief of his was used to try and excuse his sharing of
information with Apperson. Not only does it not make sense why X-It would
be sending a patent application to protect Kidde's ladder, Oslakovic knew
that the purpose of being sent the patent application in the first place
was to evaluate its strength so that Kidde could decide if it wanted to
buy X-It. Kidde would not be evaluating a patent application to decide
whether or not to buy its own ladder? Most of all, though, is the fact
that Kidde did not have its own ladder at all during August of 1999; all
it had were the copies of X-It's ladder made over the summer at the
Fenwick plant in China. Oslakovic had an X-It ladder and an X-It patent
application. He was told,". we would like to get your thoughts on its
strength and the potential it has to protect the product from
infringement when awarded. It is quite possible we may share the patent
with Kidde Safety at a later date when we have permission to do so from
our board." Thus, the disingenuousness of Oslakovic's testimony becomes
evident.

   Oslakovic, quite simply, ignored his contractual and fiduciary duties
toward Ive and X-It in and after August 1999, and tried to cover up his
wrongdoing by attempting to cloak the very documents that detailed that
wrongdoing under attorney-client privilege, and then, when this Court
ordered the production of those documents, tried to camouflage his
wrongdoing with testimonial smoke and mirrors. While this Opinion is
mostly focused on this wrongdoing as it relates to Kidde, it should not
be forgotten that as a lawyer in Illinois, Oslakovic is bound by the
Illinois Rules of Professional Conduct. Specifically, Rule 4.3 "Dealing
with Unrepresented Persons," states that "[i]n dealing on behalf of a
client with a person who is not represented by counsel, a lawyer shall
not state or imply that the lawyer is disinterested. When the lawyer
knows or reasonably should know that the unrepresented person
misunderstands the lawyer's role in the matter, the lawyer shall make
reasonable efforts to correct the misunderstanding." As Ive made clear in
his testimony, and as his letter to Oslakovic makes equally plain, Ive,
who was not represented by counsel, believed that Oslakovic was acting
not as Kidde's counsel but as a third party neutral who would keep the
claims in X-It's patent application confidential and merely come to a
professional opinion regarding the strength of the application in order to
facilitate negotiations between the parties. Even Schiefer indicated that
Oslakovic presented himself as a neutral at the confrontation on August
16, 1999. If Oslakovic truly believed that he was Kidde's agent acting
solely on Kidde's behalf at the time, it was obvious that Ive did not
realize this, and Oslakovic had a duty to inform Ive. He at least had a
duty to inquire. He chose not to.

   In fact, as late as the August 16, 1999 meeting between X-It and
Kidde, after Ive had, appropriately we might add, accused Kidde of
stealing his product,[fn31] which they had done by putting Kidde's name
over X-It's packaging and displaying copies of X-It's ladder with a
different hook assembly, Oslakovic was holding himself out as a "neutral"
to Ive. Prior to that meeting, however, Oslakovic held a one and a half
hour caucus with Apperson to discuss how they were going to handle Ive.
Hardly the actions of a "neutral."
West Page 549

This is a case where there was no real defense so attorneys for the Defendant had no choice but to fight every inch of the way. Objections, motions, and obfuscation was the defense. It was the only defense possible. Truth was the enemy. Stalingrad was saved by the Russians in World War II by literally wearing out the Germans, and this type of defense by lawyers in the last half of the last century came to be known as the Stalingrad defense. Wear the opponents out. Fight for every step. However, the Plaintiff's attorneys brought every possible action under multiple states laws and under federal law that could possibly apply and the battle became irreconcilable. Thus, rancor and accusations became the byword. This is not to indicate that the attorneys defending or prosecuting the case violated any rules of ethical conduct. However, fighting on ridiculous matters became paramount. This in turn caused undue rancor. Argumentum ad Hominum became the key and flavored the entire case and continues to do so.

The Plaintiff is **ORDERED** to submit a document indicating under which cause of action it wishes to recover within 14 days of this order. If Plaintiff fails or refuses to submit said document, this Court will enter judgment as it deems appropriate. The Court will award the Plaintiff reasonable attorney's fees and costs if appropriate to the judgment selected. The Plaintiff is also **ORDERED** to submit attorney's fees for the Courts consideration within 14 days of the entry of a final judgment but only after the exhaustion of all appeals.

The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

[fn1] The Court has ruled on this Motion, granting in part X-It's request for permanent injunction by Order dated December 19, 2001. Kidde subsequently failed to comply with this Order, yet another hearing was held, and the Court held Kidde in contempt by Order dated March 14, 2002.

[fn2] The Court has ruled on this motion ordering that some transcript portions are to remain under seal while other are not. Specifically, by Order of December 19, 2001, this Court directed the clerk to unseal all documents and transcripts pertaining to this case except those specified in that Order (trial transcript excerpts of August 3, 2001, and August 10, 2001) and specified in the Order of September 18, 2001.

[fn3] This motion will be ruled upon in a separate order.

[fn4] There is also a false advertisinge claim, but the only evidence on damages put forward by the Plaintiff was that of the net earnings of Kidde for sale of the falsely advertised and sold product.

[fn5] VA.CODE ANN. § 6.1-330.53 (2002).

[fn6] VA.CODE ANN. § 6.1-330.54 (2002).

[fn7] The undersigned became a member of the Bar on August 7, 1952.

[fn8] The $842,556.00 figure was the amount of net profit that experts and others indicated that Kidde obtained from the sale of the ladder in the infringing packaging.

[fn9] This amount, $3,151,654.00 was the figure the Plaintiff's expert testified was the value of X-It for sale of the assets and the company if it had taken place prior to the fraud and breach of contract.

[fn10] Kevin Dodge, who was the financial officer of Kidde, indicated that in discussions with Kidde that he placed a $6,000,000 value on X-It. (Tr. 1601).

[fn11] $13.00 per ladder shipped to the United States vs. $14.00 per ladder for X-It.

[fn12] Schiefer worked for Apperson but was Vice President of the parent, the various entities were run as divisions which did not follow entity lines.

[fn13] This offer may have been made, by Apperson or Tameo in a meeting which took place in Chicago on June 29, 1999, where X-It gave Kidde information on X-It's accounts. (Tr. 336).

[fn14] The corporate entities under Kidde p.l.c., based in Great Britain, the parent company of Kidde, Defendant in this action, are immensely intertwined. From the trial it was determined that Kidde p.l.c.'s president, Mr. John Michael harper, is in either daily or every other day contact with the president of Defendant in this action, Walter Kidde Portable Equipment, Inc., at the time Mr. Apperson. At trial it also came out that Kidde Portable Equipment, Inc., at the time Mr. Apperson. At trial it also came out that Kidde Portable dividended almost all of its profits up to the parent corporation. the Defendant paid $31 million in dividends to its parent corporation, Kidde p.l.c., (Tr. 1247), between 1994 and 1999, with one year in which it did not pay a dividend because of a $15 million charge associated with a product recall. Thus this company pays between $6 million or almost $8 million a year in dividends. Clearly Harper controls it all. The overall 34 companies are divided into divisions and not separated by companies. A division might encompass two or more companies and a part of one company might be managed and controlled by the officers of another company. However, Harper, overall C.E.O., is in touch with every division head every day or every other day, and nothing of substance can be done without his approval anywhere in the Kidde p.l.c. empire. Employees are also intermingled. Schiefer was also vice president of Marketing of the parent company.

[fn15] As previously discussed there were well defined lines between parent and subsidiary.

[fn16] There is no indication when am X-It ladders arrived from China except 6 copies of X-It ladders were shipped from China in early June. The only ladder manufactured by Fenwick available at trial was one manufactured sometime after September 1999, as the metal rungs were marked with a date, and kept by Oslakovic and shipped to him October 22, 1999.

[fn17] In addition, a pre-show presentation was made on August 14, 1999.

[fn18] It is clear under the facts that Oslakovic was entrusted with valuable property belonging to X-It with certain instructions from X-It. This was a trust. "At common law it was not necessary that a trust be

declared in any particular mode." *Anderson v. Harrington*, 163 N.C. 140, 79 S.E. 426, 427 (1913); *see also, Libby v. Hopkins*, 104 U.S. 303, 26 L.Ed. 769 (1881); *Hammond v. Ridley's Ex'rs*, 116 Va. 393, 82 S.E. 102 (1914).

[fn19] The definition in Black's Law Dictionary would indicate that X-It was the "client" and Kidde was the third party paver. The definition of Client includes "one who disclosed confidential matter to attorney while seeking professional aid, whether attorney was employed or not." BLACK'S LAW DICTIONARY 230 (5th ed. 1979).

[fn20] If he was not a "neutral" as Schiefer indicated Oslakovic professed to act as, then he had a clear duty under Rule 4.3 of the Rules of Professional Conduct to make sure Ive knew he was hired not to evaluate X-It's patent application for its ability to protect X-It's product, but to utilize X-It's patent application to design another product for Kidde.

[fn21] As Apperson testified: "For the first draft, it seemed to be the right shot out of the chute. Again, this was just to Kidde's eyes an X-It box, assuming X-It would be owned by Kidde." (Tr. 1823). He indicated that Mark Schiefer made the decision to use the X-It material at the presentation on August 14, 1999, and the National Hardware Show beginning on August 15, 1999. (Tr. 1836).

[fn22] X-It, in its Complaint, raised several unfair trade practices claims, invoking the Lanham Act, the Illinois Trade Secrets Act, the North Carolina Trade Secrets Act, the North Carolina Unfair Trade Practices Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, Illinois Common Law, and the Virginia Unfair Competition Act. The Court has determined that since North Carolina is the state with the most significant relationship to the issues in the case, that North Carolina Law should govern recovery.

[fn23] The extent of the infringement by Kidde is discussed in detail in Section V of this Opinion dealing with recovery under Federal Copyright law and need not be exhaustively reiterated here. Kidde's actions in copying X-It's box apply to both the cause of action concerning Federal Copyright law and to the cause of action concerning unfair competition under the common law of North Carolina. Briefly, Kidde copied the X-It box as follows:

   (1) the images on the two boxes were deceptively
   similar, (2) Kidde copied the bullet points X-It
   presented on its box, even those attributes which did
   not apply to Kiddes product, (3) Kidde copied consumer
   warnings regarding fire safety directly from X-It's
   box, (4) Kidde recommended on its box for every
   consumer to "Place a Kidde Escape Ladder in every
   upper floor room!' directly copying X-It and changing
   only the name of the product.

[fn24] This refers to the 1999 National Hardware Show in Illinois. The details and circumstances of the 1999 Show and the surrounding copyright violations were discussed in the fact section of this Opinion. The $842,556 figure was the amount of profit that Kidde obtained from the sale of the infringing packaging which contained the ladder.

[fn25] This amount, $3,151,654 was the figure the Plaintiff's expert

testified was the value of X-It for sale of the company if it had taken place as contemplated by the parties prior to the fraud and breach of contract.

[fn26] For example, the Court extensively questioned the following X-It witnesses: Andrew Ive: Tr. 264, 319, 326-27, 329-31, 335, 338, 341, 357-60, 364-65, 370, 374-78, 380, 381, 384, 385, 386, 389, 393, 394-5, 398-401, 459, 462, 466, 475-76, 530, 534-35, 539, 544, 548, 556-58, 565, 567; Kenneth Cort: Tr. 599-600; Howard Stevenson: Tr. 620, 626-27, 633; Ron Thompson: Tr. 672-73, 679; Bill Driscoll: Tr. 687; Richard Troxel: Tr. 1218-19, 1242, 1247-50, 1265, 1269, 1274, 1291, 1298, 1318-19, 1320-23, 1325; Pamela Kiecker: Tr. 1443, 1453, 1456, 1461-62, 1478-79, 1482-93, 1500, 1508-09, 1522, 1539, 1556-57; Kevin Dodge: Tr. 1600-01, 1606, 1617, 1622-23; Aldo DiBelardino: Tr. 1634, 1636, 1664, 1697, 1723, 1727, 1728, 1731, 1742; Auzville Jackson: Tr. 1944-45, 1957-58, 1979-80, 1993, 1995, 1997; and Ira Block: Tr. 2413, 2442, 2448-49, 2450, 2451-52, 2453, 2455, 2469, 2471-73, 2487-88, 2489-94.

[fn27] There is no doubt that Oslakovic offered evasive, mendacious testimony. Although Oslakovic gave Kidde confidential information from X-It's patent application with full knowledge that he was barred from doing so, he split hairs, took refuge in technicalities, and otherwise dissembled in an effort to avoid admitting his wrongdoing. The fact that Oslakovic's answers to the Court's questions were harmful to Kidde's defense is not evidence of bias or hostility by this Court. *Parodi*, 703 F.2d at 775; *Virginian Ry. Co.* 166 F.2d at 405.

[fn28] Kidde complains that the Court a preconceived bias against the veracity of Oslakovic's testimony. This assertion is based on the Court's statement that "no one but an idiot would believe Mr. Oslakovic. (Tr. 900). While this comment may indicate the Court's frustration with Oslakovic, any bias the Court felt privately is irrelevant because this comment was made out of the presence of the jury. The Courts expression of its opinion, outside the presence of the jury could not have influenced the jury against Kidde. Kidde also complains that the Court told counsel, within the jury's hearing, that Kidde was in "dire straits." (Tr. 1683). Although this comment was made during a bench conference, Kidde theorizes that the jury could hear the comment and may have been prejudiced by it. Any theoretical prejudice caused thereby would be cured by the Court's instructions to the jury before deliberation.

[fn29] English history is replete with examples of underlings carrying out what they perceive is the wish of the superior beginning with Henry II and the death of Beckett to the ultimate disaster of the killers.

[fn30] It is clear under the facts that Oslakovic was entrusted with valuable property belonging to X-It with certain instructions from X-It. This was a trust. "At common law it was not necessary that a trust be declared in any particular mode." *Anderson v. Harrington*, 103 N.C. 140, 70 S.E. 426, 427 (1913); *see also, Libby v. Hopkins*, 104 U.S. 303, 26 L.Ed. 769 (1881); *Hammond v. Ridley's Ex'rs*, 116 Va. 393, 82 S.E. 102 (1914).

[fn31] We are fortunate that Ive was an Englishman rather than a bellicose American, who may have been prone to use violence against the "Axis of Evil" that had been presented to him.
West Page 575

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved



US006795999B1

(12) **United States Patent**
Post et al.

(10) Patent No.: **US 6,795,999 B1**
(45) Date of Patent: **Sep. 28, 2004**

(54) CLEANING APPARATUS AND SYSTEM

(75) Inventors: Kenneth P. Post, Lincoln Park, MI (US); Robert Laskos, Westland, MI (US)

(73) Assignee: Consumer Solutions, Inc., Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 10/366,774

(22) Filed: Feb. 14, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 09/503,529, filed on Feb. 14, 2000, now Pat. No. 6,523,213, which is a continuation-in-part of application No. 09/104,957, filed on Jun. 25, 1998, now Pat. No. 6,178,584.

(51) Int. Cl.[7] ................................................. A47L 1/06

(52) U.S. Cl. ................. 15/220.1; 15/104.94; 15/144.1; 15/232

(58) Field of Search ............................. 15/144.1, 144.2, 15/145, 104.94, 209.1, 220.1, 228, 231, 232, 244.2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 296,235 A | 4/1884 | Sill ........................ 15/231 X |
| 672,584 A | 4/1901 | Anderson .................... 15/232 |
| 825,400 A | * 7/1906 | Lightbown .................... 15/231 |
| 1,084,184 A | 1/1914 | Wenieke .................... 15/220.1 |
| 1,158,846 A | * 11/1915 | Punch ........................ 403/79 |
| 1,989,921 A | 2/1935 | Goddard ................... 15/231 X |
| 1,993,571 A | 3/1935 | Soderberg .................... 15/231 |
| 2,127,886 A | 8/1938 | Plon ........................ 15/231 |
| 2,192,910 A | 3/1940 | Hollenbeck .................. 15/231 |
| 2,291,435 A | 7/1942 | Anderson et al. .......... 15/220.1 |
| 2,301,586 A | 11/1942 | Rubin ..................... 15/231 X |
| 2,304,127 A | 12/1942 | Stetson ...................... 15/231 |
| 2,315,325 A | 3/1943 | Gavurin .................... 15/145 X |
| 2,560,008 A | 7/1951 | Steward ...................... 15/231 |
| 2,694,212 A | 11/1954 | McGraw .................... 15/244.1 |
| 2,764,774 A | * 10/1956 | Belsky et al. ................. 15/228 |
| 3,362,037 A | 1/1968 | Griffin ................... 15/144.1 X |
| 3,761,991 A | 10/1973 | Moss ..................... 15/228 X |
| 4,503,579 A | 3/1985 | Nicely .................... 15/244.2 |
| 4,926,522 A | 5/1990 | Wang ...................... 16/427 |
| 5,003,659 A | 4/1991 | Paepke ................... 15/229.13 |
| 5,012,544 A | 5/1991 | Verry .................... 15/209.1 |
| 5,095,574 A | 3/1992 | Khanzadian ................. 15/118 |
| 5,333,347 A | 8/1994 | Stranders .................. 15/220.1 |
| 5,596,787 A | 1/1997 | Stevens et al. ........... 15/220.1 |
| 5,603,138 A | 2/1997 | Bonis ..................... 15/220.1 |
| 5,657,507 A | 8/1997 | Wasak .................... 15/220.1 |
| 5,918,342 A | * 7/1999 | Smith et al. .............. 15/244.2 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| FR | 1056318 | 10/1953 | ................. 15/228 |
| GB | 406211 | 2/1934 | ................. 15/232 |

* cited by examiner

*Primary Examiner*—Mark Spisich
(74) *Attorney, Agent, or Firm*—Young & Basile, PC

(57) **ABSTRACT**

A window cleaning apparatus includes a handle, a paddle and a cleaning element. The paddle is removably attachable to the handle. The paddle has a peripheral edge defined in part by opposed first and second ends. The paddle has an arcuate shape between the first and second ends. The cleaning element is one of a plurality of interchangeable bodies, each having one major surface engagable with one major surface of a paddle and side edges having elastic mounted thereon to draw the ends of the side edges of the body inward to form an opening smaller than the outer diameter of the paddle to releasably attach the cleaning element about the paddle. In one aspect, the cleaning apparatus forms a cleaning system including a plurality of handles, a plurality of paddles and a plurality of cleaning elements releasably interconnectable into a cleaning apparatus formed of one handle, one cleaning element and one paddle.

**10 Claims, 6 Drawing Sheets**

